E-FILED
Thursday, 30 May, 2019  08:09:25 AM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| SPEECH FIRST, INC., | |
| Plaintiff, | **COMPLAINT** |
| v. | Civil Action No. _____ |
| TIMOTHY L. KILLEEN, in his official capacity as President of the University of Illinois; ROBERT J. JONES, in his official capacity as Chancellor of the University of Illinois at Urbana-Champaign and Vice President of the University of Illinois System; DANITA M. BROWN YOUNG, in her official capacity as Vice Chancellor for Student Affairs; RHONDA KIRTS, in her official capacity as Acting Dean of Students; JUSTIN BROWN, in his official capacity as Director of the Office for Student Conflict Resolution; JANUARY BOTEN, DEBRA IMEL, RACHAEL AHART, MATTHEW PINNER, ARIANNA HOLTERMAN, DEMENTRO POWELL, JAMIE SINGSON, KIMBERLY SOUMAR, all in their official capacities as members of the Bias Assessment and Response Team; LOWA MWILAMBWE, in his official capacity as Associate Vice Chancellor for Student Affairs; ALMA R. SEALINE, in her official capacity as Director of University Housing; PATRICIA K. ANTON, in her official capacity as Associate Director of University Housing; RAMÓN CEPEDA, KAREEM DALE, DONALD J. EDWARDS, RICARDO ESTRADA, PATRICIA BROWN HOLMES, NAOMI D. JAKOBSSON, STUART C. KING, EDWARD L. MCMILLAN, JILL B. SMART, TRAYSHAWN M.W. MITCHELL, DARIUS M. NEWSOME, SHAINA HUMPHREY, GOVERNOR J. B. PRITZKER, all in their official capacities as members of the University of Illinois Board of Trustees, | |
| Defendants. | |

Plaintiff Speech First, Inc. brings this action under the First and Fourteenth Amendments to the United States Constitution against Defendants for declaratory and injunctive relief, and alleges as follows:

## INTRODUCTION

1.      "The mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). After all, "[t]he college campus is peculiarly suited to serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints." *Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979).

2.      Yet the University of Illinois at Urbana-Champaign and its officials ("the University") have created a series of rules and regulations—along with an elaborate investigative and enforcement regime—designed to restrain, deter, suppress, and punish speech concerning political and social issues of public concern.

3.      First, the University prohibits any individual from "post[ing] and distribut[ing] leaflets, handbills, and any other types of materials" about "candidates for non-campus elections" unless and until that individual receives "prior approval" from the University. Worse still, the University neither has published criteria to govern whether approval will be granted nor has limited the time within which the University must accept or reject the application. In short, this is the paradigmatic prior restraint that violates the First Amendment. Further, the University has no compelling interest in imposing a prior restraint on this category of political speech nor would this prohibition be narrowly tailored to any such interest. This rule chills protected speech and expression and forces students who do not wish to submit to this prior restraint to engage in self-censorship.

4.      Second, the University prohibits "bias-motivated incidents," which it defines as "action[s] or expression[s]" that are "motivated, at least in part, by prejudice against or hostility toward

a person (or group) because of that person's (or group's) actual or perceived age, disability/ability status, ethnicity, gender, gender identity/expression, national origin, race, religion/spirituality, sexual orientation, socioeconomic class, etc." This overbroad and vague definition encompasses speech and expression that is fully protected under the First Amendment, chills free speech, and is therefore unconstitutional.

5.      Third, the University issues "No Contact Directives"—which prohibit all "oral, written, or third party communication" between a student and the complaining party—whenever an official concludes "that a No Contact Directive is warranted." Engaging in speech or expression that is fully protected under the First Amendment can provide the justification for a No Contact Directive. This policy is overbroad, chills speech and expression protected under the First Amendment, and is therefore unconstitutional.

## JURISDICTION AND VENUE

6.      This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought via 42 U.S.C. §§ 1983 and 1988.

7.      The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

8.      Venue is proper under 28 U.S.C. § 1391 because the events giving rise to the claims occurred in the Central District of Illinois.

## PARTIES

9.      Plaintiff Speech First, Inc., is a nationwide membership organization of students, alumni, and other concerned citizens. Speech First is dedicated to preserving civil rights secured by law, including the freedom of speech guaranteed by the First Amendment. Speech First seeks to protect the rights of students and others at colleges and universities through litigation and other lawful means. Speech First has members who attend the University.

10.     The University of Illinois is a public university with three campuses—Urbana-Champaign, Chicago, and Springfield—and is organized and exists under the laws of the State of Illinois. The University is governed by its Board of Trustees, which delegates certain authority and responsibilities to others, including the Defendants in this case.

11.     Defendant Timothy L. Killeen is the President of the University of Illinois System. Killeen is responsible for the enactment and enforcement of University policies, including the policies challenged here. Killeen is sued in his official capacity.

