E-FILED
Thursday, 06 June, 2019  05:41:24 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS

SPEECH FIRST, INC.,

*Plaintiff,*

v.

Case No. 19-cv-3142

TIMOTHY L. KILLEEN, et al.,

*Defendants.*

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

William S. Consovoy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd, Suite 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com

*Counsel for Plaintiff Speech First, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

I.      The University's Restraint on Speech Concerning "Non-Campus Elections"........................... 2

II.    The University's Prohibition on "Bias-Motivated" Speech and the Bias Assessment and Response Team .................................................................................................................. 3

     A.    The Movement to Prohibit and Punish "Biased" Speech on College Campuses .............. 3

     B.    The University's Definition of "Bias-Motivated" Speech........................................ 4

     C.    The University's Enforcement of the Prohibition on "Bias-Motivated" Speech............... 5

III.   The University Housing's Prohibitions on "Bias" and "Offensive Acts"................................ 8

IV.   The University's Use of "No Contact Directives" to Silence Speech..................................... 10

V.    Speech First and This Litigation ........................................................................................ 12

ARGUMENT........................................................................................................................ 12

I.      Speech First is likely to prevail on the merits of its claims. .............................................. 13

     A.    The First Amendment fully applies to public universities. ....................................... 13

     B.    Speech First is likely to prevail on the merits....................................................... 14

          1.    The University's prior restraint on speech concerning "non-campus elections" violates the First Amendment................................................................................ 14

          2.    The University's prohibition on "bias-motivated incidents" violates the First Amendment. ........................................................................................................... 16

          3.    The University's inclusion of protected speech in the "No Contact Directive" policy violates the First Amendment......................................................................... 18

II.    Speech First satisfies the remaining preliminary-injunction criteria. .................................. 19

CONCLUSION ..................................................................................................................... 21

# TABLE OF AUTHORITIES

**Page**

**Cases**

*ACLU of Ill. v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012) ................................................................... 20

*Ass'n of Cleveland Fire Fighters v. City of Cleveland,*
  502 F.3d 545 (6th Cir. 2007) ............................................................ 17, 18

*Bair v. Shippensburg Univ.,*
  280 F. Supp. 2d 357 (M.D. Pa. 2003) .................................................... 20

*Christian Legal Soc'y v. Walker,*
  453 F.3d 853 (7th Cir. 2006) ................................................................... 20

*Citizens United v. FEC,*
  558 U.S. 310 (2010) .................................................................................. 13

*City of Lakewood v. Plain Dealer Pub. Co.,*
  486 U.S. 750 (1988) .................................................................................. 16

*Dambrot v. Cent. Mich. Univ.,*
  55 F.3d 1177 (6th Cir. 1995) ............................................................. 16, 18

*Doe v. Univ. of Mich.,*
  721 F. Supp. 852 (E.D. Mich. 1989) ...................................................... 13

*Elrod v. Burns,*
  427 U.S. 347 (1976) .................................................................................. 20

*Fairley v. Andrews,*
  578 F.3d 518 (7th Cir. 2009) ................................................................... 15

*FW/PBS, Inc. v. City of Dallas,*
  493 U.S. 215 (1990) .................................................................................. 14

*GEFT Outdoors, LLC v. City of Westfield,*
  922 F.3d 357 (7th Cir. 2019) ............................................................. 12, 13

*Gooding v. Wilson,*
  405 U.S. 518 (1972) ............................................................................ 16, 18

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) .................................................................................. 17

*Hatchett v. Barland,*
  816 F. Supp. 2d 583 (E.D. Wis. 2011) .................................................... 20

*Healy v. James,*
  408 U.S. 169 (1972) .................................................................................. 13

*Higher Society of Ind. v. Tippecanoe Cty.*,
  858 F.3d 1113 (7th Cir. 2017) .................................................................... 20

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*,
  515 U.S. 557 (1995) ..................................................................................... 14

*James v. Nelson*,
  349 F. Supp. 1061 (N.D. Ill. 1972) ............................................................ 13

*Lawson v. City of Kankakee*,
  81 F. Supp. 2d 930 (C.D. Ill. 2000) ........................................................... 21

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ..................................................................................... 19

*Papish v. Bd. of Curators of Univ. of Mo.*,
  410 U.S. 667 (1973) ................................................................................. 1, 13

*Personal PAC v. McGuffage*,
  858 F. Supp. 2d 963 (N.D. Ill. 2012) ......................................................... 21

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009) ..................................................................................... 15

*R.A.V. v. City of St. Paul, Minn.*,
  505 U.S. 377 (1992) ..................................................................................... 15

*Reed v. Town of Gilbert*,
  135 S. Ct. 2218 (2015) ................................................................................. 15

*Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*,
  359 U.S. 344 (1959) ..................................................................................... 18

*Shuttlesworth v. City of Birmingham*,
  394 U.S. 147 (1969) ..................................................................................... 14

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ................................................................................. 13, 20

