E-FILED
Thursday, 06 June, 2019  05:41:29 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT S



**FIRE**

# BIAS RESPONSE TEAM

## REPORT 2017








The mission of FIRE is to defend and sustain individual rights at America's colleges and universities. These rights include freedom of speech, legal equality, due process, religious liberty, and sanctity of conscience—the essential qualities of individual liberty and dignity. FIRE's core mission is to protect the unprotected and to educate the public and communities of concerned Americans about the threats to these rights on our campuses and about the means to preserve them.



**FIRE**
Foundation for Individual
Rights in Education

510 WALNUT ST.
SUITE 1250
PHILADELPHIA, PA 19106

  

# TABLE OF CONTENTS

**4**    **EXECUTIVE SUMMARY**

**6**    **METHODOLOGY**

**7**    **FINDINGS**

**9**    **DISCUSSION**

     9    WHY BIAS RESPONSE TEAMS EXIST

     10    HOW MANY BIAS RESPONSE TEAMS EXIST

     12    WIDELY DEFINING "BIAS"

     15    EXAMPLES OF REPORTED INCIDENTS

     19    WHO SERVES ON THE BIAS RESPONSE TEAM: THE SPEECH POLICE

     20    THE RISK OF FIRST AMENDMENT LAWSUITS

     23    A LACK OF TRAINING ON FREEDOM OF SPEECH

     24    HOW SOME UNIVERSITIES ARE RESISTING TRANSPARENCY

     26    NORMATIVE CRITICISMS OF BIAS RESPONSE TEAMS

     28    STRIKING A BALANCE

**29**    **APPENDICES**

     29    APPENDIX A: CATEGORIES OF BIAS

     31    APPENDIX B: INSTITUTIONS WITH BIAS REPORTING SYSTEMS

## EXECUTIVE SUMMARY

Over the past several years, the Foundation for Individual Rights in Education (FIRE) has received an increasing number of reports that colleges and universities are inviting students to anonymously report offensive, yet constitutionally protected, speech to administrators and law enforcement through so-called "Bias Response Teams." These teams monitor and investigate student and faculty speech, directing the attention of law enforcement and student conduct administrators towards the expression of students and faculty members.

To better understand this phenomenon, FIRE gathered data throughout 2016 on every bias reporting system we could locate. FIRE sought to determine who reviews the reports, what categories of bias they are charged with addressing, and whether the institution acknowledges that the system generates a tension with free speech and academic freedom.

FIRE discovered and surveyed **231 Bias Response Teams at public and private institutions** during 2016. The expression of at least **2.84 million American students** is subject to review by Bias Response Teams. While most students in higher education do not yet appear to be subject to bias reporting systems, we believe that the number of Bias Response Teams is growing rapidly.

The composition of Bias Response Teams is not always made public. About 28% did not reveal the names or rules of any team members. Of those whose membership FIRE could ascertain:

- 42% report speech to members of law enforcement or campus security officers, even though the teams deliberately solicit reports of a wide variety of non-criminal speech and activity.
- 12% of teams include at least one administrator dedicated to media relations, suggesting that part of the purpose of such teams is to deter and respond to controversies that might embarrass the institution.
- Fewer than a third of teams included faculty members, whose absence diminishes the likelihood that the team will have a meaningful understanding of academic freedom.

Teams tend to cast a wide net when defining "bias." Almost all use categories widely found in discrimination statutes (race, sex, sexual orientation, etc.), while others investigate bias against obscure categories, such as "smoker status," "shape," and "intellectual perspective." A significant minority include **political affiliation or speech as a potential bias, inviting reports of and investigations into political speech by law enforcement and student conduct administrators**.

In responding to reports regarding this wide array of protected expression, administrators are frequently armed with vague or overly broad rules granting them leeway to impose sanctions for speech they dislike. In December 2016, FIRE found that some 92.4% of the 449 schools surveyed for our annual speech code report maintain policies that either clearly and substantially restrict speech, or can otherwise be interpreted to punish protected speech. At such schools, a Bias Response Team's practice of broadly defining and identifying "bias" may expose a wide range of protected speech to punishment. Even where schools purport only to provide "education" to the offending speaker, instead of formal punitive sanctions (such as suspension or expulsion), this response is often undertaken by student conduct administrators, not educators, and more closely resembles a reprimand.

There is an unavoidable tension between promoting free speech and academic freedom and working to combat the presence of "bias" (however defined) on campus. Yet **only 84**

**(50.6%) of the teams surveyed acknowledged a tension with freedom of speech**, freedom of inquiry, or academic freedom on their websites or in their policies.

FIRE also used public records requests to discover the reports made at some institutions, how the schools responded to those reports, and the teams' policies and training. Many institutions complied with these requests. Others stonewalled, hid records, deleted websites, or demanded thousands of dollars to view records, claiming that knowing how Bias Response Teams operate is not in the public interest.

Further, how universities respond to bias reports may expose them to First Amendment lawsuits. Individual team members risk being held personally liable for violating constitutional rights in some circumstances. They may not even be aware of where the lines are drawn. FIRE found little evidence that Bias Response Teams are trained on First Amendment issues.

Bias Response Teams, when armed with open-ended definitions of "bias," staffed by law enforcement and student conduct administrators, and left without training on freedom of expression, represent an emerging risk to free and open discourse on campus and in the classroom. Bias Response Teams create—indeed, they are intended to create—a chilling effect on campus expression. Even if a Bias Response Team does not have the power to take punitive action, the prospect of an official investigation may make students and faculty more cautious about what opinions they dare to express.

Beyond First Amendment concerns, encouraging students and faculty to anonymously report one another to administrators for subversive or offensive views is illiberal, and antithetical to a campus open to the free exchange of ideas. While universities should certainly be listening to their students and offering resources to those who encounter meaningful difficulties in their lives on campus, the posture taken by many Bias Response Teams is all too likely to create profound risks to freedom of expression, freedom of association, and academic freedom on campus.

## METHODOLOGY

### WHAT IS A BIAS REPORTING SYSTEM?

In order to distinguish bias reporting systems from other speech codes, and to identify systems that may not be explicitly identified as a "bias reporting" system,[1] FIRE applied a three-part definition. Where it was unclear whether a particular element was met, we used our best judgment.  Links to the websites of all Bias Response Teams are provided in Appendix B so that the reader may form his or her own opinion.

FIRE defines a bias reporting system as any system identified as such, or that provides:

(1) a formal or explicit process for or solicitation of
(2) reports from students, faculty, staff, or the community
(3) concerning offensive conduct or speech that is protected by the First Amendment or principles of expressive or academic freedom.

Under FIRE's definition, a school policy or reporting system limited to criminal offenses involving hate or bias does not constitute a bias reporting system.

### LOCATING AND OBSERVING BIAS REPORTING SYSTEMS

FIRE relied on a number of methods to locate bias reporting systems, including mining schools' websites for information, using tools to monitor websites for changes, and issuing public records requests to collect additional information.

We first gathered state-by-state lists of public and private institutions on Wikipedia, as well as in FIRE's own Spotlight database,[2] to identify leading institutions in the United States. We then reviewed each school's website and Google presence, searching for references to bias reporting systems. To locate other systems, we searched for reporting forms provided by Maxient and other companies known to host reporting forms. The location process also utilized Google alerts and media reports concerning bias reporting systems.

Once the institutions were identified, FIRE monitored each Bias Response Team page for changes in text—a practice we will continue in order to observe whether, or how, institutions change their systems over time.[3]

FIRE also reviewed the public-facing websites of reporting systems to identify relevant policies, definitions, forms, and other information. We recorded the definitions of "bias" in both policies and reporting forms, which often differed from one another, to determine the categories of bias defined by each institution.

Finally, we utilized public records requests at some institutions to uncover the types of reports being made and how the Bias Response Teams acted in response to each submission.

### A NOTE ABOUT LIMITATIONS

This survey documents how Bias Response Teams operate and who serves on them. Given the number of higher education institutions in the United States, this survey was not intended to identify the rate at which institutions have adopted such systems.

---

[1] For simplicity's sake, this report uses the phrase "Bias Response Team" broadly to encompass both the teams and the reporting systems, even if there is no dedicated, independent team in place.
[2] FIRE's Spotlight database is a collection of policies at over 400 of our nation's biggest and most prestigious universities, collected in an effort to document institutions that ignore students' rights, or don't tell them the truth about how they've taken them away. Spotlight is available at https://www.thefire.org/spotlight.
[3] In doing so, we have observed a number of institutions delete, modify, or hide their bias reporting systems following media criticism or public records requests.

## BIAS REPORTING SYSTEMS ARE WIDESPREAD

During the course of 2016, at least **231** Bias Response Teams were publicized on American university or college campuses. **143** are at public institutions and **88** are at private institutions.[4] At least 2.84 million students are enrolled in these schools.

Of the 471 institutions catalogued in FIRE's Spotlight database, 181 (or 38.4%) maintain bias reporting systems. The committees that administer these systems are known by a variety of names, usually a variation on "Bias Response Team." Some schools do not provide an independent "team," instead channeling reports directly to existing offices or departments, including law enforcement or security, human resources departments, or campus housing authorities.

## CASTING A WIDE NET: WHAT CATEGORIES OF "BIAS" ARE REPORTED?

### IMMUTABLE CHARACTERISTICS AND OTHER CATEGORIES OF BIAS

The most common categories of bias reports solicited[5] come from federal and state laws governing educational and employment discrimination. Every system surveyed invites reports of bias concerning race or religion, and most invite reports concerning sex, sexual orientation, gender identity or expression, age, disability, and so on. Some are unusual, such as bias against "behavior" (**Macalester College**), which appears to define criticism of behavior of any kind as "bias."

### POLITICAL AND SOCIAL BELIEFS

Some systems define "bias incidents" to include expressions of bias against political and social affiliations. 14% of institutions include "political affiliation" among their categories of bias. Still others include bias against similar categories such as "intellectual perspective" (**University of Central Arkansas**), "political expression" (**Dartmouth**), or "political belief" (**University of Kentucky**). It is critical to note that by soliciting reports of speech that is biased against political views, universities are expressly requesting that their students report one another to the authorities for expressing divergent political views.

### DEFINITIONS OF "BIAS INCIDENTS" BROADLY ENCOMPASS SPEECH

Bias reporting systems raise free speech concerns because they solicit reports of legal, protected speech and expression in addition to unprotected conduct such as actionable discrimination or harassment. The definitions often explicitly state that students should report speech protected by the First Amendment.

Many policies include catch-all categories of bias—*e.g.*, "other" biases. In such cases, the definition of a bias incident encompasses not only protected speech, but also any speech that offends ***anyone*** for ***any*** reason. The net effect is that broad definitions of "bias" invite reports of any offensive speech, whether or not it is tethered to a discernable form of bias, thereby inviting scrutiny of student activists, organizations, and faculty engaged in political advocacy, debate, or academic inquiry. For examples of reported political expression, see the Discussion section at page 15.

---

[4] For a list of schools with bias reporting systems observed in FIRE's survey, see **Appendix B**.
[5] For a list of the categories of bias observed in FIRE's survey, see **Appendix A**.

## FINDINGS

**WHO'S ON A BIAS RESPONSE TEAM? OFTEN, LAW ENFORCEMENT**

FIRE was unable to determine the makeup of every Bias Response Team. Of the 166 teams whose composition FIRE could determine, almost half include law enforcement ("speech police," in a quite literal sense) and more than half include what appear to be student conduct administrators. Only 27% include faculty members, reducing the likelihood that a Bias Response Team will have members likely to recognize issues of academic freedom. And 12% contain public relations administrators, raising the possibility that a team's decisions, including about whether to seek discipline for those displaying "bias," may be made on the basis of an institution's desire to avoid public embarrassment. Both common sense and FIRE's extensive experience suggest that public and donor relations can be significant factors driving universities' decisions.

|  | All institutions (166) | Public (104) | Private (62) |
|---|---|---|---|
| Law Enforcement[6] | 42% (70) | 41% (43) | 43% (27) |
| Student Conduct[7] | 63% (105) | 56% (59) | 74% (46) |
| Public or Media Relations | 12% (21) | 14% (15) | 9.7% (6) |
| Faculty | 27% (45) | 24% (25) | 32% (20) |
| Students | 21% (35) | 18% (19) | 26% (16) |

**ACKNOWLEDGING A TENSION WITH FREEDOM OF EXPRESSION AND ACADEMIC FREEDOM, BUT PROVIDING LITTLE (IF ANY) TRAINING**

84 institutions (50.6%) acknowledged freedom of speech, freedom of inquiry, or academic freedom in the descriptions or policies of their Bias Response Teams. Of these, 50 are public and 34 are private.

However, despite professing a dedication to free expression and academic freedom, few schools provide meaningful training to Bias Response Teams on recognizing these issues. Public records requests issued to dozens of schools have revealed only one Bias Response Team, at Louisiana State University, that offered any substantial training whatsoever on First Amendment concerns.