12.     Defendant Robert J. Jones is the Vice President for the University of Illinois System and Chancellor of the University of Illinois at Urbana-Champaign. He oversees the departments under Student Affairs, including the Office of the Dean of Students, the Office for Student Conflict Resolution, the Bias Assessment and Response Team, and University Housing. Jones is responsible for university-wide policies, including the policies challenged here. Jones is sued in his official capacity.

13.     Defendant Danita M. Brown Young is the Vice Chancellor for Student Affairs. She oversees all departments within Student Affairs, including the Office of the Dean of Students, the Office for Student Conflict Resolution, the Bias Assessment and Response Team, and University Housing. Young is sued in her official capacity.

14.     Defendant Rhonda Kirts is the Acting Dean of Students. She oversees the Office for Student Conflict Resolution and the Bias Assessment and Response Team. Kirts is sued in her official capacity.

15.     Defendant Justin Brown is the Director of the Office for Student Conflict Resolution. He oversees, and is an *ex officio* member of, the Bias Assessment and Response Team. Brown is sued in his official capacity.

16.　　Defendants January Boten, Debra Imel, Rachael Ahart, Matthew Pinner, Arianna Holterman, Dementro Powell, Jamie Singson, and Kimberly Soumar are members of the Bias Assessment and Response Team. The Team Defendants are sued in their official capacities.

17.　　Defendant Lowa Mwilambwe is an Associate Vice Chancellor for Students Affairs. He oversees seven departments within Student Affairs including University Housing. Mwilambwe is sued in his official capacity.

18.　　Defendant Alma R. Sealine is the Director of University Housing. She is responsible for leading, planning, and directing University Housing, including the Division's bias incident protocol. Sealine is sued in her official capacity.

19.　　Defendant Patricia K. Anton is the Associate Director of University Housing. She is also responsible for the Division's bias incident protocol. Anton is sued in her official capacity.

20.　　Defendants Ramón Cepeda, Kareem Dale, Donald J. Edwards, Ricardo Estrada, Patricia Brown Holmes, Naomi D. Jakobsson, Stuart C. King, Edward L. McMillan, Jill B. Smart, Trayshawn M.W. Mitchell, Darius M. Newsome, Shaina Humphrey, and Governor J. B. Pritzker are the thirteen members of the Board of Trustees, the governing body of the University of Illinois. The Trustee Defendants are responsible for the adoption and authorization of policies that govern students at the University, including the policies challenged here. The Trustee Defendants are sued in their official capacities.

## FACTS

### I.　　College Students Have Robust First Amendment Rights.

21.　　"The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "The right of citizens to

inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010).

22.     The First Amendment's importance is at its apex at our nation's colleges and universities. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher education]. The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Shelton v. Tucker*, 364 U.S. 476 (1960)).

23.     The core principles of the First Amendment "acquire a special significance in the university setting, where the free and unfettered interplay of competing views is essential to the institution's educational mission." *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989) (citing *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. N.H. ex rel. Wyman*, 354 U.S. 234, 250 (1957). The First Amendment's protections, moreover, are "not confined to the supervised and ordained discussion which takes place in the classroom" but extend throughout a university's campus. *Solid Rock Found.*, 478 F. Supp. at 102.

24.     Put simply, "First Amendment protections [do not] apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180. "The mere dissemination of ideas— no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish*, 410 U.S. at 670. Indeed, "the point of all speech protection ... is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995).

## II.     The University Improperly Restrains Speech Concerning "Non-Campus Elections"

25.     The First Amendment protects the right of students to engage in political speech on campus.

26. Yet the University imposes burdensome restraints that are designed to inhibit students' speech about elections.

27. Under the University's student code, students may not "post and distribute leaflets, handbills, and any other types of materials" that are "promotional materials of candidates for non-campus elections" unless the student receives "prior approval" from the University. Student Code, § 2-407.

28. A student who distributes promotional materials of candidates for non-campus elections before receiving approval from the University is subject to disciplinary action. Punishment may include reprimand, censure, probation, suspension, and dismissal from the University.

29. Students who violate these restraints on political speech also may be subject to additional "educational" discipline, including "mandated service to the community," "educational programs," "research and reflective essays," "presentations to the community," "restitution," "letters of apology," "restriction from activities on campus," and other punishments that are "just and appropriate."

## III. The University's Prohibition on "Bias-Motivated" Speech and the Bias Assessment and Response Team

### A. The Movement to Prohibit and Punish "Biased" Speech on College Campuses

30. In recent years, colleges and universities have been aggressively seeking to shield their students from any speech that may be perceived as "biased." Stamping out "biased speech" on campus is a top priority, according to these colleges and universities, because "hurtful" speech may cause emotional harm to their students.

31. Whether this speech is protected by the First Amendment is of little or no concern to many colleges and universities. As one school put it, "the most important indication of bias is your own feelings," not whether the speech exceeds constitutional limits.

32.     To combat "biased speech," colleges and universities have created and deployed "bias response teams" to investigate and punish "biased" actions—including speech and expression—by students.