*Solid Rock Found. v. Ohio State Univ.*,
  478 F. Supp. 96 (S.D. Ohio 1979) ........................................................... 1, 13

*Stokes v. City of Madison*,
  930 F.2d 1163 (7th Cir. 1991) ..................................................................... 14

*Sweezy v. N.H. ex rel. Wyman*,
  354 U.S. 234 (1957) ..................................................................................... 13

*United States v. Alvarez*,
  567 U.S. 709 (2012) ..................................................................................... 15

*United States v. Frandsen,*
   212 F.3d 1231 (11th Cir. 2000) .......................................................................... 16

*United States v. Stevens,*
   559 U.S. 460 (2010) .......................................................................................... 16

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
   455 U.S. 489 (1982) .......................................................................................... 18

*Virginia v. Hicks,*
   539 U.S. 113 (2003) ..................................................................................... 16, 17

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) .......................................................................................... 14

*Watchtower Bible & Tract Society of N.Y., Inc. v. Village of Stratton,*
   536 U.S. 150 (2002) .......................................................................................... 19

*Women's Health Link, Inc. v. Fort Wayne Public Transp. Corp.,*
   45 F. Supp. 3d 857 (N.D. Ind. 2014) ................................................................. 20

# INTRODUCTION

"The mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). After all, "[t]he college campus is peculiarly suited to serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints." *Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979). Yet the University of Illinois at Urbana-Champaign and its officials ("the University") have created a series of rules and regulations—along with an elaborate investigative and enforcement regime—designed to restrain, deter, suppress, and punish speech concerning political and social issues of public concern.

Plaintiff Speech First, Inc. is a nationwide membership organization of students, alumni, and other concerned citizens—including current students who attend the University—that is dedicated to preserving civil rights secured by law, including the freedom of speech guaranteed by the First Amendment to the U.S. Constitution. Speech First is seeking a preliminary injunction to enjoin three University practices and policies, which have a profound chilling effect on its members' protected speech and expression.

*First*, the University prohibits any individual from "post[ing] and distribut[ing] leaflets, handbills, and any other types of materials" about "candidates for non-campus elections" unless and until that individual receives "prior approval" from the University. Worse, the University has neither published criteria to govern whether approval will be granted nor limited the time it has to accept or reject applications. This is the paradigmatic prior restraint that violates the First Amendment. The University has no compelling interest for this prior restraint on core political speech, nor is this prohibition narrowly tailored to any such interest.

*Second*, the University prohibits "bias-motivated incidents," which it defines as "action[s] or expression[s]" that are "motivated, at least in part, by prejudice against or hostility toward a person

1

(or group) because of that person's (or group's) actual or perceived age, disability/ability status, ethnicity, gender, gender identity/expression, national origin, race, religion/spirituality, sexual orientation, socioeconomic class, etc." This overbroad and vague definition encompasses speech and expression that is fully protected under the First Amendment. The University polices this definition— and unconstitutionally chills free speech—through its "Bias Assessment and Response Team."

*Third*, the University issues "No Contact Directives"—which prohibit all "oral, written, or third party communication" between a student and the complaining party—whenever an official concludes "that a No Contact Directive is warranted." Engaging in speech or expression that is fully protected under the First Amendment can provide the justification for a No Contact Directive. This policy is overbroad, chills protected speech and expression, and is therefore unconstitutional.

Speech First is likely to prevail on the merits of its claims and readily meets the remaining preliminary-injunction criteria. Deprivation of a core constitutional right, even for a brief period of time, constitutes irreparable injury, and a preliminary injunction would not foreclose the University from adopting policies that advance its legitimate interests without chilling protected speech. There is no doubt, moreover, that the public has a strong interest in ensuring the protection of speech and expression at public universities. Speech First thus respectfully requests that this Court grant a preliminary injunction and reaffirm that the First Amendment applies with full force at the University.

## BACKGROUND

## I.   The University's Restraint on Speech Concerning "Non-Campus Elections"

Under the University's student code, students may not "post and distribute leaflets, handbills, and any other types of materials" that are "promotional materials of candidates for non-campus elections" unless the student receives "prior approval" from the University. Connolly Decl., Ex. A at 46, § 2-407. A student who violates this rule is subject to disciplinary action. Possible punishments include reprimand, censure, probation, suspension, and dismissal from the University. Ex. B. at 9-10,

§ 2.04(a)(iii), (b). Students also can be subject to additional "educational" discipline, including "mandated service to the community," "educational programs," "research and reflective essays," "presentations to the community," "restitution," "letters of apology," "restriction from activities on campus," and other punishments that are "just and appropriate." *Id.* at 10, § 2.04(c)-(d).

## II.   The University's Prohibition on "Bias-Motivated" Speech and the Bias Assessment and Response Team

### A.   The Movement to Prohibit and Punish "Biased" Speech on College Campuses

In recent years, colleges and universities have been aggressively seeking to shield their students from any speech that may be perceived as "biased." Stamping out "biased speech" on campus is a top priority, they argue, because "hurtful" speech can emotionally harm their students. Whether this speech is protected by the First Amendment is of little or no concern. As one school put it, "the most important indication of bias is your own feelings," not whether the speech exceeds constitutional limits. *See* Grace Kay, *University Sued Over Constitutionality of Bias Response Team*, Michigan Daily, May 8, 2018, https://bit.ly/2WCFE5i.