---

[6] "Law enforcement" includes campus police departments and their equivalents at private schools.
[7] Determining whether an administrator serving on a Bias Response Team is responsible for implementing disciplinary procedures can be difficult. FIRE views the inquiry from the student's perspective: What will a reasonable student perceive the administrator's role or authority to be? This number excludes administrators affiliated with diversity offices and includes administrators affiliated with dean of students' offices, absent specific information concerning an administrator's responsibilities or authority.

## WHY DO BIAS RESPONSE TEAMS EXIST?

University administrators receive many complaints about criminal conduct on campus. They also learn of students who encounter "offensive" but legally protected speech or expression.[8] A proper response to these incidents would involve prompt, fair, and impartial discipline for instances of physical misconduct, true threats, and harassment, while fostering an environment in which offensive speech would be answered with more speech.

Campuses with Bias Response Teams have chosen to go further, often deploying administrators to conduct an "investigation" of the incident and, if the "respondent" is found "guilty," summon them for a "hearing" or an "educational" discussion, which may more closely resemble a reprimand than an enlightening exchange of views.

Such procedures risk becoming tools not only for imposing some form of political or intellectual orthodoxy, but also for policing politeness or civility.[9] They invite law-enforcement authorities and administrators, who are likely to be wary of expression that can cause conflict of

any kind, to scrutinize activism, debate, and political speech regarding every ideology and viewpoint. Yet the essential elements of free discourse, whether on campus or off, *require* that people have right to offend or to cause conflict through speech.[10]

Other factors may also contribute to a university's decision to implement a Bias Response Team, such as:

- **Inability to implement speech codes.** FIRE has seen a continuous, nine-year decline in the maintenance of speech codes that prohibit speech,[11] and courts routinely strike down speech codes at public universities on First Amendment grounds.[12] In fact, some bias reporting systems, such as **Longwood University's**, have cited the unconstitutionality of speech codes as a reason for their existence.[13]

- **The low cost of expanding employment-based anti-discrimination systems.** A university cannot function as a true "marketplace of ideas" if campus expression is as

---

[8] Eugene Volokh, *No, It's Not Constitutional for the University of Oklahoma to Expel Students for Racist Speech*, WASH. POST, Mar. 10, 2015, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/03/10/no-a-public-university-may-not-expel-students-for-racist-speech; *see also* Susan Svrluga, *Student Arrested After Wearing Gorilla Mask, Handing Out Bananas at Black Lives Matter Protest*, WASH. POST, Sept. 29, 2016, https://www.washingtonpost.com/news/grade-point/wp/2016/09/29/student-arrested-after-wearing-gorilla-mask-handing-out-bananas-at-black-lives-matter-protest.

[9] *See, e.g.*, José A. Cabranes, *If Colleges Keep Killing Academic Freedom, Civilization Will Die, Too*, WASH. POST, Jan. 10, 2017, https://www.washingtonpost.com/opinions/if-colleges-keep-killing-academic-freedom-civilization-will-die-too/2017/01/10/74b6fcc2-d2c3-11e6-9cb0-54ab630851e8_story.html (Judge on the U.S. Court of Appeals for the 2nd Circuit arguing that Bias Response Teams indicate that "campus administrators have morphed into civility police.").

[10] For example, in overturning a man's conviction for wearing a jacket reading "Fuck the Draft" in a courthouse hallway, the Supreme Court noted that "the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us," and that words can serve an "emotive function" and are "often chosen as much for their emotive as their cognitive force." Cohen v. California, 403 U.S. 15, 25-26 (1971). In other words, words chosen because they convey hostility or incivility are as deserving of protection as calm, polite debate.

[11] *Spotlight on Speech Codes 2017*, FOUND. FOR INDIVIDUAL RIGHTS IN EDUC., *available at* https://d28htnjz2elwuj.cloudfront.net/wp-content/uploads/2016/12/12115009/SCR_2017_FullCover_Revised.pdf.

[12] McCauley v. Univ. of the V.I., 618 F.3d 232 (3d Cir. 2010); DeJohn v. Temple Univ., 537 F.3d 301 (3d Cir. 2008); Dambrot v. Cent. Mich. Univ., 55 F.3d 1177 (6th Cir. 1995); Univ. of Cincinnati Chapter of Young Ams. for Liberty v. Williams, 2012 U.S. Dist. LEXIS 80967 (S.D. Ohio Jun. 12, 2012); Smith v. Tarrant Cty. Coll. Dist., 694 F. Supp. 2d 610 (N.D. Tex. 2010); Coll. Republicans at S.F. St. Univ. v. Reed, 523 F. Supp. 2d 1005 (N.D. Cal. 2007); Roberts v. Haragan, 346 F. Supp. 2d 853 (N.D. Tex. 2004); Bair v. Shippensburg Univ., 280 F. Supp. 2d 357 (M.D. Pa. 2003); Booher v. N. Ky. Univ. Bd. of Regents, No. 2:96-CV-135, 1998 U.S. Dist. LEXIS 11404 (E.D. Ky. July 21, 1998); Corry v. Leland Stanford Junior Univ., No. 740309, slip op. (Cal. Super. Ct. Feb. 27, 1995); UWM Post, Inc. v. Bd. of Regents of the Univ. of Wis., 774 F. Supp. 1163 (E.D. Wisc. 1991); Doe v. Univ. of Mich., 721 F. Supp. 852 (E.D. Mich. 1989).

[13] *Bias & Hate Incidents*, LONGWOOD UNIV., archived on June 14, 2016 and *available at* http://archive.is/uUQic; *see also*, *No Hate Initiative*, MIAMI UNIV., archived on Dec. 15, 2005 and *available at* http://web.archive.org/web/20051215002453/http://www.miami.muohio.edu/documents_and_policies/nohate/index.cfm#hc9 (noting that "[e]very college hate speech code reviewed in the federal courts has been struck down").

## DISCUSSION

highly regulated as expression among employees in business corporations. Borrowing well-developed and widely available corporate procedures is a tempting shortcut. For as little as $8,600, schools can create reporting forms derived from existing systems used by employers to permit employees to report employment-based sexual harassment.[14] But using the tools of corporate anti-discrimination systems—perhaps even those used internally among their own employees—to solicit bias reports from and about the larger campus community sets colleges on a collision course with free discourse.

- **Avoiding public controversy**. By learning of events and disputes quickly, public and media relations administrators can attempt to frame the institution's response in the media. At the **University of New Mexico**, for example, administrators pushed to release a statement "rather than waiting for the media to get ahold of" flyers criticizing UNM's logo (which involves a conquistador) that were reported to the Bias Response Team.[15] Some 12% of Bias Response Teams include media relations administrators.

- **Student demand**. Certain student groups have called upon administrators to implement bias reporting systems.[16] But this seems to be relatively rare: Of

the various recent demands from students across the country, few have involved requests for reporting systems,[17] and one institution's audit suggested that students are unfamiliar with the term "bias incident."[18]

Whatever their motivations, universities implementing Bias Response Teams have cast a wide net, inviting reports of any offensive speech, on virtually any topic, for any reason. The result is that speech on political and social subjects, which is likely (and may be intended) to offend, gets reported to law enforcement and student conduct administrators, and bias reporting systems serve to "alert administrators to specific individuals ... who would benefit most from diversity inclusion training."[19] This institutionalizes surveillance of activists of all political persuasions, exposes universities (and their administrators) to the prospect of costly First Amendment claims, and encourages an illiberal culture of anonymously reporting students or faculty for subversive or offensive speech—on hundreds of campuses across the country.

### BIAS RESPONSE TEAMS ARE FOUND ON HUNDREDS OF AMERICAN COLLEGE CAMPUSES

In early 2016, when Appalachian State University explored a proposal to create a Bias Response Team, administrators wanted to see what other schools were doing. They didn't have

---

[14] *Statement of Work*, ETHICSPOINT, July 12, 2010, produced to the Foundation for Individual Rights in Education by the University of California Office of the President in response to a public records request, *available at* https://www.documentcloud.org/documents/3418749-University-of-California-EthicsPoint-Statement.html.

[15] *See*, emails and photos produced to the Foundation for Individual Rights in Education by the University of New Mexico in response to a public records request, *available at* https://www.documentcloud.org/documents/3234845-University-of-New-Mexico-What-Indians-Report.html.

[16] *See, e.g.*, Black Student Union, *BSU Calls for Action*, THE TOWERLIGHT, Apr. 18, 2016, http://thetowerlight.com/bsu-calls-for-action.

[17] *See, e.g.*, *The Demands*, WETHEPROTESTERS, *available at* http://www.thedemands.org (last visited Jan. 9, 2017) (tracking demands of student protesters across the country).

[18] COLGATE UNIVERSITY ADVISORY COMMITTEE ON CAMPUS SECURITY, ACCS COMPLIANCE REPORT 2014-15 (2015), *available at* https://www.documentcloud.org/documents/3234248-Colgate-Advisory-Committee-on-Campus-Security.html.

[19] Liz Fonseca & John Tannous, PROMOTING DIVERSITY AND INCLUSION IN THE CLASSROOM: STRATEGIES TO FOSTER INCLUSIVE ACADEMIC ENVIRONMENTS AT LARGE RESEARCH UNIVERSITIES, EDUCATION ADVISORY BOARD (2013), *available at* https://www.mga.edu/student-affairs/docs/Promoting_Diversity_and_Inclusion_in_Classrooms.pdf.

to look far; one said she was "hard pressed to find a school without" a Bias Response Team.[20] Boston College's student government described them as "ubiquitous."[21]

To a certain extent, FIRE found this to be true. According to publicly available records, there were at least 231 Bias Response Teams publicized by four-year or post-graduate institutions during 2016. Of these, 143 were at public institutions, all of which are bound by the First Amendment, while 88 were at private institutions, most of which advertise or commit to respecting students' freedom of expression and freedom of academic inquiry in official policy. At a conservative estimate,[22] at least 2.84 million American students are subject to often-anonymous reporting systems monitored by administrators and police officers.[23] But while Bias Response Teams are in use at hundreds of institutions, and appear to be growing in number, it does not appear that they can yet be found on a majority of campuses.

The names and acronyms used for bias reporting systems vary from campus to campus. The

**University of Oregon**'s team is currently known as the "Bias Education and Response Team,"[24] and the **University of North Carolina at Asheville**'s team is the "Bias Incident Response Team."[25] While most team names appear to include some variation on "Bias Response Team," some do not. **Arizona State University** previously hosted a "Campus Environment Team,"[26] and **Illinois State University** currently utilizes an "Inclusive Community Response Team".[27] The **University of Central Florida**'s "Just Knights Response Team" reflects the name of its athletic teams.[28] And some institutions do not have a separate team for bias reports, instead relying on existing offices or departments. Some direct reports to police departments,[29] various deans[30] or human resources offices,[31] or housing authorities.[32]

To better understand these report-and-response systems, and to distinguish them from other types of speech codes, FIRE views "Bias Response Teams" as identified as such or generally adhering to three criteria:

[20] Email from Bindu Jayne, Assoc. Vice Chancellor for Equity, Diversity & Compliance, Appalachian State Univ. (Feb. 4, 2016), *available at* https://www.documentcloud.org/documents/3233900-Appalachian-State-University-Email-Re-Forming.html.

[21] Boston College UGBC Student Assembly, *A Resolution Concerning Bias Incidents*, *available at* https://www.documentcloud.org/documents/3233930-Boston-College-UGBC-Resolution-Concerning-Bias.html.

[22] This estimate assumes that each bias reporting system applies only to (1) undergraduate students, unless it is expressly dedicated to a graduate program or campus; (2) at the primary or main campus, unless it is expressly dedicated to a particular campus. It does not include faculty, staff, or (for the most part) post-graduate students or undergraduate students at satellite campuses.

[23] Enrollment statistics were calculated using data from the Integrated Postsecondary Education Data System, which is compiled by the U.S. Department of Education's National Center for Education Statistics. *About IPEDS*, NATIONAL CENTER FOR EDUCATION STATISTICS, https://nces.ed.gov/ipeds/Home/AboutIPEDS (last visited Jan. 8, 2017).

[24] Office of the Dean of Students, *Bias Education and Response Team*, UNIV. OF OREGON, http://dos.uoregon.edu/bias (last visited Jan. 1, 2017).

[25] *Bias Incident Response Team (BIRT)*, UNIV. OF N.C., https://msp.unca.edu/bias-incident-response-team-birt (last visited Jan. 2, 2017).

[26] ALLAN MICHAEL HOFFMAN ET AL., VIOLENCE ON CAMPUS: DEFINING THE PROBLEMS, STRATEGIES FOR ACTION, 300 (1998).

[27] Division of Student Affairs, *Inclusive Community Response Team*, ILLINOIS STATE UNIV., http://studentaffairs.illinoisstate.edu/who/diversity/icrt (last visited Jan. 1, 2017).