33.     Bias response teams typically claim that their goal is to foster "a safe and inclusive environment" by providing "advocacy and support to anyone on campus who has experienced, or been a witness of, an incident of bias or discrimination." But in reality, as one study found, bias response teams frequently lead to "a surveillance state on campus where students and faculty must guard their every utterance for fear of being reported to and investigated by the administration."

34.     Thus, speech that is fully protected by the First Amendment often becomes subject to investigation by bias response teams. That is, speech on issues of public policy, social issues, and politics dealing with, among other things, race, religion, gender, immigration, and sexual orientation are often labeled as "bias" by someone and then reported as such to the bias response team.

35.     As two Carlton College professors have explained, bias response teams often "result in a troubling silence: Students, staff, and faculty [are] afraid to speak their minds, and individuals or groups [are] able to leverage bias reporting policies to shut down unpopular or minority viewpoints."

36.     "While universities should certainly be listening to their students and offering resources to those who encounter meaningful difficulties in their life on campus, the posture taken by many Bias Response Teams is all too likely to create profound risks to freedom of expression, freedom of association, and academic freedom on campus."

37.     These inherent problems have led some universities to recognize this chilling effect on speech and shut down their bias response team. The University of Northern Colorado, for example, shuttered its bias response team in 2016, explaining that it had come "at the expense of free speech and academic freedom" and that its so-called "voluntary" processes "made people feel that we were telling them what they should and shouldn't say." Similarly, the University of Iowa scrapped its

plans to create a bias response team because of their "high failure rate" and their tendency to "become almost punitive."

**B.     The University's Definition of "Bias-Motivated" Speech**

38.     The University defines a "bias-motivated incident" as an "action or expression" that is "motivated, at least in part, by prejudice against or hostility toward a person (or group) because of that person's (or group's) actual or perceived age, disability/ability status, ethnicity, gender, gender identity/expression, national origin, race, religion/spirituality, sexual orientation, socioeconomic class, etc."

39.     The definition of "bias-motivated incident" encompasses speech that is fully protected under the First Amendment.

40.     Moreover, students' protected speech has been reported as a "bias-motivated incident." Examples include, but are not limited to:

- Students who planned a "Meeting with the Chief" program in support of bringing back Chief Illiniwek as the University's mascot.

- A student who posted a meme on Facebook suggesting that women are automatically admitted into Engineering programs.

- Students who planned to host a program entitled "Build that Wall" in which they would build a wall made out of blocks outside of the Illini Union to show their support for stricter immigration policies.

- Two students who supported "anti-theistic perspectives," claimed religions were "lies," and said people would have to be stupid to be religious.

**C.     The University's Enforcement of the Prohibition on "Bias-Motivated" Speech**

41.     The University enforces the prohibition on "bias-motivated" speech through its bias response team, which it calls the Bias Assessment and Response Team or "BART."

42.     The BART is housed within the Office for Student Conflict Resolution ("OSCR"), which is the University office charged with enforcing violations of the Student Code.

43.     The BART and OSCR are virtually indistinguishable. They have the same address, the same phone number, and many of the same personnel. For example, January Boten and Debra Imel are the BART's co-chairs. They are also Assistant Deans of Students within OSCR.

44.     Law enforcement also serves on the BART. Detective Rachael Ahart of the University of Illinois Police Department is a member of the BART. The BART thus is, quite literally, a speech police.

45.     The BART's mission is to eliminate "bias-motivated incidents" from the University campus. The BART aims to achieve this goal through four mechanisms: gathering reports of bias, investigating reports of bias, punishing offenders who exhibit bias, and recording allegations of bias in the student's permanent record.

46.     *First*, the BART strongly encourages students, faculty, and others associated with the University to report any incident that the viewer believes reflects the speaker's "bias." The BART encourages this reporting through signs on campus, emails, University websites, and elsewhere.

47.     The University Police Department also encourages students to report incidents of "bias" to the BART. The police department recently tweeted: "Acts of intolerance create an unsafe and unwelcoming environment for campus community members. Remember that you can always report acts of intolerance to the Bias Assessment and Response Team at http://bart.illinois.edu."

48.     The BART collects reports of "bias-motivated incidents" via a University website. This website allows individuals to report "bias" to the BART anonymously.

49.     The BART website asks the reporter to identify, among other things, when the bias incident occurred; where it occurred (e.g., a "classroom," "residence hall," or "off-campus"); and the "perceived bias" of the action or expression, such as "race/ethnicity, sexual orientation, age, national origin, religion, ability/disability status, gender/gender identity, socioeconomic class, [or] other."

50.     The BART also asks the reporter to identify how the bias was demonstrated (e.g., through "offensive language," "social media," "spoken communication, "written communication," or "other").

51.     The BART finally asks for the "name of the offender" (if known) and the offender's affiliation with the University.

52.     *Second*, after the BART collects this information, it will undertake an investigation into the "bias incident."

53.     To investigate the "bias-motivated incident," the BART will contact both the reporter and the "offender."

54.     When a BART official contacts the offender, the official tells the student that the BART has received a bias report about the student and that the BART needs to speak with the student to discuss the allegations. The BART official will not identify the person who has accused the student of "bias" or inform the student of any rights he or she may have.