To combat "biased speech," colleges and universities have created and deployed "bias response teams" to investigate and punish "biased" actions—including speech and expression—by students. Bias-response teams typically claim that their goal is to foster "a safe and inclusive environment" by providing "advocacy and support to anyone on campus who has experienced, or been a witness of, an incident of bias or discrimination." Jeffrey Aaron Snyder & Amna Khalid, *The Rise of "Bias Response Teams" on Campus*, The New Republic, Mar. 30, 2016, https://bit.ly/1SaAiDB. But in reality, as one study found, these teams frequently lead to "a surveillance state on campus where students and faculty must guard their every utterance for fear of being reported to and investigated by the administration." Ex. S at 28. Speech on issues of public policy, social issues, and politics dealing with, among other things, race, religion, gender, immigration, and sexual orientation are often deemed "biased" and then reported to the bias-response team. *See id.* at 5-7.

As two Carlton College professors have explained, bias-response teams often "result in a troubling silence: Students, staff, and faculty [are] afraid to speak their minds, and individuals or groups [are] able to leverage bias reporting policies to shut down unpopular or minority viewpoints." Snyder & Khalid, *supra*. "While universities should certainly be listening to their students and offering resources to those who encounter meaningful difficulties in their life on campus, the posture taken by many Bias Response Teams is all too likely to create profound risks to freedom of expression, freedom of association, and academic freedom on campus." Ex. S at 5.

These inherent problems have led some universities to recognize this chilling effect on speech and shut down their bias-response teams. The University of Northern Colorado, for example, shuttered its bias response team in 2016, explaining that its so-called "voluntary" processes "made people feel that we were telling them what they should and shouldn't say." Full Text of University of Northern Colorado President Kay Norton's State of the University Speech, Sept. 7, 2016, https://bit.ly/2WgBjFv. Similarly, the University of Iowa scrapped its plans to create a bias response team because of the "high failure rate in the BARTs at other institutions" and their tendency to "become almost punitive." Jeff Charis-Carlson, *University of Iowa Changing Course on Bias Response Team,* Iowa City Press-Citizen, Aug. 18, 2016, https://bit.ly/2JQOiai.

B.    **The University's Definition of "Bias-Motivated" Speech**

Similar to other schools, the University defines a "bias-motivated incident" as an "action or expression" that is "motivated, at least in part, by prejudice against or hostility toward a person (or group) because of that person's (or group's) actual or perceived age, disability/ability status, ethnicity, gender, gender identity/expression, national origin, race, religion/spirituality, sexual orientation, socioeconomic class, etc." Ex. C. This definition of "bias-motivated incident" encompasses speech that is fully protected under the First Amendment.

4

Unsurprisingly, students' protected speech has been reported as a "bias-motivated incident" at the University. Examples include:

- students who planned a "Meeting with the Chief" program in support of bringing back Chief Illiniwek as the University's mascot;

- a student who posted a meme on Facebook complaining that women are automatically admitted into engineering programs;

- students who planned to host a program entitled "Build that Wall" where they would use blocks to build a wall outside of the Illini Union to show their support for stricter immigration policies;

- two students who expressed "anti-theistic perspectives," claimed religions were "lies," and said people would have to be stupid to be religious; and

- students who planned an "affirmative action bake sale" where they would charge different prices based on race and ethnicity in order to protest race-based policies.

*See* Ex. D at 9-10; Ex. E at 5-6, 14.

### C.    The University's Enforcement of the Prohibition on "Bias-Motivated" Speech

The University enforces the prohibition on "bias-motivated" speech through its bias-response team, which it calls the Bias Assessment and Response Team or "BART." The BART is housed within the Office for Student Conflict Resolution ("OSCR"), which is the University office charged with enforcing violations of the Student Code. *See* Ex. F. The BART and OSCR are virtually indistinguishable. They have the same address, the same phone number, and many of the same personnel. *See* Exs. F, G, H. For example, January Boten and Debra Imel are the BART's co-chairs, as well as Assistant Deans of Students within OSCR. *Id.* Law-enforcement officers also serve on the BART. *See* Ex. F. The BART is thus, quite literally, a speech police.

The BART's mission is to eliminate "bias-motivated incidents" from the University campus. The BART aims to achieve this goal through four mechanisms: gathering reports of bias, investigating reports of bias, punishing offenders who exhibit bias, and recording allegations of bias in students' permanent records.

*First*, the BART strongly encourages students, faculty, and others associated with the University to report any incident that the viewer believes is "biased." The BART encourages this reporting through signs on campus, emails, University websites, and elsewhere. The University Police Department also encourages students to report incidents of "bias" to the BART. The police department recently tweeted: "Acts of intolerance create an unsafe and unwelcoming environment for campus community members. Remember that you can always report acts of intolerance to the Bias Assessment and Response Team at http://bart.illinois.edu." Ex. O.