[28] *Just Knights Response Team*, UNIV. OF CENT. FLA., http://jkrt.sdes.ucf.edu/bias (last visited Jan. 1, 2017).

[29] *See, e.g., USM Public Safety Anonymous Crime Reporting Form*, UNIV. OF SOUTHERN MAINE, https://usm.maine.edu/police/usm-public-safety-anonymous-crime-reporting-form (last visited Jan. 2, 2017) (form for reporting "Bias/hate activity" to campus police); *Human Dignity – Reporting Process*, DEPAUL UNIV., http://dignity.depaul.edu/report.html (last visited Jan. 2, 2017) ("any victim" of a "Bias Incident [...] must report the incident to the Public Safety Office" in order to be investigated).

[30] *See, e.g., Office of Student Conduct*, PENSACOLA STATE COLLEGE, http://www.pensacolastate.edu/studentconduct (last visited Jan. 2, 2017) (directing reports of bias incidents to the Office of Student Conduct); *Report an Incident*, BOWLING GREEN STATE UNIV., https://www.bgsu.edu/dean-of-students/student-conduct/report-an-incident.html (last visited Jan. 2, 2017) (directing reports to the Office of the Dean of Students).

[31] *See, e.g., Bias Incident Report Form*, WASH. STATE UNIV., http://public.wsu.edu/~hrd/programs/hbreport.pdf (last visited Jan. 2, 2017) (directing reporting party to forward the form to the Human Relations and Diversity office).

[32] *See, e.g., Bias Protocol & Illinois Intervenes*, UNIV. OF ILL. AT URBANA-CHAMPAIGN, http://housing.illinois.edu/living-options/why-housing/inclusive-communities/bias-protocol (last visited Jan. 2, 2017) (directing reports to a "Residential Life professional").

## DISCUSSION

(1) a formal or explicit process for or solicitation of

(2) reports from students, faculty, staff, or the community

(3) concerning offensive conduct or speech that is protected by the First Amendment or principles of expressive or academic freedom.[33]

These criteria are designed to include systems that invite reports of protected speech without specifically labeling it as "bias," while distinguishing speech codes unaccompanied by formal or explicit policies for reporting such incidents.

### CASTING A WIDE NET FOR BIAS INCIDENTS

What constitutes a "bias incident" varies widely from campus to campus. As the **University of West Florida** puts it, defining the term "seem[s] like a murky ground to traverse."[34]

Even the use of the term "bias incident" engenders debate and confusion. In a February 2015 audit of **Colgate University**'s bias reporting system, a campus committee reported that, although the sample size was small, *no*

student was aware that they could file bias reports online, most had never heard the phrase "bias incident" before, and the majority had "incorrect interpretations" about its meaning.[35]

Broad applications of the term can diminish serious misconduct by equating political squabbles and caustic speech with violent criminal conduct. For example, *The New York Times* was widely and credibly criticized[36] for an article[37] noting that "[b]ias incidents on both sides have been reported" at the **University of Michigan**, with one student alleging[38] that she had been "threatened with being lit on fire because she wore a hijab." The article continued: "Other students were accused of being racist for supporting Mr. Trump ... ."[39]

Such political criticism can hardly be placed under the same umbrella as true threats of violence. Yet this is precisely what many bias reporting systems do. Schools largely define bias incidents to encompass more than hate crimes or actionable conduct. Hate crimes—criminal conduct undertaken on the basis of a protected characteristic of the victim, which is *not* protected by the First Amendment[40]—are always bias incidents. "Bias incidents," however, include speech or expressive conduct that is not necessarily criminal or in violation of applicable policy.

---

[33] The U.S. Department of Justice employed a similar definition of "bias incident" in a 2001 report: "acts of prejudice that are not accompanied by violence, the threat of violence, property damage, or other illegal conduct." U.S. DEPT. OF JUSTICE BUREAU OF JUSTICE ASSISTANCE, HATE CRIMES ON CAMPUS: THE PROBLEM AND EFFORTS TO CONFRONT IT 5 (Oct. 2001), *available at* https://www.ncjrs.gov/pdffiles1/bja/187249.pdf.

[34] *What is Bias?*, UNIV. OF WEST FLA., http://uwf.edu/offices/bias-response/what-is-bias (last visited Jan. 5, 2017).

[35] COLGATE UNIVERSITY ADVISORY COMMITTEE ON CAMPUS SECURITY, ACCS COMPLIANCE REPORT 2014-15 (2015), *available at* https://www.documentcloud.org/documents/3234248-Colgate-Advisory-Committee-on-Campus-Security.html.

[36] *See, e.g.,* John K. Wilson, *Safe Spaces for Conservatives: Why Being Called a Racist Is Not a Bias Incident*, ACADEME BLOG, Dec. 11, 2016, https://academeblog.org/2016/12/11/safe-spaces-for-conservatives-why-being-called-a-racist-is-not-a-bias-incident; *see also,* Andre Segura (@andresegura), TWITTER (Dec. 8, 2016, 5:01 PM), http://twitter.com/andresegura/status/806982019674677248; Jessica Valenti (@JessicaValenti), TWITTER (Dec. 8, 2016, 4:17

PM), http://twitter.com/JessicaValenti/status/806971007307280384.

[37] Anemona Hartocollis, *On Campus, Trump Fans Say They Need 'Safe Spaces'*, N.Y. TIMES, Dec. 8, 2016, http://www.nytimes.com/2016/12/08/us/politics/political-divide-on-campuses-hardens-after-trumps-victory.html.

[38] Police later alleged that the report was false. John Counts, *U-M Student's Claim of Threat for Wearing Hijab Is False, Police Say*, MLive.com, Dec. 21, 2016, http://www.mlive.com/news/ann-arbor/index.ssf/2016/12/police_say_no_evidence_muslim.html. While some reports of bias incidents, as with any type of report to authorities, may be false, there is no shortage of true threats (if not acts) of violence similar to that alleged at the University of Michigan.

[39] Erik Wemple, *New York Times Deserts 'Both Sides' Language in Story on Campus Trump Supporters*, WASH. POST, Dec. 9, 2016, https://www.washingtonpost.com/blogs/erik-wemple/wp/2016/12/09/new-york-times-deserts-both-sides-language-in-story-on-campus-trump-supporters/?utm_term=.341a5dd304a5.

[40] Wisconsin v. Mitchell, 508 U.S. 476, 484-490 (1993).

Take, for example, the **University of Northern Iowa**'s definition:[41]

> A bias-related incident is any word or action directed toward an individual or group based upon actual or perceived identity characteristics or background of a group or person that is harmful or hurtful. Some bias-related incidents may be contrary to law or policy, while some may be speech protected by the First Amendment of the Constitution of the United States.

**Western Washington University**'s definition extends to "demonstrations" of bias, including "language, words, signs, symbols, threats, or actions that could potentially cause alarm, anger, or fear in others[.]"[42] Moreover, the existence of a bias incident under the policy turns entirely on whether the complainant subjectively perceived the incident to be motivated by bias, rather than on the intent of the speaker.[43]

In targeting speech that may cause "alarm, anger, or fear," or that might otherwise offend on the basis of a proscribed subject, universities expressly set their sights on constitutionally protected speech. All speech is presumptively protected by the First Amendment unless it falls within certain narrow exceptions carved out by the Supreme Court: incitement to immediate violence; so-called "fighting words"; harassment[44]; true threats and intimidation; obscenity; child pornography; and defamation. Speech is *not* unprotected simply because it is offensive,[45] insulting,[46] causes anger,[47] or is viewed as prejudiced or as "hate speech."[48] If the speech in question does not fall within one of the listed exceptions, it most likely is protected speech.[49]

Most reporting systems are predicated on specific, enumerated characteristics. Of the systems identified by FIRE, 199 (or 86%) explicitly set forth these characteristics. Among them, the categories vary widely on different campuses. Each of these teams solicits reports about bias against race or religion, and all but one explicitly solicit reports about disability or sexual orientation.[50] There is less agreement on more specific categories. For example, while 94.5% seek reports of bias based on national origin or nationality, only 14.1% explicitly seek reports of bias against immigration or citizenship status.

Some categories of "bias" are peculiar. For example, the **University of Kentucky** permits

---

[41] *Bias Response Protocol*, UNIV. N. IOWA, https://uni.edu/brt/bias-response-protocol#overlay-context=bias-response-protocol (last visited Jan. 5, 2017).

[42] *Bias Incident Reporting Form*, WESTERN WASH. UNIV., http://www.wwu.edu/eoo/bias-incident-response.shtml (last visited Jan. 5, 2017).

[43] *See, e.g.*, *Florida State University Bias Incident Response System*, FLA. STATE UNIV., http://thecenter.fsu.edu/article/florida-state-university-bias-incident-response-system (last visited Jan. 5, 2017) ("An incident of bias may occur whether the act is intentional or unintentional").

[44] For more on the application of peer harassment law on campus, see Azhar Majeed, *The Misapplication of Peer Harassment Law on College and University Campuses and the Loss of Student Speech Rights*, 35 J.C. & U.L. 385 (2009), *available at* https://ssrn.com/abstract=1400300.

[45] Texas v. Johnson, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

[46] Boos v. Barry, 485 U.S. 312, 322 (1988) (First Amendment protects "insulting, and even outrageous, speech").

[47] Terminiello v. Chicago, 337 U.S. 1, 4 (1949) (A "function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.").

[48] Eugene Volokh, *No, There's No "Hate Speech" Exception to the First Amendment*, WASH. POST., May 7, 2015, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/05/07/no-theres-no-hate-speech-exception-to-the-first-amendment/?utm_term=.2cca993394b8.

[49] For a more in-depth discussion of the application of the First Amendment to public universities, and of the principles of freedom of speech to the private institutions that promise it, see FIRE's *Spotlight on Speech Codes 2017*, *supra* note 11, *available at* https://d28htnjz2elwuj.cloudfront.net/wp-content/uploads/2016/12/12115009/SCR_2017_Full-Cover_Revised.pdf#page=10.

[50] The anomaly, at Baylor University, appears to be the result of a lack of effort to promulgate a complete definition, providing that bias incidents relate to "race, nationality, religion, gender, age, etc." *Bias Motivated Incident Support Team*, BAYLOR UNIV., http://www.baylor.edu/student_life/index.php?id=85780 (last visited Jan. 5, 2017).

## DISCUSSION

reports of bias against "smoker status,"[51] perhaps as a result of borrowing language from a state law concerning employment discrimination against tobacco users.[52]

There is also significant divergence when it comes to reporting bias based on political affiliation, views, or conduct. Worryingly, 21% of public institutions seek out reports of bias on the basis of political affiliation, as opposed to 2.6% of private institutions. Among them, concerns regarding bias against political and social views vary:

- **Dartmouth College** lists "political expression" as a potential motivation on its reporting form[53] and defines bias to include "[t]reating someone negatively because of their actual or perceived .... [p]olitical or social affiliation."[54] This broad wording could encompass voting against a person for campus political offices or simply criticizing their political                    speech.

- The **University of North Carolina at Charlotte** includes "[p]olitical beliefs" in its definition of bias, and provides the following example: "Drawing pictures or cartoons that belittle someone because of their beliefs ... or political affiliation."[55] This would apply to virtually all political cartoons.

- Examples of bias incidents at **Williams College** include "comments on social media about someone's ... political affiliations/beliefs."[56] This definition could include any response to any political view posted on social media, or even simple criticism of elected officials.

- The **University of Colorado** included both "political philosophy" and "political affiliation" as protected classes.[57] (It has since shut down its Bias Response Team.)

- The **University of Kentucky**'s definition targets, in part, bias against a person for his or her "political belief."[58]

Other systems invite reports of even broader ranges of criticism and discussion:

- **Macalester College**'s now-deleted definition included "bias against another person based on ... his or her membership in a group ... or an individual's particular characteristics, *role*, or *behavior*."[59] This definition could apply to almost any criticism of anyone.

- Both **Syracuse University** and **Longwood University** list political and "social affiliation" as unacceptable grounds for bias.[60] It is nearly impossible

[51] *Bias Incident Report Form*, UNIV. OF KY., https://docs.google.com/forms/d/e/1FAIpQLSezIXDEHHU1RX-sldceuBDcZioM4buVea9F2CJmaatW61-nDA/viewform (last visited Jan. 5, 2017).
[52] Unlawful discrimination by employers – Difference in health plan contribution rates for smokers and nonsmokers and benefits for smoking cessation program participants excepted, KY. REV. STAT. § 344.040.
[53] *Bias Incident Reporting Form*, DARTMOUTH COLLEGE, http://www.dartmouth.edu/~opal/act (last visited Jan. 5, 2017).
[54] *Achieving Community Together (A.C.T.) Program*, DARTMOUTH COLLEGE, http://www.dartmouth.edu/~opal/act (last visited Jan. 5, 2017).
[55] *What is Bias*, UNIV. N.C. BIAS ASSESSMENT AND RESOURCE TEAM, http://unccdso.uncc.edu/org/biasassessmentandresourceteam145871/What_Is_Bias (last visited Jan. 31, 2017).