55.     The BART will investigate "bias-motivated incidents" whether they occur on campus or off campus.

56.     *Third*, if the BART determines that a bias incident has occurred, it will impose various corrective measures on the "offender." Such measures include, but are not limited to, "educational conversations," "mediation [and] facilitated dialogue," "resolution agreements," "referrals to other offices and/or programs," and "educational referrals."

57.     If the BART believes that a provision of the Student Code has been violated, it will refer the case to the Office for Student Conflict Resolution. For example, students can be disciplined for "conduct that threatens the health or safety of any person," "conduct that violates the University's sexual misconduct policy," "stalking," and "hazing."

58.     *Fourth*, if the BART determines the identity of the student who committed the "bias," it will record the details of the incident on the student's permanent record. The BART will make this information available to others outside of the BART.

59.     For example, one Speech First member at the University was accused of "bias" as a result of his participation in an organization that advocates for the interests of Israel. When the student met with his academic advisor later that semester, the advisor told him that he could see from the student's files that the student had met with someone from the BART. The advisor commented that the student had not been "behaving" that semester.

60.     Each year, the BART issues a report describing the investigations it has undertaken. The BART categorizes the bias it investigates into the following categories: "disability/ability status," "gender/sex," "gender identity/expression," "national origin," "race/ethnicity," "religion," "sexual orientation," and "unclassified."

61.     The BART has been particularly active in allegations of "bias" against students who advocate for bringing back Chief Illiniwek as the University's mascot.

62.     In 2007, the University of Illinois retired its mascot, Chief Illiniwek, after years of protests and pressure from the NCAA. Despite the University's best efforts to make the issue go away, many students and alumni want to bring the mascot back, arguing that Chief Illiniwek is respectful and honors Native American heritage. They frequently protest in support of bringing the Chief back by, among other things, writing articles, posting support online, and attending homecoming and sporting events dressed as the Chief.

63.     The BART frequently investigates these protestors. For example, the BART has investigated a student who dressed as Chief Illiniwek and marched in the homecoming parade; a student who posted a picture of Chief Illiniwek on the student's Facebook page; a student who posted

a meme about Chief Illiniwek in a Facebook group; and students who planned a "Meeting with the Chief" program in support of bringing back the Chief.

64.    According to January Boten, the BART "regularly get[s] cases related to the chief," and "until people stop using that image, we're going to continue to get cases about it. It's something that offends people" and "specifically targets a group of people. As long as that image is around, we're going to get cases about it."

65.    Indeed, the BART actively encourages reports about speech in favor of bringing back the Chief. For example, a few months ago, someone complained on Facebook that a student dressed as Chief Illiniwek had been allowed to attend a University basketball game and walk around the stadium. Ms. Boten responded to the post by asking anyone who saw the incident to report it to the BART as a "bias-motivated incident."

66.    A particularly insidious effect of the BART is that some students weaponize the office against their fellow students. Students will report (or threaten to report) other students to the BART because they know students fear the consequences of dealing with the BART.

67.    This weaponization of the BART is especially prevalent against students whose actions or expressions involve support for Israel.

68.    Students who are anti-Israel frequently threaten to report students who are members of pro-Israel student organizations to the BART. They also post the BART's reporting website online and encourage others to report the pro-Israel students to the BART for their bias.

69.    These reports (and the threat of a report) to the BART discourage many students from joining pro-Israel student organizations and otherwise expressing support for Israel.

## IV.    The University Housing's Prohibitions on "Bias" and "Offensive Acts"

70.    Students who live in residential housing on campus have the right to engage in First Amendment protected speech in their living environment.

71.     Yet the University inhibits the free speech of students living in University Housing by extending the ban on "bias-motivated incidents" to residence halls.

72.     The University's residence halls have their own "specific rules and regulations, as well as general guidelines of good citizenship and responsible behavior."

73.     Every student who lives in University residence halls must "abide by [these] rules and regulations and … observe standards expected of students."

74.     Under these rules and standards, students who live in the University's residence halls are prohibited from engaging in "any acts of bias," "acts of intolerance," or "any offensive acts" that are "committed within [University Housing] facilities."

75.     If a student is accused of a "bias-motivated incident," University Housing implements a "bias protocol." This protocol is designed to "address and implement corrective action" for the "offensive acts" that the student committed within University Housing facilities.

76.     Under the bias protocol, University Housing will convene a "bias response meeting" of various University officials that will review the allegations, investigate whether a "bias-motivated incident" has occurred, and then implement "corrective action" if a student is found to have engaged in such an incident.

77.     A student who commits a "bias-motivated incident" is subject to myriad punishments, including reprimand, censure, probation, being forced to change dormitories, and even expulsion from University Housing.

78.     The University also can impose "educational conditions" on students who commit "bias-motivated incidents," including "no-contact orders," "mandated community service," "classes on "ethical decision-making," "educational writing assignments," and "educational referrals and interviews."