The BART collects reports of "bias-motivated incidents" via a University website. *See* Ex. I. This website allows individuals to report "bias" to the BART anonymously. *Id.* at 1. The BART website asks the reporter to identify, among other things, when the bias incident occurred; where it occurred (e.g., a "classroom," "residence hall," or "off-campus"); and the "perceived bias" of the action or expression, such as "race/ethnicity, sexual orientation, age, national origin, religion, ability/disability status, gender/gender identity, socioeconomic class, [or] other." *Id.* at 3-4. The BART also asks the reporter to identify how the bias was demonstrated (e.g., through "offensive language," "social media," "spoken communication," "written communication," or "other"). *Id.* at 4. The BART finally asks for the "name of the offender" (if known) and the offender's affiliation with the University. *Id.* at 6.

*Second*, after the BART collects this information, it will undertake an investigation into the "bias incident." The BART first contacts both the reporter and the "offender." *See* Neily Decl. ¶ 12. When a BART official contacts the offender, the official tells the student that the BART has received a bias report about the student and that the BART needs to speak with the student to discuss the allegations. *Id.* The BART official will not identify the person who has accused the student of "bias" or inform the student of any rights he or she may have. *Id.* The BART will investigate "bias-motivated incidents" whether they occur on campus or off campus. *See* Ex. I at 4.

*Third*, if the BART determines that a bias incident has occurred, it will impose various corrective measures on the "offender." Ex. I at 6. Such measures include, but are not limited to, "educational conversations," "mediation [and] facilitated dialogue," "resolution agreements," "referrals to other offices and/or programs," and "educational referrals." Ex. J. If the BART believes that a provision of the Student Code has been violated, it will refer the case to the Office for Student Conflict Resolution. *Id.* For example, students can be disciplined for "conduct that threatens the health or safety of any person," "conduct that violates the University's sexual misconduct policy," "stalking," and "hazing." Ex. A at 10-11, § 1-302.

*Fourth*, if the BART determines the identity of the student who committed the "bias," it will record the details of the incident on the student's permanent record. Neily Decl. ¶¶ 13-14. The BART will make this information available to others outside of the BART. *Id.* For example, one Speech First member at the University was accused of "bias" after engaging in speech in support of Israel. *Id.* When the student met with his academic advisor later that semester, the advisor told him that he could see from the student's files that the student had met with someone from the BART. *Id.* The advisor commented that the student had not been "behaving" that semester. *Id.*

Each year, the BART issues a report describing the investigations it has undertaken. The BART categorizes the bias it investigates into the following categories: "disability/ability status," "gender/sex," "gender identity/expression," "national origin," "race/ethnicity," "religion," "sexual orientation," and "unclassified." Ex. K.

The BART has been particularly active in allegations of "bias" against students who advocate for bringing back Chief Illiniwek as the University's mascot. In 2007, the University of Illinois retired its mascot, Chief Illiniwek, after years of protests and pressure from the NCAA. Despite the University's best efforts to make the issue go away, many students and alumni want to bring back the mascot, arguing that Chief Illiniwek is respectful and honors Native American heritage. They

7

frequently protest in support of the Chief by, among other things, writing articles, posting support online, and attending homecoming and sporting events dressed as the Chief. *See* Mitch Smith, *An Indian 'Chief' Mascot Was Dropped. A Decade Later, He's Still Lurking*, N.Y. Times, Feb. 1, 2018, https://nyti.ms/2wyIR7n.

The BART frequently investigates these protestors. For example, the BART has investigated a student who dressed as Chief Illiniwek and marched in the homecoming parade; a student who posted a picture of Chief Illiniwek on the student's Facebook page; a student who posted a meme about Chief Illiniwek in a Facebook group; and students who planned a "Meeting with the Chief" program in support of bringing back the Chief. Ex. D at 6, 9; Ex. E at 6. According to January Boten, the BART "regularly get[s] cases related to the chief," and "until people stop using that image, we're going to continue to get cases about it. It's something that offends people" and "specifically targets a group of people. As long as that image is around, we're going to get cases about it." Weekly Illini Podcast at 6:57 (Feb. 7, 2018), https://bit.ly/310yBmn. Indeed, the BART actively encourages students to report speech in favor of bringing back the Chief to the BART. For example, a few months ago, someone complained on Facebook that a student dressed as Chief Illiniwek had been allowed to attend a University basketball game. Ms. Boten responded to the post by asking anyone who saw the incident to report it to the BART as a "bias-motivated incident." Ex. R.

## III.   The University Housing's Prohibitions on "Bias" and "Offensive Acts"

Students who live in residential housing on campus have First Amendment rights, including the right to engage in protected speech, in their living environment. Yet the University inhibits the free speech of students living in University Housing by extending the ban on "bias-motivated incidents" to residence halls.