[56] *Questions about Bias and Bias Reporting*, WILLIAMS COLLEGE, http://speakup.williams.edu/faq (last visited Jan. 6, 2017).
[57] *Definitions*, UNIV. OF COLO., archived on July 25, 2016 and available at http://archive.is/hR0ps.
[58] *Bias Incident Report Form*, UNIV. OF KY., https://docs.google.com/forms/d/e/1FAIpQLSezIXDEHHU1RX-sldceuBDcZioM4buVea9F2CJmaatW61-nDA/viewform (last visited Jan. 5, 2017).
[59] *What is a bias-related incident?*, MACALESTER COLLEGE, archived on Sept. 12, 2016 and available at http://archive.is/27e8C (emphasis added).
[60] *What is bias?*, SYRACUSE UNIV., http://www.syracuse.edu/currentstudents/stopbias/whatisbias.html (last visited Jan. 5, 2017); *What is Bias?*, LONGWOOD UNIV., http://www.longwood.edu/diversity/experiencing-bias/what-is-bias (last visited Jan. 5, 2017).

to discern a meaningful limit to this category.

Some of these examples are likely the result of definitions borrowed from state employment discrimination statutes. Yet asking students to report one another for broadly defined bias against their voluntary political or social affiliation invites surveillance of and intrusion into political speech, subjecting it to the scrutiny of administrators and police.

## EXAMPLES OF REPORTED INCIDENTS: CAUGHT IN A WIDE NET, UNIVERSITIES ENTANGLE THEMSELVES INTO REFEREEING POLITICAL SPEECH

It is not mere speculation that core political speech, academic discourse, and outspoken activists are likely to become the subjects of bias incident reports. FIRE used public records requests, reviewed similar requests by media outlets, and examined the sparse public disclosures by Bias Response Teams to discern what gets reported.

The reports we reviewed, which often fail to disclose what action (if any) was undertaken in response, span the ideological spectrum:

- **Appalachian State University**: A student filed a report regarding the 2016 presidential election, claiming to be "offended by the politically biased slander that is chalked up everywhere reading 'TRUMP IS A RACIST'" and describing the "slander" as "unlawful." Another report stated that supporters of then-candidate Bernie Sanders were "destroying" messages chalked by

Trump supporters by drawing penises next to them. Yet another report complained that a pro-Trump student organization was using chalk to write "hate speech" in support of Trump.[61]

Another series of reports was filed against a student activist on several grounds: tweeting that she "hate[s] white men"; "refus[ing] to support all students if a student fits the certain stereotype of a white male"; "display[ing] disturbing apathy [and] ignorance and bitterness"; and "express[ing] profound disregard for the lives of students based on race and gender and for [police] officers based on their careers."[62]

- **Texas Tech University**: The Black Student Union (BSU) was reported to administrators for tweeting "All lives don't matter... White lives don't matter... Blue lives don't matter... #BlackLivesMatter." The complainant wanted the BSU characterized as a "Hate Group" and complained that the student chapter of the College Democrats planned to release a statement in support of BSU.[63]

- **University of California, San Diego** (UCSD): A student humor publication, *The Koala,* lost its student funding after satirizing "safe spaces" on campus.[64] Spurred by bias incident reports, specifically one calling on UCSD to "stop funding" *The Koala,* administrators asked the university's lawyer to "think creatively" about how to address the newspaper, which they felt "crosse[d]

[61] Spreadsheet of Incidents Reported, APPALACHIAN STATE UNIV., produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* http://www.documentcloud.org/document/3255183-Appalachian-State-University-Bias-Incident.html.
[62] APPALACHIAN STATE UNIV., *supra* note 61.
[63] Texas Tech University Campus Climate & Incident Reporting Form Submitted on July 14, 2016, produced to the Foundation for Individual Rights in Education in response to a public records

request, *available at* https://www.documentcloud.org/documents/3255186-Texas-Tech-BSA-Black-Lives-Matter-tweet.html.
[64] Adam Steinbaugh, *As 'The Koala' Files Lawsuit Against University of California, San Diego, Public Records Reveal Administration's Censorship,* NEWSDESK, June 1, 2016, https://www.thefire.org/as-the-koala-files-lawsuit-against-university-of-california-san-diego-public-records-reveal-administrations-censorship/.

## DISCUSSION

the 'free speech' line."[65] It didn't, and *The Koala* is suing UCSD with the assistance of the ACLU of Southern California.[66]

- **John Carroll University**: A summary report recounted that an "[a]nonymous student reported that [the] African-American Alliance's student protest was making white students feel uncomfortable."[67]

- **University of Northern Colorado** (UNC): Two professors were investigated for encouraging students to debate gay and transgender rights in class—including one professor who was responding to a student's comments on the issue and encouraging his students to confront arguments they find uncomfortable.[68] Other reports indicated that students were ordered to remove a Confederate flag from their dormitory room because it might offend someone.[69] These disclosures spurred letters of inquiry from two state senators,[70] a condemnation from the *Denver Post* editorial board,[71] and

concessions from a UNC administrator that the Bias Response Team's efforts may have been improper in some cases.[72] UNC subsequently shuttered its Bias Response Team.[73]

- **University of Oregon:** The Bias Response Team intervened to explain "community standards and expectations" when students had the audacity to "express[] anger about oppression."[74] In a separate incident, the Bias Response Team intervened with the reporter and editor of a student newspaper after an anonymous report that the "newspaper gave less press coverage to trans students and students of color."[75]

- **University of Michigan**: A snow sculpture perceived to be a "snow penis" was reported.[76]

- **Connecticut College**: Pro-Palestinian students were reported over flyers mimicking Israeli eviction notices to Palestinians, sparking an investigation

[65] Email from Becky Pettit, Univ. of Cal. San Diego Vice Chancellor for Equity, Diversity, and Inclusion, to Daniel Park, Univ. of Cal. San Diego Chief Campus Counsel, Nov. 13, 2016, *available at* https://d28htnjz2elwuj.cloudfront.net/wp-content/uploads/2016/06/01095740/Koala-v-UCSD_Public-Records-and-Bias-Incident-Reports.pdf#page=8.

[66] *Defending Freedom of Speech for Everyone, ACLU Sues UCSD to Enforce First Amendment Rights of the Student Press*, AM. CIVIL LIBERTIES UNION OF SAN DIEGO, May 31, 2016, https://www.aclusandiego.org/defending-freedom-speech-everyone-aclu-sues-ucsd-enforce-first-amendment-rights-student-press/.

[67] JOHN CARROLL UNIV., INTERIM REPORT ON BIAS REPORTING SYSTEM SUMMER-FALL 2015 4 (2015) *available at* http://webmedia.jcu.edu/bias/files/2016/02/Bias-Reports-Fall-2015-web-rev.-2.24.2016.pdf.

[68] Adam Steinbaugh & Alex Morey, *Professor Investigated for Discussing Conflicting Viewpoints, 'The Coddling of The American Mind'*, NEWSDESK, June 20, 2016, https://www.thefire.org/professor-investigated-for-discussing-conflicting-viewpoints-the-coddling-of-the-american-mind/.

[69] Tyler Silvy, *University of Northern Colorado's Handling of Speech Deemed Offensive Raises Questions, Concerns*, GREELEY TRIBUNE, June 28, 2016, http://www.greeleytribune.com/news/local/university-of-northern-colorados-handling-of-speech-deemed-offensive-raises-questions-concerns/.

[70] Tyler Silvy, *Sen. John Cooke Rips University of Northern Colorado in Scathing Letter*, GREELEY TRIBUNE, July 2, 2016, http://www.greeleytribune.com/news/local/sen-john-cooke-rips-university-of-northern-colorado-in-scathing-letter/.

[71] Denver Post Editorial Board, *UNC's Weak-Kneed Commitment to Free Speech*, DENVER POST, July 5, 2016, http://www.denverpost.com/2016/07/05/uncs-weak-kneed-commitment-to-free-speech/.

[72] Alex Morey, *Facing More Troubling Details and Public Outcry, Northern Colorado Vows to Reconsider Bias Response Team*, NEWSDESK, June 27, 2016, https://www.thefire.org/facing-more-troubling-details-and-public-outcry-northern-colorado-vows-to-reconsider-bias-response-team/.

[73] Adam Steinbaugh, *University of Northern Colorado to End 'Bias Response Team,' But What Next?*, NEWSDESK, Sept. 9, 2016, https://www.thefire.org/university-of-northern-colorado-to-end-bias-response-team-but-what-next/.

[74] Conor Friedersdorf (@conor64), TWITTER (May 14, 2016, 12:29 PM), https://twitter.com/conor64/status/731521764912730112.

[75] UNIVERSITY OF OREGON BIAS RESPONSE TEAM, ANNUAL REPORT 2014-2015 10 (2015), archived at http://web.archive.org/web/20151015075754/http://uodos.uoregon.edu/Portals/0/BRT/Annual%20Report%202014-2015.pdf.

[76] Erin Dunne, *Snow Penis Reported as Bias-Incident*, MICH. REVIEW, Feb. 25, 2016, http://www.michiganreview.com/snow-penis-reported-as-bias-incident/.

by a dean.[77] The college's response led to students occupying the president's office, inquiring "about the differential treatment of alleged bias incidents on campus, particularly why some bias incidents warrant all-campus communications and administrative actions while others do not."[78]

- **Colby College**: Logs of bias incident reports—which are now hidden from public view[79]—show one student reported for claiming that a student group was racist against white people, while another was reported for using the phrase "on the other hand," which was perceived as ableist.[80]

- **University of New Mexico** (UNM): A student member of the College Republicans was reported and investigated by the office of the dean of students for criticizing a student and her organization by name[81] during a public debate over whether UNM should cut ties with Chick-fil-A.[82]

- **Cornell University**: A professor was reported for speaking at a rally as a private citizen and referring to police as "terrorists." The complaint was referred to human resources administrators, who discussed freedom of speech policies with the complainant.[83]

In a separate instance, an anonymous person reported the student government for participating in efforts to encourage Cornell to become a sanctuary campus.[84]

- **Ohio State University**: A group of students was reported for sharing memes comparing Hillary Clinton to Adolf Hitler in a "political discussion," resulting in a housing employee holding a "mandatory floor meeting about triggering events."[85]

Another student called upon administrators to compel the College Democrats to allow anyone to attend their meetings after the Democrats had asked the student to leave, believing him to be a member of the College Republicans sent to observe the meeting.[86]

Yet another student reported a chalk message stating "Build the Wall," which the student wanted "erased"; the student also requested "a clear message from the

[77] Lea Speyer, *Anti-Israel Students at Connecticut College 'Occupy' Office of School President in Protest Over Investigation of Mock Eviction Notices*, ALGEMEINER, May 16, 2016, https://www.algemeiner.com/2016/05/16/anti-israel-students-at-connecticut-college-occupy-office-of-school-president-in-protest-over-investigation-of-mock-eviction-notices/.
[78] *Why We're Here*, OCCUPY FANNING, May 13, 2016, http://occupyfanning2.blogspot.com/2016/05/why-were-here.html.
[79] Colby College's bias incident policy earned that institution the dubious honor of being FIRE's July 2016 Speech Code of the Month. Samantha Harris, *Speech Code of the Month: Colby College*, NEWSDESK, July 20, 2016, https://www.thefire.org/speech-code-of-the-month-colby-college/.
[80] *Bias Incident Log*, COLBY COLLEGE, archived on July 23, 2016 and *available at* http://archive.is/wRwfw.
[81] University of New Mexico Hate/Bias Incident Reporting Form, Feb. 27, 2013, produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3234843-University-of-New-Mexico-Chick-Fil-a-Report.html.
[82] Astrid Galvin, *UNM Board: Chick-fil-A to Stay*, ALBUQUERQUE JOURNAL, Feb. 27, 2013,

https://www.abqjournal.com/173096/unm-board-chick-fil-a-to-stay.html; *Chick-Fil-A to Stay on UNM Campus*, KOAT-TV, Feb. 27, 2013, https://www.youtube.com/watch?v=LYUCfnstTro.
[83] *Bias Incident Summaries: July 1 – August 31, 2016*, CORNELL UNIV., http://diversity.cornell.edu/sites/default/files/documents/Aug2016_Incident%20Summaries.pdf.
[84] *Bias Incident Summaries: July 1 – November 30, 2016*, CORNELL UNIV., http://diversity.cornell.edu/sites/default/files/documents/Nov2016_Incident%20Summaries.pdf.
[85] Bias incident report dated Oct. 23, 2015, OHIO STATE UNIV., produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3255200-Ohio-State-University-Bias-Assessment-and.html. How OSU responded to these reports is unclear, as OSU declined to produce "voluminous" records relating to its responses.
[86] Bias incident report dated Feb. 1, 2016, OHIO STATE UNIV., produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3418811-Ohio-State-University-College-Democrats-Report.html.

university that this type of hate speech will not be allowed."[87]

(OSU's police chief, in an article posted on OSU's Bias Assessment and Response Team's website, recommends that students who are "verbally insulted or confronted by someone with whom you strongly disagree" should "not engage in debate.")[88]

- **University of Texas at Austin**:[89] The Campus Climate Response Team (CCRT) fielded dozens of reports about a conservative student group's protest of affirmative action in the form of an "affirmative action bake sale."[90] 94% of the reports sought disciplinary action. Administrators met with the student group following the reports and acknowledged in an open letter that it was the student group's "right to" engage in the protest.[91] The CCRT's annual report also disclosed that "[f]aculty and student commentary in the classroom perceived as derogatory and insensitive" was an example of the "types of incidents" reported to the CCRT.[92]

- **University of Wisconsin—Platteville**: Documents acquired by *Heat Street* showed that students were reported for dressing up as the "Three Blind Mice" for Halloween, which the complainant feared *might* offend others who *might* believe the costumes were making fun of disabilities.[93]

- **Case Western Reserve University** (CWRU): A professor was reported for a writing assignment that challenged students to "[w]rite about a gay child being kicked out of their house, and make the audience feel sorry for the person kicking them out."[94]

  Another CWRU professor was reported because, among other things, students were "required to read plays with racist depictions of First Nations people."[95]

  A third CWRU professor was reported for asking students who were neither citizens nor permanent residents to raise their hands, then pointing out that they could be sued anywhere.[96] This appears to have been an exercise in explaining residency and venue during a law school course on civil procedure.[97]

  There is no public indication as to whether CWRU intervened in any of these cases.