79.     University Housing imposes these "corrective action[s]" on students because it is the University's goal "to hold students responsible for their behavior within the living community," which "is done by applying appropriate formal sanctions and assigning educational conditions to these sanctions."

80.     Students' protected speech has been reported as a "bias-motivated incident" to University Housing. Examples include, but are not limited to:

- A student displaying a confederate flag in the window of his residence hall.

- A student making "microaggressive comments" regarding race/ethnicity.

- A student hanging a Chief Illiniwek poster on the student's door.

## V.     The University's Use of "No Contact Directives" to Silence Speech

81.     Under the University's rules, disciplinary officers have the power to "enforce student behavioral standards" by ordering students "to have no contact with one or more other persons." The University refers to these orders as "No Contact Directives."

82.     The University claims virtually limitless power to issue No Contact Directives. Indeed, a disciplinary officer can issue a No Contact Directive simply because the officer concludes "that a No Contact Directive is warranted."

83.     Disciplinary officers thus can issue a No Contact Directive even if there is no allegation that the student has violated the Student Code.

84.     Students who are subject to a No Contact Directive have their freedom of movement and speech severely inhibited. Among other things, the No Contact Directive prohibits the student from having any "oral, written, or third party communication" with the complaining party; prohibits the student from taking "deliberate nonverbal acts" that are "intended to provoke" the complaining party; and warns student that they must "leave the vicinity if they encounter one of the other parties." These prohibitions apply whether the parties are on campus or off campus.

85.     No Contact Directives last indefinitely—*i.e.*, until the student graduates—unless the disciplinary officer specifies an end date or otherwise terminates a directive.

86.     The recommended punishment for violating a No Contact Directive is "dismissal from the university."

87.     Engaging in speech that is fully protected under the First Amendment can provide the justification for a No Contact Directive.

88.     No Contact Directives can be imposed because of speech that occurred both on campus and off campus.

89.     In a well-publicized incident, the University issued a No Contact Directive against a student solely because of the student's protected speech.

90.     In November 2017, a graduate assistant, Tariq Khan, got in a shouting match with two students at an "anti-Trump" rally and subsequently broke one student's phone. Two days later, another student, Andrew Minik—who was not at the event—wrote an article about the incident for the online publication Campus Reform. The article shared a video of the incident and described what had occurred at the rally.

91.     Shortly after the article was published, Khan sought a No Contact Directive against Minik. The University issued the directive—even though Minik was not present when the dispute occurred and merely wrote an article about the dispute for Campus Reform. The No Contact Directive against Minik stated: "The Office for Student Conflict Resolution has become aware of a problem involving you and another student . . . . Therefore, I am directing you to have NO CONTACT with Tariq Kahn (oral or written, directly or through any third party) until further notice." The order warned that "[a]ny violation of this directive may result in charges before the appropriate Subcommittee on Student Conduct. Violations of no contact directives are taken very seriously and can have very significant consequences, including dismissal from the university."

92. The University informed Minik that the No Contact Directive was issued against him because of the Campus Reform article, and that it was a "probationary measure" to ensure that he would not contact Khan. Minik was told that if he wanted "the situation to improve" he should "not write about [Khan] anymore."

VI. **The University's Unconstitutional Policies Are Causing Concrete Injuries to Speech First's Members.**

93. Speech First's members who attend the University are suffering concrete injuries as a result of the University's unconstitutional policies and actions.

94. One Speech First member ("Student A") is a rising sophomore at the University.

95. Student A enrolled in the University because she wanted to learn in an intellectually challenging environment in which students and faculty are free to engage in lively, fearless debate and deliberation.

96. Student A holds political, social, and policy views that are unpopular on campus. For example, Student A opposes abortion, supports President Trump, believes in traditional marriage, and supports strong immigration policies, including the building of a wall along the U.S. southern border.

97. Student A wants to engage in open, robust, and civil discourse with her fellow students, including those who disagree with her, about these issues of public concern on campus, online, and in the city of Champaign-Urbana. Student A wants to point out the flaws in her fellow students' arguments and encourage them to change their minds about these and other topics or at least better understand her point of view.

98. Student A is aware of the University's ban on "bias-motivated incidents." She credibly fears that expressing her views could result in being reported, investigated, and punished by the BART for engaging in a "bias-motivated incident."

99. Student A is aware that the University has imposed No Contact Directives on students for engaging in protected speech and understands that violating a No Contact Directive can lead to

- 17 -

severe penalties, including expulsion from the University. Student A credibly fears that expressing her views could result in a No Contact Directive.

100.    The ban on "bias-motivated incidents" and issuance of No Contact Directives for engaging in protected speech chill Student A's speech and deter her from speaking openly about issues of public concern. The only way for Student A to have certainty that she will not be investigated or punished is to engage in self-censorship.

101.    Student A also wants to distribute literature about non-campus elections, including literature supportive of President Trump's reelection. Student A is aware that the University prohibits her from doing so without first securing approval and that she can be severely punished for violating this prohibition on political speech. Student A credibly fears that distributing literature about non-campus elections without prior authorization could result in punishment.