The University's residence halls have their own "specific rules and regulations, as well as general guidelines of good citizenship and responsible behavior." Ex. L. Every student who lives in

University residence halls must "abide by [these] rules and regulations and … observe standards expected of students." *Id.* Under these rules and standards, students who live in the University's residence halls are prohibited from engaging in "any acts of bias," "acts of intolerance," or "any offensive acts" that are "committed within [University Housing] facilities." Ex. M. If a student is accused of a "bias-motivated incident," University Housing implements a "bias protocol." *Id.* This protocol is designed to "address and implement corrective action" for the "offensive acts" that the student committed within University Housing facilities. *Id.*

Under the bias protocol, University Housing will convene a "bias response meeting" of various University officials that will review the allegations, investigate whether a "bias-motivated incident" has occurred, and then implement "corrective action" if a student is found to have engaged in such an incident. *Id.* A student who commits a "bias-motivated incident" is subject to myriad potential punishments, including reprimand, censure, probation, dormitory changes, and even expulsion from University Housing. Ex. L. The University also can impose "educational conditions" on students who commit "bias-motivated incidents," including "no-contact orders," "mandated community service," classes on "ethical decision-making," "educational writing assignments," and "educational referrals and interviews." *Id.*

University Housing imposes these "corrective action[s]" on students in order "to hold students responsible for their behavior within the living community," which "is done by applying appropriate formal sanctions and assigning educational conditions to these sanctions." Ex. L at 1. Speech protected by the First Amendment has been reported as a "bias-motivated incident" to University Housing. Examples include:

- a student displaying a confederate flag in the window of his residence hall;

- a student making "microaggressive comments" regarding race/ethnicity; and

- a student hanging a Chief Illiniwek poster on the student's door.

Ex. N at 6-7.

## IV.   The University's Use of "No Contact Directives" to Silence Speech

Under the University's rules, disciplinary officers have the power to order students "to have no contact with one or more other persons." Ex. B at 17, § 4.06(a). The University refers to these orders as "No Contact Directives." *Id.* The University claims virtually limitless power to issue No Contact Directives. Indeed, a disciplinary officer can issue a No Contact Directive simply because the officer concludes "that a No Contact Directive is warranted." *Id.* at 18, § 4.06(d). Disciplinary officers thus can issue a No Contact Directive even if there is no allegation that the student has violated the Student Code.

Students who are subject to a No Contact Directive have their freedoms of movement, association, and speech severely inhibited. *Id.* Among other things, the No Contact Directives prohibit students from having any "oral, written, or third party communication" with the complaining party; prohibit students from taking "deliberate nonverbal acts" that are "intended to provoke" the complaining party; and warn students that they must "leave the vicinity if they encounter one of the other parties." *Id.* at 17-18, § 4.06(b). These prohibitions apply whether the parties are on or off campus. *Id.* No Contact Directives last indefinitely—*i.e.*, until the student graduates—unless the disciplinary officer specifies an end date or otherwise terminates the directive. *Id.* at 18, § 4.06(d). The recommended punishment for violating a No Contact Directive is "dismissal from the university." *Id.* at 18, § 4.06(c).

Engaging in speech that is fully protected under the First Amendment, whether on or off campus, can provide the justification for a No Contact Directive. *Id.* at 18, § 4.06(d). In a well-

10

publicized incident, the University issued a No Contact Directive against a student solely because of the student's protected speech. *See* Lauren Cooley, *Student Journalists Punished for Reporting on Violent Anti-Trump Rally: Lawsuit*, Wash. Examiner, Apr. 12, 2018, https://washex.am/2HPq3Hq. In November 2017, a graduate assistant, Tariq Khan, got in a shouting match with two students at an "anti-Trump" rally and subsequently broke one student's phone. Two days later, another student, Andrew Minik—who was not at the event—wrote an article about the incident for the online publication Campus Reform. The article shared a video of the incident and described what had occurred at the rally. *See* Andrew Minik, *Instructor Arrested for Attacking Conservative Students*, Campus Reform, Nov. 18, 2017, https://bit.ly/2JXdpbN.

Shortly after the article was published, Khan sought a No Contact Directive against Minik. The University issued the directive—even though Minik was not present when the dispute occurred and merely wrote an article about it. The No Contact Directive against Minik stated: "The Office for Student Conflict Resolution has become aware of a problem involving you and another student . . . . Therefore, I am directing you to have NO CONTACT with Tariq Kahn (oral or written, directly or through any third party) until further notice." Ex. P. The order warned that "[a]ny violation of this directive may result in charges before the appropriate Subcommittee on Student Conduct. Violations of no contact directives are taken very seriously and can have very significant consequences, including dismissal from the university." *Id.* The University informed Minik that the No Contact Directive was issued against him because of the Campus Reform article, and that it was a "probationary measure" to ensure that he would not contact Khan. Ex. Q. Minik was told that if he wanted "the situation to improve" he should "not write about [Khan] anymore." *Id.*