---

[87] Bias incident report dated Apr. 18, 2016, OHIO STATE UNIV., produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3418842-Ohio-State-University-Build-the-Wall-Report.html.

[88] Paul S. Denton, *How OSU Police Respond to Incidents of Bias or Intimidation*, OHIO STATE UNIV., http://studentlife.osu.edu/bias/pdfs/how-osu-police-respond-to-incidents-of-bias-or-intimidation.pdf (last visited Jan. 31, 2017); *see also*, *Bias Response Tools*, OHIO STATE UNIV., http://studentlife.osu.edu/bias/bias-response-tools.aspx (last visited Jan. 6, 2017) (linking to Chief Denton's article as one of its "bias response tools").

[89] UT Austin asked FIRE to pay $2,437.20 for records relating to how its CCRT responded, although other Texas institutions provided such records at no cost. We declined.

[90] UNIVERSITY OF TEXAS AT AUSTIN CAMPUS CLIMATE RESPONSE TEAM, CAMPUS CLIMATE TREND REPORT, 2013-2014 20 (2014), *available at* http://utexas.app.box.com/s/88ccrqlayd41b1nzqjos7z3izkrepol3.

[91] *Statement From Dr. Gregory Vincent About the Young Conservatives of Texas's Bake Sale*, UNIV. OF TEXAS AT AUSTIN, Sept. 27, 2013, http://diversity.utexas.edu/news/2013/09/27/statement-from-dr-gregory-vincent-about-the-young-conservatives-of-texass-bake-sale/.

[92] UNIVERSITY OF TEXAS AT AUSTIN CAMPUS CLIMATE RESPONSE TEAM, *supra* note 90 at p. 15.

[93] Jillian Kay Melchior, *'Bias Incident Team': Students' Three Blind Mice Halloween Costume 'Makes Fun of a Disability'*, HEAT STREET, Aug. 3, 2016, https://heatst.com/culture-wars/bias-incident-team-students-three-blind-mice-halloween-costume-makes-fun-of-a-disability/.

[94] *Bias Reporting System (BRS)*, CASE WESTERN RESERVE UNIV., archived on Sept. 12, 2016 at http://archive.is/kpceX.

[95] *Id.*

[96] *Id.*

[97] 28 U.S.C. § 1391 (2011).

To be sure, Bias Response Teams also field a number of reports of conduct *not* protected by the First Amendment. For example, many reports involve vandalism, assault, or true threats motivated by bias. These, however, are acts that may be reported to existing resources, such as student conduct administrators or police departments. Schools could also invite students to report unlawful conduct using online reporting systems, or even to a team set aside to address unlawful conduct motivated by bias. But schools are implementing broad definitions of "bias" to expressly invite reports of protected *speech*, including a broad range of political speech, and they often do so without any training on First Amendment rights.

### WHO SCRUTINIZES THE SPEECH? POLICE, CONDUCT ADMINISTRATORS, AND MEDIA RELATIONS STAFF

Having cast a wide net, who reviews the reported speech? Bias Response Teams are often populated by police and student conduct administrators. They also include, to a lesser extent, media relations administrators, faculty members, and students.

Some institutions, including the **University of West Florida**[98] and **Montana State University**,[99] embed police or security officials within their Bias Response Teams. Others, such as the **University of Montana**[100] and **DePaul University**,[101] direct reports straight to police or security officers.

Some 42% of Bias Response Teams include police or security officials. By including police and student conduct administrators on their Bias Response Teams, schools send a message to students that undercuts claims of respect for freedom of expression: If you say something that offends someone, you may (or in some cases *will*) be investigated by police. Their inclusion can also lead universities to use police to investigate offensive speech or anonymous speakers.[102] For example, at **Evergreen State College**, administrators responded to anonymous flyers critical of, among other things, Black Lives Matter, by emailing students:[103]

> The College wants to identify the individual(s) engaged in posting and distributing these flyers. If you have any information about who may be doing this, it is critical that you contact Police Services or provide information anonymously using the online incident report form.

Including student conduct administrators, as do approximately 63% of Bias Response Teams, also sends a chilling message. Students summoned to meet with a member of the office of the dean of students are likely to view the meeting not as educational, but as punitive. Even when the intention is not punitive, administrators are likely to approach "offensive" speech or sharp disagreement from a conflict-resolution perspective. This approach may conflict with a student speaker's purpose; many use speech to heighten or clarify conflict and disagreement in order to further their message.

---

[98] *About Us,* UNIV. OF WEST FLA., http://uwf.edu/offices/bias-response/about-us (last visited Jan. 9, 2017) (including Chief of University Police on its Bias Response Team).
[99] *Bias Incident Response Team,* MONT. STATE UNIV., http://www.montana.edu/biasreporting/BIRT.html (last visited Jan. 9, 2017) (Bias Incident Response Team includes a "representative from the Montana State University Police Department").
[100] *Hate Crime Form,* UNIV. OF MONT., http://www.umt.edu/police/Police/Hate%20Crime%20Form.php (last visited Jan. 9, 2017) (Police department soliciting reports of bias incidents, including "Leafleting" and the use of slurs).

[101] *Reporting Process,* DEPAUL UNIV., http://dignity.depaul.edu/report.html (last visited Jan. 9, 2017) (directing reports to the DePaul Public Safety Office).
[102] The First Amendment protects anonymous speech and association. *See, e.g.,* Talley v. California, 362 U.S. 334, 357 (1960) (anonymous pamphleteering), NAACP v. Alabama, 357 U.S. 449, 462 (1958) (anonymous association).
[103] *Bias Related Incident – April 19 Flyers,* EVERGREEN STATE COLLEGE, Apr. 19, 2016, produced to the Foundation for Individual Rights in Education in response to a public records request and *available at* https://www.documentcloud.org/documents/3418430-Evergreen-State-College-April-19-2016-Flyers.html.

## DISCUSSION

Including media relations administrators is also concerning, because it suggests that a school's decision to respond to offensive speech may be driven by the potential impact to the school's reputation. Where this is the case, it undermines the notion implicitly underlying Bias Response Teams that universities are primarily concerned with providing a safe environment.

And there is reason to be concerned that universities' responses may be driven by a desire to manage the institutions' reputation at the expense of protecting freedom of expression. At the **University of New Mexico**, administrators wanted to rush to release a statement from the Office of the President "rather than waiting for the media to get ahold of" flyers critical of the university's logo, which included conquistadors but not Native Americans.[104] These flyers were perceived by the Bias Response Team as a threat to Native Americans because the mock logo incorporated skulls and bones underneath the feet of conquistadors—a rather obvious criticism of the treatment of Native Americans in the New Mexico area. Ultimately, it was faculty members on the Diversity Council who placed the flyers in context. Without their intervention, it is possible that administrators who erroneously viewed the flyers as threatening could have continued their investigation and initiated charges.



In other words, the lack of faculty or student membership may deprive Bias Response Teams of valuable insight into instances of purportedly offensive speech, as well as principles of academic freedom. That may explain why the **University of Northern Colorado**'s Bias Response Team warned at least one professor that he could face lengthy, intrusive investigations for permitting students to debate controversial issues in class.[105]

### BIAS RESPONSE TEAMS MAY EXPOSE UNIVERSITIES TO FIRST AMENDMENT LAWSUITS

To date, FIRE is aware of no legal challenges to a bias reporting system. It's unclear whether a legal challenge could be mounted by a student or faculty member based on the mere existence of such a system. However, each time a Bias Response Team embarks upon an investigation or intervention with the reported person, it risks exposing the institution and its administrators to claims under the First Amendment.

That a university provides a mechanism for community members to share information concerning offensive speech may not, alone, amount to a justiciable First Amendment controversy. In *Laird v. Tatum* (1972), the Supreme Court of the United States held that the "mere existence" of broad, intelligence-gathering programs does not, "without more," impermissibly chill speech.[106]

The First Amendment, however, does not simply restrict the government from expressly *penalizing* or *prohibiting* speech. It also prohibits "adverse government action against an individual because of First Amendment freedoms."[107] When universities depart from the *Laird* baseline by mounting investigations or interventions with offending speakers, they expose themselves to the possibility of a First

---

[104] *See* emails and photos produced to the Foundation for Individual Rights in Education by the University of New Mexico in response to a public records request, *available at* https://www.documentcloud.org/documents/3234845-University-of-New-Mexico-What-Indians-Report.html.

[105] Jillian Kay Melchior, *Colorado 'Bias Response Team' Threatened Prof to Change His Lessons*, HEAT STREET, July 5, 2016, https://heatst.com/culture-wars/bias-response-team-threatened-prof-with-title-ix-vii-probe/.
[106] Laird v. Tatum, 408 U.S. 1, 10 (1972).
[107] Izen v. Catalina, 398 F.3d 363, 367 (5th Cir. 2005).

Amendment retaliation claim. This exposure isn't limited to legal action against the university; because many First Amendment principles are so well established under the law, members of a Bias Response Team risk being held *personally* liable for their actions in some circumstances.

To mount a First Amendment retaliation claim, for example, an aggrieved party must demonstrate three things: "first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech."[108] Whether government conduct has an adverse effect is determined by an objective standard: if the retaliatory conduct "would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights."[109] The retaliatory conduct need not be successful, as the cause of action is intended to address "conduct that tends to *chill* [speech], not just conduct that *freezes* it completely."[110]

To the extent that Bias Response Teams are used to better understand students' perspectives, to prepare general programming to constituents of

the institution, or to provide resources to a complaining student, these goals are unobjectionable on First Amendment grounds. But the reality is that Bias Response Teams are generally intended to deter offensive speech and conduct. Their goal is to chill speech that the institution or its constituents find offensive or unkind.[111]

When Bias Response Teams intervene directly with the reported student, the risk of exposing the university to First Amendment claims increases. Bias Response Teams often submit speech to the review of police and campus conduct administrators, who launch an "investigation"[112] or bring "charges"[113] against the "respondent,"[114] who may be summoned for a "hearing"[115] and found "guilty"[116] or be provided with an "educational"[117] reprimand—or, in the case of **Longwood University**, "education sanctions."[118] This is the language of punitive systems, not educators, and it is likely to be perceived as such by students and by courts. Simply calling a quasi-punitive response system "educational" doesn't make it so. After all, many institutions already describe at least some of their *punitive* measures as "educational" in nature.[119]