102.    The University's ban on political speech chills Student A's speech and deters her from distributing literature about non-campus elections. Student A is forced to engage in self-censorship because of her unwillingness to seek permission to engage in protected speech.

103.    Another Speech First member ("Student B") is a rising senior at the University.

104.    Student B enrolled in the University because she wanted to learn in an intellectually challenging environment in which students and faculty are free to engage in lively, fearless debate and deliberation.

105.    Student B holds political, social, and policy views that are unpopular on campus. Student B considers herself a "classical liberal." She supports Israel, believes that the U.S. Immigration and Customs Enforcement "keeps us safe" from illegal immigration, supports policies that would lead to the "deradicalization of Islam," and believes that so-called "hate speech" is entitled to First Amendment protection.

106.     Student B wants to engage in open, robust, and civil discourse with her fellow students, including those who disagree with her, about these issues of public concern on campus, online, and in the city of Champaign-Urbana. Student B wants to point out the flaws in her fellow students' arguments and encourage them to change their minds about these and other topics or at least better understand her point of view.

107.     Student B is aware of the University's ban on "bias-motivated incidents." She credibly fears that expressing her views could result in being reported, investigated, and punished by the BART for engaging in a "bias-motivated incident."

108.     Student B is aware that the University has imposed No Contact Directives on students for engaging in protected speech and understands that violating a No Contact Directive can lead to severe penalties, including expulsion from the University. Student B credibly fears that expressing her views could result in a No Contact Directive.

109.     The University's ban on "bias-motivated incidents" and issuance of No Contact Directives for engaging in protected speech chill Student B's speech and deter her from speaking openly about issues of public concern. The only way for Student B to have certainty that she will not be investigated or punished is to engage in self-censorship.

110.     Student B also wants to distribute literature about non-campus elections, including literature supportive of President Trump's reelection. Student B is aware that the University prohibits her from doing so without first securing approval and that she can be severely punished for violating this prohibition on political speech. Student B credibly fears that distributing literature about non-campus elections without prior authorization could result in punishment.

111.     The ban on political speech chills Student B's speech and deters her from distributing literature about non-campus elections. Student B is forced to engage in self-censorship because of her unwillingness to seek permission to engage in protected speech.

112.    Another Speech First member ("Student C") is a rising sophomore at the University.

113.    Student C will be living in the University's residential housing in the Fall.

114.    Student C enrolled in the University because he wanted to learn in an intellectually challenging environment in which students and faculty are free to engage in lively, fearless debate and deliberation.

115.    Student C holds political, social, and policy views that are unpopular on campus. For example, Student C opposes abortion, supports tougher border security and stricter immigration policies, and opposes gun control measures that conflict with what he views as his rights under the Second Amendment.

116.    Student C wants to engage in open, robust, and civil discourse with his fellow students, including those who disagree with him, about these issues of public concern in his residence hall, on campus, online, and in the city of Champaign-Urbana. Student C wants to point out the flaws in his fellow students' arguments and encourage them to change their minds about these and other topics or at least better understand his point of view. Student C has no interest in "causing trouble," but simply wants to be free to express his beliefs without having to worry about getting in trouble.

117.    Student C is aware of the University's ban on "bias-motivated incidents" and that this ban extends to residential housing. He credibly fears that expressing his views could result in being reported, investigated, and punished by the BART and University Housing for engaging in a "bias-motivated incident."

118.    Student C is aware that the University has imposed No Contact Directives on students for engaging in protected speech and understands that violating a No Contact Directive can lead to severe penalties, including expulsion from the University. Student C credibly fears that expressing his views could result in a No Contact Directive.

119.    The ban on "bias-motivated incidents" and issuance of No Contact Directives for engaging in protected speech chill Student C's speech and deter him from speaking openly about issues of public concern. The only way for Student C to have certainty that he will not be investigated and punished is to engage in self-censorship.

120.    Student C also wants to distribute literature about non-campus elections, including literature supportive of President Trump's reelection. Student C is aware that the University prohibits him from doing so without first securing approval and that he can be severely punished for violating this prohibition on political speech. Student C credibly fears that distributing literature about non-campus elections without prior authorization could result in punishment.

121.    The ban on political speech chills Student C's speech and deters him from distributing literature about non-campus elections. Student C is forced to engage in self-censorship because of his unwillingness to seek permission to engage in protected speech.

122.    Another Speech First member ("Student D") is a rising senior at the University.

123.    Student D enrolled in the University because he wanted to learn in an intellectually challenging environment in which students and faculty are free to engage in lively, fearless debate and deliberation.

124.    Student D holds political, social, and policy views that are unpopular on campus. Student D considers himself a libertarian. For example, Student D opposes government restrictions on firearms that he believes violate his rights under the Second Amendment. Student D disagrees with those who believe that certain speech should be forbidden because it is "hate speech." He believes other students often misinterpret his support of free speech with an endorsement of certain speech, and fears that he will be labeled a "bigot" because he supports other students' right to engage in speech that may be bigoted. As a libertarian, Student D supports LGBT rights and believes that this issue is

none of the government's business. Student D believes that voicing confusion or asking questions about LGBT issues he does not understand could be labeled as "bias."