11

## V.      Speech First and This Litigation

Plaintiff Speech First is a nationwide membership organization of students, alumni, and others that is dedicated to preserving civil rights secured by law, including the freedom of speech guaranteed by the First Amendment. Neily Decl. ¶ 2. In particular, Speech First seeks to protect the rights of students and others at colleges and universities, through litigation and other lawful means. *Id.*

Speech First has several members who are current students at the University, in a variety of different class years, including Students A, B, C, and D. *Id.* ¶¶ 4-5. Speech First's members want to freely distribute literature about non-campus elections, but they credibly fear that doing so without prior authorization from the University could result in punishment. *Id.* ¶¶ 18-19. Speech First's members also hold views that are deeply controversial on campus, including, for example, advocating for the construction of a wall along the U.S. southern border to stop illegal immigration and for policies that encourage the "deradicalization of Islam." *Id.* ¶ 9. They are aware of the University's ban on "bias-motivated incidents" and credibly fear that expressing their views could result in being reported, investigated, and punished by the BART for engaging in a "bias-motivated incident." *Id.* ¶¶ 8-15. Speech First's members also are aware that the University has imposed No Contact Directives on students for engaging in protected speech, understand that violating a No Contact Directive can lead to severe penalties, including expulsion from the University, and credibly fear that expressing their views could result in such a directive. *Id.* ¶¶ 16-17.

## ARGUMENT

"To obtain a preliminary injunction, a plaintiff must establish that it has some likelihood of success on the merits; that it has no adequate remedy at law; that without relief it will suffer irreparable harm." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (cleaned up). Then, "if the plaintiff passes that threshold, the court must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an

injunction is in the public interest." *Id.* Speech First is entitled to a preliminary injunction because it is likely to prevail on the merits and satisfies the remaining preliminary-injunction criteria.

## I.    Speech First is likely to prevail on the merits of its claims.

### A.    The First Amendment fully applies to public universities.

"The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010). The First Amendment's importance is at its apex at colleges and universities. "[T]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher education]." *Healy v. James*, 408 U.S. 169, 180 (1972); *see also Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989).  "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. N.H. ex rel. Wyman*, 354 U.S. 234, 250 (1957). The First Amendment's protections, moreover, are "not confined to the supervised and ordained discussion which takes place in the classroom" but extend throughout a university's campus. *Solid Rock*, 478 F. Supp. at 102.

Put simply, "First Amendment protections [do not] apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180; *see also James v. Nelson*, 349 F. Supp. 1061, 1063 (N.D. Ill. 1972). "[T]he mere dissemination of ideas—no matter how offensive to good taste—on a state university campus" thus "may not be shut off in the name alone of 'conventions of decency.'" *Papish*, 410 U.S. at 670. After all, "[t]he college campus is peculiarly suited to serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints." *Solid Rock*, 478 F. Supp. at 102. Indeed, "the point of all speech protection ... is to shield just those choices of content that in

someone's eyes are misguided, or even hurtful." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995).

**B.      Speech First is likely to prevail on the merits.**

**1.      The University's prior restraint on speech concerning "non-campus elections" violates the First Amendment.**

The University's prohibition on "post[ing] and distribut[ing] leaflets, handbills, and any other types of materials" about "candidates for non-campus elections" without "prior approval" is unconstitutional for at least two reasons.

*First*, the University's policy is an unconstitutional prior restraint. As the Seventh Circuit has explained, "a prior restraint exists when a regulation 'gives public officials the power to deny use of a forum in advance of actual expression.'" *Stokes v. City of Madison*, 930 F.2d 1163, 1168 (7th Cir. 1991) (quoting *Se. Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553, (1975)). "The relevant question is whether the challenged regulation *authorizes* suppression of speech in advance of its expression." *Ward v. Rock Against Racism,* 491 U.S. 781, 795 n.5 (1989). "[A]ny system of prior restraint comes to [court] bearing a heavy presumption against its constitutional validity." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990). Prior restraints cannot overcome this heavy presumption if they either "place[] unbridled discretion in the hands of a government official or agency" or  "fail[] to place limits on the time within which the decisionmaker must issue the license." *Id.* at 225-26. Thus, "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150-51 (1969).

Here, the University's prior restraint affords the University unbridled discretion to grant or deny requests to engage in speech concerning "non-campus elections." Ex. A. at 46, § 2-407. The policy also fails to place any limits on the time that the University has to grant or deny permission.

*See id.* This prior restraint is a "quintessential first-amendment violation." *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009).

**Second**, the University's prior restraint is a content-based restriction on protected speech. The Supreme Court has consistently recognized the "substantial and expansive threats to free expression posed by content-based restrictions." *United States v. Alvarez*, 567 U.S. 709, 717 (2012). "Content-based regulations are" thus "presumptively invalid." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992). Accordingly, "any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). Notably, "[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic. Thus, a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015). For instance, "a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." *Id.*

So too here. The University expressly authorizes the distribution of all materials concerning any "sociopolitical or educational issue[]" *except* for the "promotional materials of candidates for non-campus elections." Ex. A at 46, § 2-407. This is a classic content-based regulation. *See Reed*, 135 S. Ct. at 2230. For example, the University's policy allows a student to pass out a flyer that says "Support Universal Healthcare" but requires prior approval to pass out a flyer that says "Biden 2020." That is indefensible.