[108] Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005).
[109] *Id.*
[110] Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005) (emphasis in original).
[111] Rio Fernandes, *In a Charged Climate, Colleges Adopt Bias-Response Teams*, CHRON. OF HIGHER EDUC., Feb. 1, 2016, http://www.chronicle.com/article/In-a-Charged-Climate-Colleges/235120 (describing how Ohio State University formed a bias response team because "they needed a proactive means to prevent occurrences of offensive speech").
[112] *See, e.g.*, *Discrimination Cases, Fall 2015*, UNIV. OF CAL. DAVIS, http://reporthateandbias.ucdavis.edu/fall_2015.html (last visited Jan. 30, 2017) ("Offensive classroom comments, course content" resulted in an "Investigation").
[113] *See, e.g.*, *Student Reporting of Bias-Related Incidents*, STATE UNIV. OF N.Y. GENESEO, https://www.geneseo.edu/diversity/procedures (last visited Jan. 30, 2017) (in a "Level I" incident, "the accused student is made aware of the charges and has a hearing with the Student Conduct Administrator").
[114] *See, e.g.*, *Tolerance Program Annual Report: 2014-2015*, UNIV. OF ILL. AT URBANA-CHAMPAIGN, at 4, *available at* http://www.conflictresolution.illinois.edu/tolerance/downloads/toleranceReport_1415.pdf ("If a meeting with the respondent(s) occurs, the assigned [Bias Incident Investigation Team] member will provide her/him with general information about bias-

motivated incidents and the Tolerance Program and will give her/him the opportunity to respond to the report.").
[115] *See, e.g.*, *Student Reporting of Bias-Related Incidents*, *supra* note 113 (describing a "hearing with the Student Conduct Administrator").
[116] *See, e.g.*, *Difference Between a Hate Crime and a Bias Incident*, DAVIDSON COLLEGE, http://www.davidson.edu/student-life/multicultural-life/hate-crime-and-bias-incidents (last visited Jan. 30, 2017) ("Professors who make pejorative comments or stereotypes about a protected class of people ... are also guilty of commiting [*sic*] a bias incident.").
[117] *See, e.g.*, *Bias and Discrimination Response Protocol*, COLUMBIA COLLEGE, https://www.cc-seas.columbia.edu/studentlife/bias/protocol (last visited Jan. 30, 2017) ("Columbia College and Columbia Engineering students involved in perpetrating a hate crime/ bias incident will be subject to an educational and/or disciplinary process determined by Judicial Affairs.").
[118] *Bias & Hate Incidents*, LONGWOOD UNIV., http://www.longwood.edu/diversity/experiencing-bias/bias--hate-incidents (last visited Jan. 9, 2017).
[119] *See, e.g.*, Missouri State University, which promises not to "discipline" through its Bias Response Team, but instead "provide educational opportunities for those engaging in speech contrary to ... values [of diversity and inclusion.]" Its Code of Conduct, however, is *also* "intended to be educational in nature[.]" If

## DISCUSSION

Even the public pronouncement that an investigation is underway—particularly when conducted by law enforcement—can itself have a chilling effect.[120] While universities need not remain silent about offensive speech, going "beyond simple vocal condemnation" and implying that particular instances of protected speech may be punished can amount to a violation of the First Amendment.[121]

The Supreme Court's perspective in *Bantam Books, Inc. v. Sullivan* (1963) is instructive. There, the state of Rhode Island established a commission whose goal was to, among other things, "educate the public" about books and printed materials it viewed as obscene, acting as a gatekeeper to "investigate and recommend the prosecution" of persons found to be distributing obscene materials.[122] The commission promulgated lists of "objectionable" publications to police departments and, when booksellers were reportedly selling objectionable material, the commission sent them notices suggesting that the commission had the power to recommend prosecution if materials were found to be obscene.[123] The Supreme Court held that the commission's claim that it simply "exhort[ed]" publishers to avoid distributing obscenity, and could not itself punish booksellers, was "untenable":[124]

> It is true that [the] books have not been seized or banned by the State, and that no one has been prosecuted for their possession or sale. But though the Commission is limited to informal sanctions—the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation—the record amply demonstrates that the Commission deliberately set about to achieve the suppression of publications deemed "objectionable" and succeeded in its aim. We are not the first court to look through forms to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications ... .

Bias Response Teams are arguably quite comparable to the Rhode Island commission discussed in *Bantam Books*. While they might protest that they are intended not to punish speech but to discourage speech contrary to the values of the institution, even if that speech is protected, Bias Response Teams are nevertheless intended to chill speech. By using the language, tools, and administrators associated with disciplinary systems, Bias Response Teams risk being perceived as intimidating, not educating. While some systems strike an appropriate balance by, among other things, limiting their definitions of reportable conduct to speech unprotected by the First Amendment,[125] the vast majority do not.

---

discipline can be described as educational, then an "educational" response which is mandatory or lacks substance may be perceived as disciplinary. *Cf. Bias Response Team,* MO. STATE UNIV., https://www.missouristate.edu/dos/268885.htm (last visited Jan. 11, 2017); *Code of Student Rights and Responsibilities,* MO. STATE UNIV., https://www.missouristate.edu/policy/G5_01_StudentRightsand Responsibilities.htm (last visited Jan. 11, 2017).

[120] *See generally* Adam Steinbaugh, *The Chilling Effect of Investigations,* NEWSDESK, May 11, 2016, https://www.thefire.org/the-chilling-effect-of-investigations/; *see also* Sweezy v. New Hampshire, 354 U.S. 234, 245 (1957) ("There is no doubt that legislative investigations, whether on a federal or state level, are capable of encroaching upon the constitutional liberties of individuals. It is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press,

freedom of political association, and freedom of communication of ideas, particularly in the academic community."); *see also* Coszalter v. City of Salem, 320 F.3d 968, 976 (9th Cir. 2003) (an "unwarranted disciplinary investigation" alone amounted to an adverse employment action in a First Amendment retaliation case).

[121] Levin v. Harleston, 966 F.2d 85, 89-90 (2d Cir. 1992); *but see* Stolle v. Kent State Univ., 610 Fed. App'x 476, 482-83 (6th Cir. 2015) (faculty member verbally reprimanded for sending letter to legislator on university letterhead in violation of policy amounted to "de minimus" act insufficient to deter departure of ordinary firmness from First Amendment activities).

[122] Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 59-60 (1963).

[123] *Id.* at 62-63.

[124] *Id.* at 66-67 (footnotes omitted).

[125] *See, e.g.,* Azhar Majeed, *UW-Madison Demonstrates What a 'Green Light' Definition of a Bias Incident Looks Like,* NEWSDESK, Oct. 6, 2016, https://www.thefire.org/uw-madison-demonstrates-

The prospect of a retaliation claim should alarm colleges and universities. The central question of such a claim—whether the conduct would deter a person of ordinary firmness from continuing to speak—is fact-based, meaning it's unlikely to be resolved before summary judgment, increasing universities' legal exposure.[126] Additionally, many of the scattered decisions on what meets the "ordinary firmness" test are based in the context of government employment, where the government's interest is given substantially more weight, than in the context of retaliation against a non-employee.[127]

This is not to say that universities must refrain from criticizing or condemning offensive conduct or speech. Criticism is not censorship, whether it is broadcast to the student body or public at large or instead sent directly to a student. University officials retain their own First Amendment right to contribute to discourse on campus and can do so without creating a substantial risk of a First Amendment retaliation claim.[128] The tools universities deploy in response to speech, how they are deployed, and how universities describe these systems to students matter.

Finally, because universities often keep opaque records documenting their interventions with reported speakers (discussed below), universities have a diminished ability to argue that such interventions provided meaningful education, as opposed to a chilling instruction to stop speaking.

## DESPITE ACKNOWLEDGING FIRST AMENDMENT TENSIONS, UNIVERSITIES PROVIDE LITTLE IF ANY TRAINING

The First Amendment issues faced by Bias Response Teams are complex, nuanced, and fraught with potential pitfalls that may lead public institutions into costly lawsuits. Leaving aside legal risks, Bias Response Teams also risk conflicting with essential principles of academic freedom, freedom of expression, and freedom of inquiry. Yet despite these risks, few Bias Response Teams receive meaningful training, if any, on the contours of these issues.

Of institutions surveyed, **84** (50.6%) acknowledge a tension with freedom of speech, freedom of inquiry, or academic freedom on their websites or in their policies. Of these, 50 are public institutions and 34 are private.

While Bias Response Team training requirements and materials were not part of FIRE's survey, FIRE has utilized state public records requests to explore the types of training required of members of Bias Response Teams. Although FIRE has issued or reviewed dozens of public records requests to universities seeking training materials distributed to Bias Response Teams, we've only seen materials from one school, **Louisiana State University**, that provided substantive training on First Amendment issues.[129]

---

what-a-green-light-definition-of-a-bias-incident-looks-like (definition of bias incidents consistent with standard for peer-on-peer hostile environment harassment standard in an educational setting, as set forth in Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 651 (1999)).

[126] Thompson v. Ohio State Univ., 990 F. Supp. 2d 801, 809 (S.D. Ohio) (retaliation claim against professor proper where the professor allegedly filed charges against a student in retaliation for criticism of a colleague, as issue of whether an action is sufficient to deter a person of ordinary firmness) (citing Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 584 (6th Cir. 2012)).

[127] *See generally* Kinney v. Weaver, 367 F.3d 337, 358-60 (5th Cir. 2004) (noting that First Amendment analyses proceed on a "spectrum").

[128] *See, e.g.*, Samad v. Jenkens, 845 F.2d 660, 663 (6th Cir. 1988) (university's statement to outgoing dean that it would release

information to defend itself against any criticism by the dean was a reservation of "their own first amendment right to speak out," and the subjective chill resulting was insufficient to establish a justiciable controversy); *see also,* Nunez v. City of Los Angeles, 147 F.3d 867, 875 (9th Cir. 1998) (concluding in the employment context that merely being "bad-mouthed and verbally threatened" by supervisors was insufficient, and that it "would be the height of irony, indeed, if mere speech, in response to speech, could constitute a First Amendment violation"); *but see* De Leon v. Little, 1999 U.S. Dist. LEXIS 23091, at *13-14 (D. Conn. Sept. 29, 1999) (criticizing Nunez as inconsistent with Supreme Court precedent in that threats of dismissal can support First Amendment retaliation claims).

[129] FIRE is currently sponsoring a First Amendment lawsuit against Louisiana State University over its treatment of a former

## DISCUSSION

Other institutions, despite acknowledging that identifying First Amendment issues can be nuanced, do not appear to provide training. For example, the **University of California, San Diego (UCSD)** notes on its website that "[i]ssues pertaining to freedom of speech and expression can be very complicated and confusing."[130] The university's definition of "bias incidents" likewise observes that the "protection of freedom of expression, including controversial speech and sometimes even offensive or hurtful words, is vital to a community of teachers and learners" and that some "acts of bias may either not be severe enough to violate policy or be protected expressions of speech."[131] Yet despite freedom of expression being both "complicated" and "vital," the University of California's Office of the President, responding on UCSD's behalf to a public records request issued by FIRE, did not produce any training materials relating to the First Amendment at UCSD.

Another school, **Longwood University**, claimed as recently as August 2016 that because universities could not impose "campus judicial codes that include specific prohibitions related to bias and hate" under the First Amendment, it instead "train[s] board members to identify bias-related behavior and include appropriate education sanctions when a student is found responsible."[132] An August 2016 "Bias Response Team Training" memorandum, in discussing

"consequences" for bias incidents, asserted that there are "no laws for bias incidents" and that the team doesn't "get the firm backing through law or the institution in general about these topics."[133] A contemporaneous training slideshow indicated that Bias Response Team members would be trained on "legal issues" without elaboration.[134] None of the materials provided to FIRE indicate that any training on First Amendment issues was provided.

## A RESISTANCE TO TRANSPARENCY

With few exceptions, Bias Response Teams suffer from a lack of transparency, and universities are too often willing to stonewall public records requests concerning their teams. While protecting the privacy of both reporting and reported parties is important, this hesitance to engage in meaningful transparency is worrisome. The ways in which universities respond to offensive speech and discrimination are of particular public concern,[135] and doing so without being transparent, or being selectively transparent,[136] risks being seen as an effort to hide incidents from the community.

Approximately 28% of institutions with bias reporting systems do not even disclose who reviews the reports. If universities are unwilling to publicly identify who is responsible for

---

faculty member, Teresa Buchanan, but the case does not involve the school's Bias Response Team.

[130] *Freedom of Speech and Expression at UC San Diego*, UNIV. CAL., SAN DIEGO, https://students.ucsd.edu/student-life/diversity/expression (last visited Dec. 29, 2016).

[131] *Frequently Asked Questions*, UNIV. CAL., SAN DIEGO OFFICE FOR THE PREVENTION OF HARASSMENT & DISCRIMINATION, http://ophd.ucsd.edu/faq/index.html#What-are-bias-incidents? (last visited Dec. 29, 2016).

[132] *Bias & Hate Incidents*, LONGWOOD UNIV., archived on Aug. 26, 2016 and *available at* http://web.archive.org/web/20160826220917/http://www.longwood.edu/diversity/45365.htm.

[133] *Bias Response Team Training (Handout)*, LONGWOOD UNIV., Aug. 11, 2016, produced to the Foundation for Individual Rights in Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3288823-Longwood-University-Bias-Response-Team-Training.html.