125.     Student D wants to engage in open, robust, and civil discourse with his fellow students, including those who disagree with him, about these issues of public concern on campus, online, and in the city of Champaign-Urbana. Student D wants to point out the flaws in his fellow students' arguments and encourage them to change their minds about these and other topics or at least better understand his point of view. Student D simply wants "to be part of the conversation" about these important issues.

126.     Student D is aware of the University's ban on "bias-motivated incidents." He credibly fears that expressing his views could result in being reported, investigated, and punished by the BART for engaging in a "bias-motivated incident."

127.     Student D is aware that the University has imposed No Contact Directives on students for engaging in protected speech and understands that violating a No Contact Directive can lead to severe penalties, including expulsion from the University. Student D credibly fears that expressing his views could result in a No Contact Directive.

128.     The ban on "bias-motivated incidents" and issuance of No Contact Directives for engaging in protected speech chill Student D's speech and deter him from speaking openly about issues of public concern. The only way for Student D to have certainty that he will not be investigated or punished is to engage in self-censorship.

129.     Student A, Student B, Student C, and Student D are examples of Speech First members at the University who are suffering concrete harm to their First and Fourteenth Amendment rights as a result of Defendants' actions.

## COUNT I
## Violation of the First Amendment
### (Prior Restraint on Speech Concerning "Non-Campus Elections")

130.     Plaintiff repeats and realleges each of the prior allegations in this Complaint.

131.     "[A] prior restraint exists when a regulation 'gives public officials the power to deny use of a forum in advance of actual expression.'" *Stokes v. City of Madison*, 930 F.2d 1163, 1168 (7th Cir. 1991) (quoting *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553 (1975)). "The relevant question is whether the challenged regulation *authorizes* suppression of speech in advance of its expression." *Ward v. Rock Against Racism,* 491 U.S. 781, 795 n.5 (1989).

132.     "While prior restraints are not unconstitutional *per se* any system of prior restraint comes to [court] bearing a heavy presumption against its constitutional validity." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990).

133.     The Supreme Court has "identified two evils that will not be tolerated in such schemes. First, a scheme that places unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship .... Second, a prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible." *Id.* at 225-26. Thus, "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969). This "prior restraint is the quintessential first-amendment violation." *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009).

134.     The Supreme Court also has consistently recognized the "substantial and expansive threats to free expression posed by content-based restrictions." *United States v. Alvarez*, 567 U.S. 709, 717 (2012). "Content-based regulations are" therefore likewise "presumptively invalid." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992).

- 23 -

135.    "The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic. Thus, a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter. For example, a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2230 (2015).

136.    "[A]ny restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009).

137.    The Supreme Court permits "facial challenges to prior restraints on speech without requiring the plaintiff to show that there are no conceivable set of facts where the application of the particular government regulation might or would be constitutional." *United States v. Frandsen*, 212 F.3d 1231, 1236 (11th Cir. 2000). That is because there are "two major First Amendment risks associated with unbridled licensing schemes: self-censorship by speakers in order to avoid being denied a license to speak; and the difficulty of effectively detecting, reviewing, and correcting content-based censorship 'as applied' without standards by which to measure the licensor's action." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 759 (1988). "Therefore, a facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Id.*

138.    Under the University rules, no individual can "post and distribute leaflets, handbills, and any other types of materials" about "candidates for non-campus elections" unless that individual receives "prior approval" from the University.

139.    This licensing regime neither limits the discretion of University officials nor imposes time limits on their approval or disapproval.

140.    The rule lacks narrow, objective, definite, and time-limited standards to guide the University in making decisions about whether to approve applications to engage in speech about candidates for non-campus elections.

141.    The University has no compelling interest in imposing a prior restraint on this category of political speech. Nor would the rule be narrowly tailored to any compelling interest the University might claim to be advancing.

142.    The rule chills protected speech and expression and forces students who do not wish to submit to this prior restraint to engage in self-censorship.

143.    Defendants adopted this unconstitutional rule under color of state law.

**COUNT II**
**Violation of the First Amendment**
**("Bias-Motivated Incidents"**)

144.    Plaintiff repeats and realleges each of the prior allegations in this Complaint.

145.    The First Amendment prohibits State officials at public universities from adopting regulations of students that are "so broad as to chill the exercise of free speech and expression." *Dambrot v. Cent. Michigan University*, 55 F.3d 1177, 1182 (6th Cir. 1995). "Because First Amendment freedoms need breathing space to survive, a state may regulate in the area only with narrow specificity." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972).