For both of these reasons, the University's prior restraint on speech is facially unconstitutional. The Supreme Court permits "facial challenges to prior restraints on speech without requiring the plaintiff to show that there are no conceivable set of facts where the application of the

particular government regulation might or would be constitutional." *United States v. Frandsen*, 212 F.3d 1231, 1236 (11th Cir. 2000). That is because there are "two major First Amendment risks associated with unbridled licensing schemes: self-censorship by speakers in order to avoid being denied a license to speak; and the difficulty of effectively detecting, reviewing, and correcting content-based censorship 'as applied' without standards by which to measure the licensor's action." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 759 (1988). "Therefore, a facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Id.* The University's prior restraint does just that and, thus, is unconstitutional.

### 2. The University's prohibition on "bias-motivated incidents" violates the First Amendment.

The University's prohibition on "bias-motivated incidents" violates the First Amendment for two reasons.

**First**, the University's prohibition on "bias-motivated incidents" is overbroad. The First Amendment prohibits public universities from adopting regulations that are "so broad as to chill the exercise of free speech and expression." *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995). "Because First Amendment freedoms need breathing space to survive, a state may regulate in the area only with narrow specificity." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972). "[A] law may be invalidated as overbroad if a substantial number of its applications are unconstitutional." *United States v. Stevens*, 559 U.S. 460, 473 (2010). Overbroad regulations are facially unconstitutional because "the threat of enforcement … may deter or 'chill' constitutionally protected speech," as "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech, harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

16

Here, the University defines "bias-motivated incident" as an "action or expression" that is "motivated, at least in part, by prejudice against or hostility toward a person (or group) because of that person's (or group's) actual or perceived age, disability/ability status, ethnicity, gender, gender identity/expression, national origin, race, religion/spirituality, sexual orientation, socioeconomic class, etc." Ex. C. This definition encompasses speech that is fully protected by the First Amendment. For example, two of Speech First's members want to advocate for stronger immigration policies, including building a wall along the U.S. southern border; another member wants to advocate for policies that would lead to the "deradicalization of Islam"; and still another member wants to voice confusion and ask questions about LGBT issues he does not understand. Neily Decl. ¶ 9. These categories of speech all have been the subject of complaints and investigations by the BART or University Housing. *See, e.g.,* Ex. E at 2 (investigating expressions deemed to be "Anti-Hispanic"); *id.* at 15 (investigating speech and events advocating for building a wall to prevent illegal immigration); Ex. D at 10 (same); *cf.* Ex. N. at 7 (investigating "microaggressive comments" regarding race/ethnicity); Ex. E at 2 (investigating expressions deemed to be "Anti-Islamic"); *id.* at 6 (same); *id.* at 10 (same); *cf.* Ex. N at 5 (investigating student who said "most terrorists are Arab" in a class on counterterrorism); Ex. E at 3 (investigating expressions deemed to be "Anti-Lesbian/Gay/Bisexual/Transgender"); *id.* at 9 (same). The BART and University Housing thus threaten to subject students to investigations and punishment based *solely* on the content of their speech. This is unconstitutional.

**Second**, the University's prohibition on "bias-motivated incidents" is void for vagueness. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "[T]he vagueness doctrine has two primary goals: (1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement [by officials]." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007). "With respect to the first goal, … '[a] statute which either forbids or requires the doing of an

act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925)). "With respect to the second goal, … 'if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [officials] for resolution on an ad hoc and subjective basis.'" *Id.* (quoting *Grayned*, 408 U.S. at 108-09).

This principle of clarity is especially demanding when First Amendment freedoms are at stake. If the challenged law "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). "Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law." *Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959).

Here, even though "bias-motivated incidents" can subject students to investigation and punishment, the University has offered no guidance about the meaning of that term or how students can avoid committing a violation. A "bias-motivated incident" appears to simply be whatever speech a reporter or the BART "perceive[s]" as "offensive," "bias[ed]," or "intoleran[t]." Ex. L; Ex. I at 4. The absence of a clear standard creates a serious risk that this prohibition will be enforced in an arbitrary or discriminatory manner, or will be used to target speech based on the viewpoint expressed. The University's prohibition on "bias-motivated incidents" is thus void for vagueness.