[134] *Bias Response Team Training (Slideshow)*, LONGWOOD UNIV., Aug. 11, 2016, produced to the Foundation for Individual Rights in

Education in response to a public records request, *available at* https://www.documentcloud.org/documents/3288824-Longwood-University-Bias-Response-Team-Training.html.

[135] *See, e.g.*, Black Student Union, *BSU Calls for Action*, THE TOWERLIGHT, Apr. 18, 2016, http://thetowerlight.com/bsu-calls-for-action (student group, "disheartened by the lack of communication and transparency" concerning a student's conduct, calls upon administrators to take acts "to ensure that hate bias on this campus is heavily policed, reported, and made transparent").

[136] *See, e.g.*, Lea Speyer, *Anti-Israel Students at Connecticut College 'Occupy' Office of School President in Protest Over Investigation of Mock Eviction Notices*, THE ALGEMEINER, May 16, 2016, http://www.algemeiner.com/2016/05/16/anti-israel-students-at-connecticut-college-occupy-office-of-school-president-in-protest-over-investigation-of-mock-eviction-notices (students protest, in part, over mass email concerning political protest labeled as a bias incident, when other bias incidents weren't similarly announced).

reviewing and responding to reports, then students, faculty, and the public will be hindered in holding public servants accountable. Similarly, a refusal to identify Bias Response Team members does not instill confidence that schools take complaints seriously by devoting capable people to overseeing them.

And while many Bias Response Teams purport to exist for the purpose of keeping statistics, the statistics themselves are rarely published. The **University of California**, for example, developed its multi-campus reporting system in 2010 with the "[p]rimary purpose" of "statistical reporting,"[137] yet it appears to have *never* published statistics. The University of California Office of the President, in response to a public records request for all statistics,[138] only provided statistics last compiled in 2012 and apparently never published.[139] Some institutions publish statistics on periodic bases, with varying degrees of transparency. And while the Clery Act requires federally funded institutions to publish statistics concerning hate crimes,[140] most schools define "bias incident" more broadly than criminal acts. In any event, most institutions publish neither statistics nor reports.

FIRE has utilized public records requests under state law—similar to requests pursuant to the federal Freedom of Information Act—to ask dozens of schools to produce records relating to complaints; how they responded to those complaints; and the composition, policies, and training of their Bias Response Teams. While most complied with both the letter and spirit of the law,[141] a number have resisted. Ominously, even where schools produce records, those records often fail to substantially document the actions the university took in response to the report, instead stating that the respondent was provided with "education." This does not inspire confidence that the response was meaningful education, as opposed to a reprimand.

Justice Louis Brandeis famously opined that sunlight was the best of disinfectants.[142] But a popular tactic of sunshine-shy administrators is the employment of hefty fees to locate and redact public records, notwithstanding open records laws encouraging universities to reduce or waive fees when releasing documents that would serve the public interest. The **University of Northern Colorado** attempted to charge FIRE hundreds of dollars for records eventually obtained by a media outlet, *Heat Street,* which revealed that UNC's Bias Response Team had discouraged professors from discussing subjects of debate raging in legislatures and the media.[143] That blast of sunlight caused UNC to shutter its Bias Response Team.[144]

Similarly, the **University of Oregon** concluded that releasing its records would not be in the public interest,[145] demanding that FIRE pay

---

[137] Meg Carter & Jerlena Griffin-Desta, *Campus Climate Project Requirements,* UNIV. OF CAL., June 16, 2010, produced to the Foundation for Individual Rights in Education in response to a public records request and *available at* https://www.documentcloud.org/documents/3288857-University-of-California-Campus-Climate-Project.html.
[138] California Public Records Act Request from Adam Steinbaugh to the University of California Office of the President, Apr. 8, 2016, *available at* https://www.documentcloud.org/documents/3288861-2016-04-08-Public-Records-Request-to-the.html.
[139] *Update on Universitywide Campus Climate Incidents Reporting System,* UNIV. OF CAL. ETHICS, COMPLIANCE AND AUDIT SERVICES, Feb. 7, 2012, produced to the Foundation for Individual Rights in Education in response to a public records request and *available at* https://www.documentcloud.org/documents/3288860-University-of-California-Feb-7-2012-Update-on.html.
[140] Institutional Security Policies and Crime Statistics, 34 C.F.R. § 668.46(c)(1)(iii).

[141] Evergreen State College merits an honorable mention, having produced over seven *thousand* pages of thorough records on a timely basis, in a response to a records request by FIRE. Contrast this with the University of California, which produced scant records after months of delay and obfuscation.
[142] Louis D. Brandeis, *Other People's Money,* HARPER'S WEEKLY, Dec. 20, 1913, at 92.
[143] Jillian Kay Melchior, *Colorado 'Bias Response Team' Threatened Prof to Change His Lessons,* HEAT STREET, July 5, 2016, https://heatst.com/culture-wars/bias-response-team-threatened-prof-with-title-ix-vii-probe/.
[144] Adam Steinbaugh, *University of Northern Colorado to End 'Bias Response Team,' But What Next?,* NEWSDESK, Sept. 9, 2016, https://www.thefire.org/university-of-northern-colorado-to-end-bias-response-team-but-what-next/.
[145] *See* In Defense of Animals v. Oregon Health Sciences University, 112 P.3d 336, 354 (Or. Ct. App. 2004) (agencies may reduce or waive fees if it determines that the records relate to a matter which "affects the community or society as a whole, in contrast to a concern or interest of a private individual or entity").

## DISCUSSION

$1,483.30 to review its team's records.[146] The university's steadfast refusal to acknowledge the public interest was plainly belied by criticism by national media outlets,[147] which spurred a faculty inquiry into the team's activities. When the records were eventually produced, Oregon was unable to locate records of some incidents, including one pilloried in the media.[148]

Other institutions have been quick to delete or hide once-public websites documenting bias incidents following public criticism. **Colby College** placed its log of bias incidents behind a password-protected field after it was publicly criticized.[149] So, too, did **Skidmore College**.[150] More alarmingly, several institutions responded to FIRE's public records requests by initially claiming that there were no records to produce. When FIRE issued additional requests seeking records of what efforts the school made to search for records, the originally-requested records were suddenly located and produced. This suggests a certain lack of good faith from these institutions in following their legal obligations.

Other institutions found more creative ways to stonewall. The **University of California**'s Office of the President (UCOP), for example, intervened to respond on behalf of its subsidiary campuses after FIRE issued records requests to each campus about its processes. Months later, UCOP professed that it would be too difficult for the central office to locate records of how its campuses responded to reported incidents. UCOP also refused to produce records of any reported incident whatsoever, claiming that it would be too difficult to redact students'

names—a task somehow accomplished without complaint by dozens of other schools, many of which boast far fewer resources than the University of California system.

## NORMATIVE CRITICISMS OF BIAS RESPONSE TEAMS

Given that reported incidents of perceived "bias" run the ideological gamut, subjecting campus speech to review by conflict-averse administrators runs the risk of chilling speech from any and every perspective. This illiberal approach invites administrative intervention whenever there are impolite words or disagreement of any sort. College campuses must remain open for vehement disagreement and impolite rhetoric lest they invite administrators to limit speech and debate.

This view is not FIRE's alone. Writing in the *New Republic*, Carleton College professors Jeffrey Aaron Snyder and Amna Khalid aptly observed the limitations of Bias Response Teams and their potential chilling effects on academic discourse and campus speech:

> We do not want our campuses overrun with eager "see something, say something" "student informants." Far from empowering students with the requisite skills for having difficult conversations, bias response initiatives, as a Boston College student asserted, encourage "students to ask the administration to solve problems

[146] Adam Steinbaugh, *University of Oregon on 'Bias Response Team': Nothing to See Here*, NEWSDESK, May 27, 2016, https://www.thefire.org/university-of-oregon-on-bias-response-team-nothing-to-see-here/.

[147] *See, e.g.*, Catherine Rampell, *College Students Run Crying to Daddy Administrator*, WASH. POST, May 19, 2016, https://www.washingtonpost.com/opinions/college-students-run-crying-to-daddy-administrator/2016/05/19/61b53f54-1deb-11e6-9c81-4be1c14fb8c8_story.html?utm_term=.f2f5652cd55c; *see also, e.g.*, Robby Soave, *The University of Oregon's Thought Police Investigate Students for Saying Anything*, REASON, May 10, 2016, http://reason.com/blog/2016/05/10/the-university-of-oregons-thought-police.

[148] Conor Friedersdorf (@conor64), TWITTER (May 14, 2016, 12:29 PM), https://twitter.com/conor64/status/731521764912730112.

[149] Samantha Harris, *Speech Code of the Month: Colby College*, NEWSDESK, July 20, 2016, https://www.thefire.org/speech-code-of-the-month-colby-college/; Robby Soave, *Saying 'On the Other Hand' Got a Student Reported to the Campus Bias Police*, REASON, June 22, 2016, http://reason.com/blog/2016/06/22/saying-on-the-other-hand-got-a-student-r.

[150] Blake Neff, *Skidmore College: 'Make America Great Again' Is A 'Racialized Attack'*, THE DAILY CALLER, July 1, 2016, http://dailycaller.com/2016/07/01/skidmore-college-maka-america-great-again-is-a-racialized-attack/.

instead of solving them amongst themselves."

[...]

Let us be clear: Bias and discrimination are real and pressing concerns on campuses across the country. There must be channels for students, especially those from historically underrepresented populations, to communicate their concerns to administrators and their peers. Institutions need to keep on top of "campus climate" concerns through surveys and community-wide discussions. But to institute a formal body that assesses the merits of bias incident complaints is profoundly misguided.

[...]

BRTs will result in a troubling silence: Students, staff, and faculty will be afraid to speak their minds, and individuals or groups will be able to leverage bias reporting policies to shut down unpopular or minority viewpoints.[151]

At **John Carroll University**, a private, Catholic institution, Bias Response Team administrators acknowledged that critiques concerning freedom of speech "must be taken seriously."[152] Troubled both by the potential for "malicious-anonymous" abuse of the ability to anonymously report others and by the possibility that the system might have a chilling effect on speech, the university's annual report observed:[153]

If a person is able to report a peer, professor, supervisor, or other community member for "speech code violations," and particularly if those reports result in punitive action toward the offender, the system could shut down, rather than open up, critically important dialogue. On a university campus with an implicit commitment to the free exchange of ideas, such a result must be considered unacceptable.

Other institutions have recognized these risks. In August 2016, the **University of Iowa** scrapped a planned Bias Response Team, observing a "high failure rate in the [teams] at other institutions" as they became "almost punitive in nature," rendering them "scolding panels." Although the University of Iowa's planned team did not involve a punitive component, the type of response undertaken by other BRTs "accomplishes nothing," said one administrator.[154]

As academic freedom expert Donald Downs, professor of political science, law, and journalism at the University of Wisconsin—Madison, observed, Bias Response Teams attempt to strike a difficult balance:[155]

In some telling respects, some of these new policies [including Bias Response Teams] do not overtly call for censorship, as the old speech codes did. Rather, they are meant to "educate" the academic community about the negative impact that certain types of speech can have. Such educational schemes can be consistent with the goals of higher education if

---

[151] Jeffrey Aaron Snyder & Amna Khalid, *The Rise of "Bias Response Teams" on Campus*, THE NEW REPUBLIC, Mar. 30, 2016, https://newrepublic.com/article/132195/rise-bias-response-teams-campus.

[152] JOHN CARROLL UNIVERSITY, BIAS REPORTS 2014-2015, *available at* http://webmedia.jcu.edu/diversity/files/2015/12/2014-2015-Bias-Report-web-version.pdf.

[153] *Id.*

[154] Jeff Charis-Carlson, *University of Iowa Changing Course on Bias Response Team*, IOWA CITY PRESS-CITIZEN, Aug. 18, 2016, http://www.press-citizen.com/story/news/education/university-of-iowa/2016/08/18/university-iowa-changing-course-bias-response-team/88962048.

[155] Donald Downs, *The Good, the Less-Good, and the Path Forward: Thoughts on FIRE's Annual Report*, OPEN INQUIRY PROJECT, Jan. 4, 2017, http://openinquiryproject.org/blog/thoughts-on-fires-annual-report/.

## DISCUSSION

done right and in the right spirit. There is nothing intrinsically wrong with educating students and others about the potential impacts of speech, so long as such educational endeavors are not smokescreens for informal or formal ideological bullying. However, given the climates on many campuses today, such educational efforts too often amount to speech codes in disguise. The new policies may not be overt speech codes, but they can accomplish censorship by other means.

### STRIKING A BALANCE

It is understandable that universities wish to monitor the climate for students on their campuses and to have support systems in place for students who, for one reason or another, may be struggling to feel at home on campus. But it does not follow from these precepts that universities must effectively establish a surveillance state on campus where students and faculty must guard their every utterance for fear of being reported to and investigated by the administration.