146.    "[A] law may be invalidated as overbroad if a substantial number of its applications are unconstitutional." *United States v. Stevens*, 559 U.S. 460, 473 (2010). The Court must find such regulations facially unconstitutional because "the threat of enforcement of an overbroad [regulation] may deter or 'chill' constitutionally protected speech," as "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation,

will choose simply to abstain from protected speech, harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

147.    The University defines a "bias-motivated incident" as an "action or expression" that is "motivated, at least in part, by prejudice against or hostility toward a person (or group) because of that person's (or group's) actual or perceived age, disability/ability status, ethnicity, gender, gender identity/expression, national origin, race, religion/spirituality, sexual orientation, socioeconomic class, etc."

148.    The definition of "bias-motivated incident" encompasses speech that is fully protected under the First Amendment, and enforcement actions confirm that the definition does not exempt fully protected speech.

149.    The BART and University Housing investigate and punish those students who engage in "bias-motivated incidents." The BART and University Housing thus threaten to subject students to investigations and punishment based solely on the content of their speech.

150.    The policy against "bias-motivated incidents" is unconstitutionally overbroad as it encompasses protected speech, and there are a substantial number of instances where the policy cannot be applied consistent with the First Amendment.

151.    This overbroad policy chills protected speech and expression.

152.    Defendants adopted this unconstitutional policy under color of state law.

## COUNT III
### Violation of the First and Fourteenth Amendments: Void for Vagueness
### ("Bias-Motivated Incidents")

153.    Plaintiff repeats and realleges each of the prior allegations in this Complaint.

154.    "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "[T]he

vagueness doctrine has two primary goals: (1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement [by officials]." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007).

155.    "With respect to the first goal, … '[a] statute which either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925)). "With respect to the second goal, … 'if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [officials] for resolution on an ad hoc and subjective basis.'" *Id.* (quoting *Grayned*, 408 U.S., at 108-09).

156.    This principle of clarity is especially demanding when First Amendment freedoms are at stake. If the challenged law "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). "Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law." *Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959).

157.    Even though "bias-motivated incidents" can subject students to investigation and punishment, the University has offered no guidance about the meaning of that term or how students can avoid committing a violation.

158.    The absence of a clear standard creates a serious risk that this prohibition will be enforced in an arbitrary or discriminatory manner, or will be used to target speech based on the viewpoint expressed.

159.    The University's prohibitions on "bias-motivated incidents" are thus void for vagueness.

160.   Defendants adopted this unconstitutionally vague policy under color of state law.

## COUNT IV
### Violation of the First Amendment
### (**"No Contact Directives"**)

161.   Plaintiff repeats and realleges each of the prior allegations in this Complaint.

162.   The University issues a No Contact Directive whenever an official concludes "that a No Contact Directive is warranted."

163.   Among other things, the No Contact Directive prohibits the student from having any "oral, written, or third party communication" with the complaining party; prohibits the student from taking "deliberate nonverbal acts" that are "intended to provoke" the complaining party; and warns students that they must "leave the vicinity if they encounter one of the other parties."

164.   No Contact Directives last indefinitely—*i.e.*, until the student graduates—unless the disciplinary officer specifies an end date or otherwise terminates it, and the punishment for violating a No Contact Directive is "dismissal from the university."

165.   Engaging in speech that is fully protected under the First Amendment can provide the justification for a No Contact Directive.

166.   The University's "No Contact Directive" policy encompasses protected speech and expression, and there are a substantial number of instances in which it cannot be applied consistent with the First Amendment.

167.   This overbroad policy chills protected speech and expression.

168.   Defendants adopted this unconstitutional policy under color of state law.

**WHEREFORE**, Plaintiff Speech First respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants and provide the following relief:

A.   A declaratory judgment that the University's prior restraint on speech concerning non-campus elections violates the First and Fourteenth Amendments;

B.      A declaratory judgment that the University's prohibition on bias-motivated incidents violates the First and Fourteenth Amendments;

C.      A declaratory judgment that the University's "No Contact Directive" policy violates the First and Fourteenth Amendments insofar as it encompasses speech protected by the First Amendment;

D.      A permanent injunction barring Defendants from enforcing the University's prior restraint on speech concerning non-campus elections;

E.      A permanent injunction barring Defendants from using the BART, University Housing, or any other University officials to investigate, threaten, or punish students (including informal punishments) for bias-motivated incidents;

F.      A permanent injunction barring Defendants from issuing "No Contact Directives" without clear, objective procedures that ensure the directives are issued consistently with the First Amendment;

G.      A preliminary injunction granting the relief specified above during the pendency of this action;

H.      Plaintiff's reasonable costs and expenses of this action, including attorneys' fees, in accordance with 42 U.S.C. § 1988 and all other applicable laws; and

I.      All other further relief to which Plaintiff might be entitled.

3:19-cv-03142-SEM-TSH   # 1   Page 30 of 30

Respectfully submitted,

*/s/ J. Michael Connolly*

Dated: May 30, 2019

William S. Consovoy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
3033 Wilson Blvd., Suite 700
Arlington, VA 22201
(703) 243-9423
will@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com

*Counsel for Plaintiff Speech First, Inc.*

- 30 -