### 3. The University's inclusion of protected speech in the "No Contact Directive" policy violates the First Amendment.

The University's authorization of No Contact Directives is unconstitutionally overbroad. As explained above, the First Amendment prohibits the University from adopting regulations that are "so broad as to chill the exercise of free speech and expression," *Dambrot*, 55 F.3d at 1182, and requires universities to "regulate … only with narrow specificity," *Gooding*, 405 U.S. at 522. Here, the

University's policy on No Contact Directives is incredibly broad. A No Contact Directive will be issued whenever an official concludes "that a No Contact Directive is warranted." Ex. B at 18, § 4.06(d). Engaging in speech that is fully protected under the First Amendment thus can provide the sole justification for a No Contact Directive. Indeed, the University has a history of issuing No Contact Directives solely in response to speech that is fully protected by the First Amendment. *Supra* 10-11. And a student subject to such a directive will have his or her freedoms of movement, association, and speech severely limited. *Supra* 10.

To be sure, the University could properly issue No Contact Directives in certain circumstances—*e.g.*, if necessary to protect "the health or safety of any person" or to prevent conduct that violates the University's sexual-misconduct policy. Ex. A at 10, § 1-302. But the University's policy on No Contact Directives is not even close to being "tailored to [those] interests," *Watchtower Bible & Tract Society of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 168 (2002), as it authorizes these directives simply when "warranted." The First Amendment does not permit such a blunderbuss approach. "Where certain speech is associated with particular problems, silencing the speech is sometimes the path of least resistance. But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). The University's policy on No Contact Directives unquestionably "burden[s] substantially more speech than necessary to achieve" the University's interests and is unconstitutionally overbroad. *Id.* at 490.

## II.     Speech First satisfies the remaining preliminary-injunction criteria.

In "a free speech case, ... the likelihood of success on the merits will often be the determinative factor. That is because even short deprivations of First Amendment rights constitute irreparable harm, and the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that

is probably unconstitutional." *Higher Society of Ind. v. Tippecanoe Cty.*, 858 F.3d 1113, 1116 (7th Cir. 2017) (cleaned up). In short, "'the analysis begins and ends with the likelihood of success on the merits of the [First Amendment] claim.'" *Id.* Because Speech First is likely to prevail on its First Amendment claims, the Court should grant the preliminary injunction. In any event, Speech First independently satisfies the equitable criteria for a preliminary injunction.

**First**, Speech First will suffer irreparable harm without interim relief. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("The loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate."); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (same); *Women's Health Link, Inc. v. Fort Wayne Public Transp. Corp.*, 45 F. Supp. 3d 857, 868 (N.D. Ind. 2014) (same); *Hatchett v. Barland*, 816 F. Supp. 2d 583, 607 (E.D. Wis. 2011) (same). Absent a preliminary injunction, Speech First's members will be deprived of their free-speech rights.

**Second**, the balance of harms overwhelmingly favors a preliminary injunction. Speech First has a powerful interest in ensuring the protection of open and vigorous discourse at the University without prior restraints or threats of investigation or punishment. In contrast, the University has no interest in restraining, banning, or chilling speech protected by the First Amendment, even if such speech is "particularly hurtful to many." *Snyder*, 562 U.S. at 456. Further, even if the Court awards Speech First a preliminary injunction, the University remains "free to enact new regulations that are tailored so as to conform to First Amendment jurisprudence." *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 373 (M.D. Pa. 2003).

**Third**, a preliminary injunction is in the public interest. As the Seventh Circuit has explained, "injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y*, 453 F.3d at 859. The public undoubtedly has a strong interest in ensuring the protection of

speech and expression at state-funded universities. *See Lawson v. City of Kankakee*, 81 F. Supp. 2d 930,

936 (C.D. Ill. 2000) ("[T]he public interest also favors a preliminary injunction" because "[t]he First

Amendment reflects a 'profound national commitment' to the principle that debate on public issues

should be uninhibited and robust, and the Supreme Court has consistently commented on the central

importance of protecting speech on public issues.") (quoting *Boos v. Barry,* 485 U.S. 312, 318 (1988));

*see also Personal PAC v. McGuffage*, 858 F. Supp. 2d 963, 969 (N.D. Ill. 2012).

## CONCLUSION

This Court should grant Speech First's motion and preliminarily enjoin Defendants from

(1) enforcing the University's prior restraint on speech concerning non-campus elections; (2) using

the BART, University Housing, or any other University officials to investigate, log, threaten, or punish

students (including informal punishments) for bias-motivated incidents; and (3) issuing "No Contact

Directives" without clear, objective procedures that ensure the directives are issued consistently with

the First Amendment.

Respectfully submitted,

Dated: June 6, 2019

 /s/ J. Michael Connolly

William S. Consovoy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com

*Counsel for Plaintiff Speech First, Inc.*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)(4)(b)**

I certify that the foregoing memorandum complies with the type-volume limitations set forth in Local Rule 7.1(B)(4)(b). The memorandum contains 6,795 words, including all headings, subheadings, footnotes, and quotations.

*/s/  J. Michael Connolly*

**CERTIFICATE OF SERVICE**

I certify that on June 6, 2019, I electronically filed this memorandum with the Clerk of Court

using the CM/ECF system. I also certify that this document was mailed overnight to:

The Office of University Counsel
258 Henry Administration Building
506 S. Wright Street
Urbana, Illinois 61801


                       */s/ J. Michael Connolly*