While not every Bias Response Team impermissibly limits protected speech, the reality is that it is extremely difficult to have a system in place for the reporting of protected speech without creating a risk that speech and expression on campus will be chilled as a result. As lawyer, writer, and former FIRE President David French wrote, universities with Bias Response Teams are playing a "dangerous constitutional game" by not explicitly prohibiting protected speech but creating a "process-is-punishment" mechanism that deters people from speaking out.[156]

When setting parameters for their teams and implementing responses, universities must be cognizant of the risks created by broad definitions, anonymous reporting systems, unclear policies, and lack of training, and must take steps to minimize or eliminate these risks. While some Bias Response Teams have demonstrated familiarity with freedom of speech in their responses to reports of offensive speech, such actions are too often *not* the result of effective training and policies.

If bias reporting systems are to exist on campuses, they should describe reportable situations narrowly, excluding protected speech, or at the very least avoid characterizing the teams and their responses in ways that convey a punitive message. Universities should also recognize that even narrow definitions of bias are likely to result in reports of protected speech, and provide accurate and impartial training to Bias Response Team members so that they are able to identify protected speech.

Universities would do best to focus on how they can help the reporting student, not on the reported speaker. Unless a community member has engaged in conduct *unprotected* by the First Amendment or academic freedom, any institutional response to bias should avoid uninvited intervention with the speaker and instead focus on providing resources to the reporting student. In doing so, they will help encourage all community members to express themselves and participate in the marketplace of ideas that our nation's colleges and universities are uniquely suited to provide.

---

[156] David French, *Campus Ideologues Double Down on Censorship—Beware the 'Bias Response Team,'* NAT'L REVIEW, Feb. 3, 2016, http://www.nationalreview.com/corner/430750/campus-ideologues-bias-response-teams-first-amendment.

APPENDIX A: CATEGORIES OF BIAS

The following is the percentage of schools that promulgate the following categories of bias:

**Race and Culture**
Race: 100%
National Origin or Nationality: 94.5%
Ethnicity or Ethnic Origin: 73%
Color: 60.3%
Ancestry: 25.6%
Immigration Status or Citizenship: 14.1%
Language or Accent: 2%
Culture: 2%
Geographic Origin: 1%
Anti-Semitism: 0.50% (U. Vermont)
Place of Birth: 0.50% (Middlebury)

**Religion or Existential Beliefs**
Religion or Spiritual Beliefs: 100%
Creed: 22%
Spirituality: 0.50% (Middlebury)

**Sex, Gender, and Sexuality**
Sexual Orientation: 99.5%
Gender Identity or Expression: 81%
Gender: 61%
Sex: 41.2%

**Military Service**
Veteran Status: 60%
Military Status: 9%
National Guard Status: 0.50% (SUNY Potsdam)

**Family and Relationships**
Marital Status: 36.2%
Familial or Parental Status: 7%
Victim of Domestic Violence: 1%
Relationship Status: 0.50% (U. Nebraska—Omaha)
Civil Union Status: 0.50% (Rutgers)
Domestic Partnership: 0.50% (Rutgers)
Spousal Relationship to Current Employee: 0.50% (N. Dakota State U.)
Childbirth: 0.50% (Grinnell College)

**Ex-Offender Status:** 4%

**Ability, Disability, Health, or Physical Attributes Unrelated to Race or Gender**
Disability: 99%
Age: 81.4%
Genetic Information: 19%
Pregnancy: 15%
Mental Health: 7%
Physical Appearance: 7%
Medical Condition: 5%
Size: 2.5%
Height: 2%
Weight: 2%
Shape: 0.50% (U. Northern Colorado)
Atypical Heredity: 0.50% (Rutgers)
Cellular Blood Trait: 0.50% (Rutgers)
Positive HIV-Related Blood Test Results: 0.50% (Middlebury)
Intellectual Ability: 0.50% (Clemson)
Emotional Ability: 0.50% (Clemson)
Smoker Status: 0.50% (U. Kentucky)

**Views and Beliefs**
Political Affiliation: 14%
Membership Affiliation: 3.5%
Group Affiliation: 1.5%
Intellectual Perspective: 0.50% (U. Central Arkansas)
Participation in Lawful, Off-Campus Activity: 0.50% (North Dakota State U.)
Role: 0.50% (Macalester College)
Political Expression: 0.50% (Dartmouth)
Religious Expression: 0.50% (Dartmouth)
Social Affiliation: 1% (Syracuse, Longwood U.)
Social Standing: 0.50% (UNC Charlotte)
Belief System: 0.50% (UNC Charlotte)
Political Belief: 1% (U. Kentucky, U. Central Arkansas)

**Income, Housing, and Welfare**
Socioeconomic Status: 23.6%
Public Assistance Status: 1.5%
Homelessness: 1 %

## APPENDIX A: CATEGORIES OF BIAS

**Miscellaneous Categories of Bias**[157]

Anti-Semitism: University of Vermont

Atypical Heredity: Rutgers University

Behavior: Macalester College

Belief System: University of North Carolina, Charlotte

Cellular Blood Trait: Rutgers University

Characteristics: Macalester College

Childbirth: Grinnell College

Cultural: University of Wisconsin, Madison

Emotional Ability: Clemson

Intellectual Ability: Clemson

Intellectual Perspective: University of Central Arkansas

Major of Study: Missouri University of Science and Technology

National Guard Status: SUNY Potsdam

Participation in Lawful, Off-Campus Activity: North Dakota State University

Place of Birth: Middlebury College

Political Belief: University of Central Arkansas, University of Kentucky

Political Expression: Dartmouth

Positive HIV-Related Blood Test Results: Middlebury College

Religious Expression: Dartmouth

Role: Macalester College

Shape: University of Northern Colorado

Smoker Status: University of Kentucky

Social Affiliation: Syracuse University, Longwood University

Social Standing: University of North Carolina, Charlotte

Spirituality: Middlebury College

Spousal Relationship to Current Employee: North Dakota State University

Victim of Domestic Violence: SUNY Potsdam, University of Denver

---

[157] These categories of bias are unique to only one or two institutions. Some are identified in subcategories above and repeated here.

## APPENDIX B: INSTITUTIONS WITH OBSERVED BIAS REPORTING SYSTEMS

**Alabama**
University of Alabama at Birmingham

**Alaska**
None observed

**Arizona**
Arizona State University
Northern Arizona University
University of Arizona

**Arkansas**
University of Central Arkansas

**California**
California Polytechnic State University,
    San Luis Obispo
California State Polytechnic Institute,
    Pomona
California State University, Chico
Humboldt State University
Loyola Marymount University
Occidental College
Pepperdine University
Pomona College
Sonoma State University
University of California, Berkeley
University of California, Los Angeles
University of California, Davis
University of California, Irvine
University of California, Merced
University of California, Riverside
University of California, San Diego
University of California, San Francisco
University of California, Santa Barbara
University of California, Santa Cruz
University of Southern California
University of the Pacific
Whittier College

**Colorado**
Colorado State University
University of Colorado at Boulder
University of Denver
University of Northern Colorado

**Connecticut**
Central Connecticut State University
Connecticut College
Trinity College
University of Connecticut
University of New Haven

**Delaware**
None observed

**Florida**
Florida International University
Florida State University
Pensacola State College
Stetson University
University of Central Florida
University of Florida
University of West Florida

**Georgia**
Armstrong State University
Emory University
Georgia Southern University
Kennesaw State University

**Hawaii**
None observed

**Idaho**
Boise State University

**Illinois**
DePaul University
Illinois State University
Loyola University Chicago
Northeastern Illinois University
Northern Illinois University
Northwestern University
Saint Xavier University
University of Chicago
University of Illinois at Urbana—
    Champaign

**Indiana**
Ball State University
DePauw University
Indiana University—Bloomington
Purdue University

APPENDIX B: INSTITUTIONS WITH OBSERVED BIAS REPORTING SYSTEMS

**Iowa**
Coe College
Grinnell College
University of Northern Iowa

**Kansas**
Kansas State University

**Kentucky**
Georgetown College
Kentucky State University
University of Kentucky
University of Louisville

**Louisiana**
Louisiana State University—Baton Rouge
Tulane University

**Maine**
Bates College
Bowdoin College
Colby College
University of Southern Maine

**Maryland**
St. Mary's College of Maryland
Towson University

**Massachusetts**
Babson College
Boston College
Clark University
Emerson College
Framingham State University
Harvard University
Mount Holyoke College
Northeastern University
Smith College
Tufts University
University of Massachusetts Amherst
Williams College

**Michigan**
Grand Valley State University
Michigan State University
University of Michigan—Ann Arbor

**Minnesota**
Carleton College[j]
Hamline University
Macalester College
Minnesota State University, Mankato
University of Minnesota—Morris
University of Minnesota—Twin Cities

**Mississippi**
University of Mississippi

**Missouri**
Missouri State University
Missouri University of Science and Technology
Saint Louis University
Southeast Missouri State University
University of Central Missouri
University of Missouri—Columbia
Washington University in St. Louis

**Montana**
Montana State University
University of Montana

**Nebraska**
University of Nebraska—Lincoln
University of Nebraska—Omaha
University of Nebraska Medical Center

**Nevada**
None observed

**New Hampshire**
Dartmouth College
Plymouth State University
University of New Hampshire

**New Jersey**
Montclair State University
Rowan University
Rutgers University
The College of New Jersey

**New Mexico**
University of New Mexico

APPENDIX B: INSTITUTIONS WITH OBSERVED BIAS REPORTING SYSTEMS

**New York**
Alfred University
Bard College
Buffalo State College
Colgate University
Columbia University
Cornell University
Empire State College
Fordham University
Hamilton College
Le Moyne College
New York University
Skidmore College
SUNY Binghamton
SUNY Buffalo
SUNY Cobleskill
SUNY Cortland
SUNY Fredonia
SUNY Geneseo
SUNY New Paltz
SUNY Old Westbury
SUNY Oneonta
SUNY Oswego
SUNY Potsdam
Syracuse University
Union College
University of Rochester
Vassar College

**North Carolina**
Appalachian State University
Davidson College
Duke University
Elon University
Fayetteville State University
North Carolina State University—Raleigh
University of North Carolina, Asheville
University of North Carolina, Charlotte
Wake Forest University
Western Carolina State University

**North Dakota**
North Dakota State University
Valley City State University

**Ohio**
Bowling Green State University
Case Western Reserve University
John Carroll University
Kenyon College
Miami University of Ohio
The Ohio State University
University of Cincinnati
Wright State University

**Oklahoma**
University of Oklahoma

**Oregon**
Lewis & Clark College
Oregon Institute of Technology
Oregon State University
Portland State University
Reed College
Southern Oregon University
University of Oregon

**Pennsylvania**
Albright College
Allegheny College
Bryn Mawr College
Bucknell University
Dickinson College
Gettysburg College
Lafayette College
Lehigh University
Muhlenberg College
Pennsylvania State University—
    University Park
Swarthmore College
University of Pittsburgh
Villanova University
West Chester University of Pennsylvania
Widener University

**Rhode Island**
Providence College
Rhode Island College
University of Rhode Island

## APPENDIX B: INSTITUTIONS WITH OBSERVED BIAS REPORTING SYSTEMS

**South Carolina**
   Clemson University
   Furman University
   University of South Carolina
   Winthrop University

**South Dakota**
   None observed

**Tennessee**
   Sewanee, The University of the South
   University of Tennessee, Knoxville

**Texas**
   Baylor University
   Southern Methodist University
   Texas A&M University—College Station
   Texas Tech University
   University of Texas at Austin

**Utah**
   University of Utah

**Vermont**
   Middlebury College
   University of Vermont

**Virginia**
   George Mason University
   Longwood University
   University of Mary Washington
   University of Richmond
   University of Virginia
   Virginia Commonwealth University
   Virginia Polytechnic Institute
    and State University

**Washington**
   Central Washington University
   Evergreen State College
   Washington State University
   Western Washington University
   Whitman College

**Washington, D.C.**
   Georgetown University

**West Virginia**
   None observed

**Wisconsin**
   Marquette University
   St. Norbert College
   University of Wisconsin—Eau Claire
   University of Wisconsin—Green Bay
   University of Wisconsin—La Crosse
   University of Wisconsin—Madison
   University of Wisconsin—Milwaukee
   University of Wisconsin—Oshkosh
   University of Wisconsin—Platteville
   University of Wisconsin—River Falls
   University of Wisconsin—Stevens Point
   University of Wisconsin—Stout
   University of Wisconsin—Whitewater

**Wyoming**
   None observed

---

[i] **Correction:** Carleton College was included due to a misinterpretation of a proposed policy found on its website. FIRE has since been informed that the proposal was rejected and was not implemented, and we regret the error. This report has been updated to reflect minor changes in figures impacted by the removal of Carleton College, but no findings were significantly impacted.



**510 WALNUT ST.**
**SUITE 1250**
**PHILADELPHIA, PA 19106**

