E-FILED
Monday, 22 July, 2019  06:04:44 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

Speech First, Inc.,

        Plaintiff,

    vs.

Killeen, et al.,

        Defendants.

Case No. 3:19-CV-3142-CSB
Judge Colin S. Bruce

## DEFENDANTS' OPPOSITION TO
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Ishan K. Bhabha
Lauren J. Hartz
Jennifer J. Yun
Jenner & Block LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001
Telephone:  (202) 637-6327
Facsimile:  (202) 639-6066
IBhabha@jenner.com
LHartz@jenner.com
JYun@jenner.com

William D. Heinz (IL 1176900)
Richard Steinken (IL 3128253)
Jenner & Block LLP
353 N. Clark St
Chicago, IL 60654
Telephone:  (312) 222-9350
Facsimile:  (312) 840-7338
WHeinz@jenner.com
RSteinken@jenner.com

*Counsel for Defendants*

# TABLE OF CONTENTS

INDEX OF SUPPORTING MATERIALS ............................................................... ii

TABLE OF AUTHORITIES ............................................................................ iv

INTRODUCTION .......................................................................................... 1

BACKGROUND ........................................................................................... 2

    A.    The University's Commitment To Freedom Of Expression .................................. 2

    B.    Amendment To Section 2-407 .................................................................. 5

    C.    The Bias Assessment & Response Team And University Housing's Bias Incident Protocol .................................................................................. 5

    D.    No Contact Directives .......................................................................... 8

    E.    Speech First's Lawsuit ......................................................................... 9

ARGUMENT .............................................................................................. 10

I.    Plaintiff Is Unlikely To Prevail On The Merits. ............................................. 11

    A.    Plaintiff's Prior Restraint Claim Is Moot. .................................................. 11

    B.    Plaintiff Lacks Standing ....................................................................... 12

        1.    Plaintiff lacks standing for its claims regarding bias-motivated incidents. ...................................................................................... 14

        2.    Plaintiff lacks standing for its No Contact Directives claim .................... 16

    C.    Plaintiff Would Not Prevail On The Merits Even If Plaintiff Had Standing. ......... 18

        1.    The University's policies on bias-motivated incidents do not implicate the First Amendment. ................................................................... 18

        2.    The provision on No Contact Directives is not overbroad. ...................... 19

II.    Additional Factors Weigh Against A Preliminary Injunction. ............................ 21

CONCLUSION ........................................................................................... 22

## INDEX OF SUPPORTING MATERIALS

Declaration of January Boten, Co-Chair of Bias Assessment & Response Team ("Boten Decl.")

Exhibit 1: Mission Statement, Bias Assessment & Response Team

Exhibit 2: Excerpts from Student Code of University of Illinois at Urbana-Champaign, 2018-2019

Declaration of Justin Brown, Director of Office for Student Conflict Resolution ("Brown Decl.")

Exhibit 1: University's Form Charge Notice for Student Code Violations

Exhibit 2: Excerpts from Student Code of University of Illinois at Urbana-Champaign, 2018-2019

Exhibit 3: *Statement of Support for Tariq Khan*, Facebook (Jan. 21, 2018)

Exhibit 4: *Uphold the Student Code*, Daily Illini (Sept. 6, 2017), https://dailyillini.com/opinions/2017/09/06/administration-fails-at-condemning-anti-semitic-speech/

Exhibit 5: University's Form Notice for No Contact Directives

Exhibit 6: Student Disciplinary Procedures of University of Illinois at Urbana-Champaign

Declaration of Rony Die, Associate Director of Office for Student Conflict Resolution ("Die Decl.")

Declaration of Rhonda Kirts, Associate Dean of Students ("Kirts Decl.")

Exhibit 1: Excerpts from Student Code of University of Illinois at Urbana-Champaign, 2018-2019

Exhibit 2: University of Illinois System Guiding Principles (Dec. 8, 2017), https://www.uillinois.edu/about/guiding_principles

Exhibit 3: Campus Communications on Speech and Expression

Exhibit 4: *Trump's Wall: A Necessary Evil?*, Daily Illini (Mar. 7, 2019), https://dailyillini.com/opinions/2019/03/08/trumps-wall-a-necessary-evil

Exhibit 5: *Understanding Trump: Separating Man from President*, Daily Illini (Mar. 5, 2019), https://dailyillini.com/opinions/2019/03/05/understanding-trump/

Exhibit 6: *Professor Examines Trump's Immigration Laws*, Daily Illini (Jan. 22, 2019), https://dailyillini.com/news/2019/01/22/professor-examines-trumps-immigration-laws/

Exhibit 7: *Illini Republicans President Aims to Incite Change*, Daily Illini (Nov. 12, 2018), https://dailyillini.com/features/2018/11/12/illini-republicans-message-conservatism/

Exhibit 8: *Political Debate Addresses Hot-Button Issues*, Daily Illini (Oct. 3, 2018), https://dailyillini.com/news/2018/10/03/political-debate-illini-democrat-republican/

Exhibit 9: *Anti-abortion Group Demonstrates Graphic Imagery on Main Quad*, Daily Illini (Apr. 18, 2018), https://dailyillini.com/news/2018/04/18/anti-abortion-group-demonstrates-graphic-imagery-on-main-quad/

Exhibit 10: *Students Clash Over Immigration*, Daily Illini (Mar. 15, 2018), https://dailyillini.com/news/2018/03/15/students-clash-over-immigration/

Exhibit 11: *Letter to the Editor: Divestment Referendum Targets Israel*, Daily Illini (Feb. 27, 2018), https://dailyillini.com/opinions/2018/02/27/letter-editor-divestment-referendum-targets-israel/

Exhibit 12: *Campus Reflects on Trump's First Year in Office*, Daily Illini (Jan. 20, 2018), https://dailyillini.com/news/2018/01/20/campus-reflects-trumps-first-year-office/

Exhibit 13: *Turning Point Founder Charlie Kirk Speaks on Socialism*, Daily Illini (Oct. 5, 2017), https://dailyillini.com/news/2017/10/05/turning-point-founder-charlie-kirk-speak-socialism/

Exhibit 14: *Letter to the Editor: Free Speech Needs to be Protected*, Daily Illini (Aug. 30, 2017), https://dailyillini.com/opinions/2017/08/30/letter-to-the-editor-free-speech-needs-to-be-protected/

Exhibit 15: July 18, 2019 Approved Changes to the Student Code of Conduct

Declaration of Alma R. Sealine, Executive Director of University Housing ("Sealine Decl.")

Exhibit 1: Mission & Vision, University Housing at the University of Illinois at Urbana-Champaign

Exhibit 2: Hallmarks: Your Guide to Living in the Resisdence Halls in University Housing, University Housing at the University of Illinois at Urbana-Champaign

# TABLE OF AUTHORITIES

**CASES**

*Abbott v. Pastides*, 900 F.3d 160 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 1292 (2019) .................................................................................................................15

*BBL, Inc. v. City of Angola*, 809 F.3d 317 (7th Cir. 2015) ...........................................11

*Bell v. Keating*, 697 F.3d 445 (7th Cir. 2012)................................................................13

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ...............................................................18

*Christian Legal Society v. Walker*, 453 F.3d 853 (7th Cir. 2006) .................................21

*Commodity Trend Service, Inc. v. Commodity Futures Trading Commission*, 149 F.3d 679 (7th Cir. 1998) ..............................................................................................20

*D'Kids Partners, LP v. Kirlin*, No. 17-3057, 2017 WL 1502790 (C.D. Ill. Apr. 26, 2017) ............................................................................................................................10

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)..................................................13

*EEOC v. Flambeau, Inc.*, 846 F.3d 941 (7th Cir. 2017)..................................................11

*Federation of Advertising Industry Representatives, Inc. v. City of Chicago*, 326 F.3d 924 (7th Cir. 2003) ...................................................................................11, 12

*Foodcomm International v Barry*, 328 F.3d 300 (7th Cir. 2003) ...................................21

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States, Inc.*, 549 F.3d 1079 (7th Cir. 2008) ...........................................................................................11

*Hill v. Colorado*, 530 U.S. 703 (2000) ..........................................................................18

*International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Brock*, 477 U.S. 274 (1986) ............................................. 12-13

*Johnson v. City of Rock Island*, No. 4:11-CV-4058, 2012 WL 4510434 (C.D. Ill. Sept. 28, 2012) .............................................................................................................14

*Laird v. Tatum*, 408 U.S. 1 (1972)....................................................................13, 14, 18

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................................13

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990) ........................................13

*Magnuson v. City of Hickory Hills*, 933 F.2d 562 (7th Cir. 1991) .................................12

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) .......................................................................10

*Meese v. Keene*, 481 U.S. 465 (1987) ..................................................................................18

*Minik v. Board of Trustees of University of Illinois,* No. 2:18-CV-02101 (C.D. Ill. Sept. 21, 2018), ECF No. 25, *adopted*, 2018 WL 4904942 (C.D. Ill. Oct. 9, 2018) ...............................................................................................................................9

*Munaf v. Geren*, 553 U.S. 674 (2008) ..................................................................................10

*New York State National Organization for Women v. Terry*, 886 F.2d 1339 (2d Cir. 1989) ...............................................................................................................................17

*Regan v. Time, Inc.*, 468 U.S. 641 (1984) .....................................................................18, 20

*Schirmer v. Nagode*, 621 F.3d 581 (7th Cir. 2010) .........................................................14, 15

*Schultz v. City of Cumberland*, 228 F.3d 831 (7th Cir. 2000) ...........................................21

*Smego v. Weitl*, No. 13-3068, 2015 WL 13688435 (C.D. Ill. Nov. 30, 2015) .................11, 22

*Sonnier v. Crain*, 649 F. Supp. 2d 484 (E.D. La. 2009) ....................................................22

*Speech First, Inc. v. Fenves*, No. 1:18-CV-1078, 2019 WL 2358057 (W.D. Tex. June 4, 2019), *appeal docketed*, No. 19-50529 (5th Cir. June 7, 2019) ...............10, 15, 16, 18

*Speech First, Inc. v. Schlissel*, 333 F. Supp. 3d 700 (E.D. Mich. 2018), *appeal docketed*, No. 18-1917 (6th Cir. Aug. 15, 2018) ...........................................10, 12, 16, 21, 22

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ..................................13, 14, 16

*United States v. Stansell*, 847 F.2d 609 (9th Cir. 1988) ....................................................20

*Wisconsin Right To Life, Inc. v. Barland*, 751 F.3d 804 (7th Cir. 2014) ........................21

*Woods v. Buss*, 496 F.3d 620 (7th Cir. 2007) ....................................................................11

*Yoona Ha v. Northwestern University*, No. 14-CV-895, 2014 WL 5893292 (N.D. Ill. Nov. 13, 2014) ........................................................................................................18

## INTRODUCTION

Since its founding in 1867, the University of Illinois has honored an unwavering commitment to the freedom of expression.  Because diverse perspectives are central to its educational mission, the University has fostered a vibrant community where thousands of students and registered student organizations express and debate beliefs spanning the ideological spectrum. The University has built and maintained a community where, as Chancellor Robert Jones put it during the 2018 State of the University Address, "unpopular, unexpected or controversial viewpoints are greeted with reasoned and productive debate rather than with derision, insult or violence."

Plaintiff Speech First, Inc., a national advocacy organization, distorts the reality of life at the University, depicting a campus rife with censorship and overrun by "speech police."  Relying on the same allegations it used in previous unsuccessful challenges against other public universities, Plaintiff claims the University burdens the First Amendment rights of four unidentified students who contend they cannot express "controversial" viewpoints on campus without fear of reprisal.  Plaintiff's mischaracterizations of University policy and practice provide no basis for the extraordinary relief Plaintiff seeks.

*First*, the core of Plaintiff's complaint is moot.  Section 2-407 of the Student Code, which required prior approval for posting and distributing "materials of candidates for non-campus elections," has been eliminated through a formal and final amendment process.  The predicate for Plaintiff's first claim thus no longer exists.

*Second*, Plaintiff claims the University's Bias Assessment & Response Team (BART) and University Housing's Bias Incident Protocol (BIP) punish students for incidents alleged to be motivated by bias even when the incident involves speech protected by the First Amendment.

1

Nothing could be further from the truth.  BART and BIP provide voluntary, private opportunities for support and dialogue and lack any disciplinary authority whatsoever.  As such, BART and BIP simply do not implicate students' First Amendment rights at all.

*Third*, Plaintiff avers that University officials use No Contact Directives (NCDs) to punish students who engage in controversial, but protected, speech.  Again, not so.  This claim relies on a complete misreading of the University's Student Disciplinary Procedures, which authorize NCDs only in cases of reported or imminent violations of the Student Code.  Activity protected by the First Amendment—such as the speech the four anonymous students wish to express—cannot alone form the basis of a Code violation.

Plaintiff's claims fail not only because they misconstrue the letter of University policies, but also because they ignore how those policies operate in practice.  Although students, organizations, publications, and invited speakers routinely express exactly the viewpoints that Plaintiff's anonymous members on campus claim they wish to express, Plaintiff does not cite a *single* instance of any disciplinary action—whether through BART, BIP, NCDs, or otherwise— being taken as a result of the expression of those views.  The complaint's silence in this regard speaks volumes.

For precisely these reasons, two other federal district courts have rejected Speech First's virtually identical efforts to obtain extraordinary relief against public universities.  This case requires the same result and Plaintiff's motion for a preliminary injunction should be denied.

## BACKGROUND

### A.    The University's Commitment To Freedom Of Expression

The very *first* provision of the University's Student Code emphasizes the University's overriding commitment to free expression on campus:  "A student at the University of Illinois at

the Urbana-Champaign campus is a member of a University community of which all members have at least the rights and responsibilities common to all citizens, free from institutional censorship." Brown Decl. ¶ 9 & Ex. 2, § 1-101. The next provision states that instructors in the classroom "should encourage free discussion, inquiry, and expression," and prohibits a student from being evaluated on anything other than academic standards. Brown Decl., Ex. 2, § 1-102. And the following provision states that "[m]embers and organizations in the University community may invite and hear any persons of their own choosing, subject only to reasonable requirements on time, place, and manner for use of University facilities," and "campus press and media are to be free of censorship." *Id*. § 1-102(b)-(c). The Student Code does not contain a single provision penalizing students for speech alone, even if that speech is motivated by bias, Brown Decl. ¶ 11, and Plaintiff cites no such provision.

In addition to the Student Code, the University of Illinois System also has "Guiding Principles" that protect free expression on campus. Kirts Decl. ¶ 5 & Ex. 2. These principles emphasize that "freedom of speech—even controversial, contentious, and unpopular speech—is indispensable to developing the analytical and communication skills of our students and empowering all members of our university communities to be active and informed citizens." Kirts Decl., Ex. 2, at 4. Recognizing that the "most serious issues facing all of higher education are related to free speech and expression around divisive and difficult topics," Chancellor Jones recently created an initiative called "Chancellor's Critical Conversation," in which the University community can participate in "meaningful and respectful dialogue around local and national issues." Kirts Decl. ¶ 6(e).

The reality of campus life reflects the University's unbending commitment to free expression. The University boasts over 1,800 registered student organizations, including

numerous groups devoted to advocacy across the political and social spectrum.  *Id.* ¶ 10.  Several groups support and advocate for the views Plaintiff's anonymous members apparently wish to express—among them the Illini Republicans; the Illini Libertarians; Free Speech Uncensored; the Illini Public Affairs Committee (supporting a strong U.S.-Israel relationship); Turning Point USA (promoting "free markets and limited government" and exposing professors who allegedly "discriminate against conservative students and advance leftist propaganda in the classroom"); WeDignify (advancing pro-life policies); and Students for Chief Illiniwek.  *Id.* ¶ 11.  These groups, like all registered student organizations, receive financial and logistical support from the University for their programming.  *Id.* ¶ 10.  For example, in recent years, the University provided financial support for student events hosting prominent conservative television and talk radio hosts; funded a pro-life television display on the Main Quad of the University; and paid for a police presence at an event hosted by the Illini Republicans with an Immigration and Customs Enforcement official.  *Id.* ¶ 13(a)-(k).

Diverse viewpoints also flourish in campus publications.  Recent opinion pieces and letters to the editor in the *Daily Illini* have expressed support for building a wall on the country's southern border; have opposed a University referendum to divest from Israel; and have advocated for the right to engage in hate speech.  *Id.* ¶ 9(a)-(k).  *Daily Illini* articles describe vigorous debates on campus over issues ranging from immigration reform to gun control to abortion.  *Id.* ¶ 9(e).  And a feature examining President Trump's first year in office quoted multiple students who offered strong support for the president and noted an increase in registered student organizations backing his administration and its policies.  *Id.* ¶ 9(i).

All of this expression is fully protected by the University, which does not punish students for controversial or unpopular viewpoints.  In fact, the University has honored its commitment to

free expression even in the face of criticism from stakeholders who believe the University should restrict unpopular or offensive speech.  *See* Brown Decl. ¶¶ 14-15 & Exs. 3-4.

### B.    Amendment To Section 2-407

Section 2-407 of the Student Code described a pre-approval process for posting and distributing "promotional materials of candidates for non-campus elections."  Pl.'s Mot. for Prelim. Inj. ("Mot.") at 2.  There is no evidence that the provision was ever enforced, Kirts Decl. ¶ 15, and Plaintiff makes no such allegation.  Regardless, on July 18, 2019, the University amended the Student Code to remove that provision.  Consistent with the "Procedure for Amending the Student Code," *see id*. ¶ 16 & Ex. 1 at iv, the Conference on Conduct Governance (CCG) considered and voted to recommend the proposed rule amendment that eliminated this provision from the pre-approval requirements.  The change was subsequently approved by the Chancellor and went into effect immediately upon approval.  Kirts Decl. ¶ 16.  This definitive change reflects the considered judgment of the University's officials, and it brings written policy in line with a history of non-enforcement.  *Id*.

### C.    The Bias Assessment & Response Team And University Housing's Bias Incident Protocol

The University's Bias Assessment & Response Team (BART) supports students affected by bias-motivated incidents, promotes education and awareness about the impact of actions motivated by prejudice, and facilitates respectful and productive dialogue between individuals and groups with differing or opposing views.  *See* Boten Decl. ¶¶ 3-4 & Ex. 1.  As part of this mission, BART provides a forum on campus for students to engage in voluntary and private discussions

about incidents that are alleged to be motivated by bias.  *See* Boten Decl. ¶ 7.[1]  These incidents can range from a student referring to another student using an offensive slur, to a piece of racist graffiti on campus, to a planned student event on a controversial subject.  *See generally* Mot., Ex. E.  Such incidents can be reported to BART via email or online and are usually presented anonymously.  Boten Decl. ¶ 19.

BART's members, who hail from various University departments, meet periodically to review reports of incidents.  *Id.* ¶¶ 8, 22.  In cases where the reports identify by name students who allegedly engaged in the bias-motivated conduct, BART members decide whether to invite the students to participate in an optional conversation about the incident—including how it has affected members of the community, and whether the students involved need any support.  *Id.* ¶¶ 22-26.  If a student indicates that she wishes to continue in the conduct that formed the basis for the report, BART members will then offer to formulate action plans to make sure the student can continue to express those views safely and without interference.  *Id.* ¶¶ 25-26.  BART's interactions with students are kept private and are not disclosed outside of the Office for Student Conflict Resolution unless a student gives permission.  Brown Decl. ¶ 6.  BART interactions are likewise not recorded in academic or disciplinary records.  Boten Decl. ¶ 27.

BART's authority is limited in ways critical to Plaintiff's allegations.  BART members cannot compel students to speak with them about alleged bias-motivated incidents.  *Id.* ¶¶ 5, 24.  If a student declines to speak with BART, and many do, the student is not sanctioned in any way.  *Id.*  In addition, BART cannot make a "finding" that a bias-motivated incident has or has not

---

[1] As another example of this mission in practice, BART recently convened a restorative circle event with two student organizations that frequently accused each other of engaging in bias-motivated conduct.  *Id.* ¶ 30.  The students who participated in this optional event reported that it strengthened the relationship between the groups.  *Id.*

occurred.  Boten Decl. ¶¶ 6, 14; Kirts Decl. ¶¶ 7, 9.  Moreover, BART cannot and does not impose discipline of any kind upon students whose actions have been reported to it.  Boten Decl. ¶¶ 4-6, 14-15, 25; Brown Decl. ¶¶ 6-7, 25; Kirts Decl. ¶¶ 7, 9.  If, after meeting with BART, a student wishes to continue engaging in the reported conduct, the student has the right to do so without penalty.  Boten Decl. ¶ 25.  Simply put, BART is not "a speech police"—it has no coercive or disciplinary role whatsoever.  And none of BART's members—including its liaison from the University Police Department—have any law enforcement function.  *Id.* ¶¶ 8-10.  Rather, BART is part of the University's effort to encourage students on all sides of an issue to engage in dialogue and express disagreement over ideas or beliefs in a respectful manner.

The University provides a forum similar to BART in the campus housing context, known as the Bias Incident Protocol (BIP).  Sealine Decl. ¶¶ 7, 11-12.  Students who reside in University Residence Halls can report incidents alleged to be motivated by bias.  *Id.* ¶ 11.  As with the BART process, when a BIP member contacts a specific student, the student's participation in any discussion is entirely voluntary, and no consequences attach to the student's decision whether to participate or whether to persist in the reported behavior.  *Id.* ¶¶ 14-17.  BIP staff members do not make findings, impose penalties, or discourage protected speech.  *Id.* ¶¶ 8-12.

Notwithstanding Plaintiff's attempts at conflation, BART and BIP are entirely distinct from the student disciplinary procedures that apply to charged violations of the Student Code or a student's housing contract.  *Id.* ¶¶ 8-12; Boten Decl. ¶¶ 13-14.  The Student Code could not be clearer:  "The University discipline system may take action only upon" six enumerated grounds.  Reports of bias-motivated incidents are not one of those grounds.  Brown Decl., Ex. 2, § 1-301.  The system addresses potential violations of the Student Code through formal procedures that include mandatory student participation in an investigation, a determination of responsibility, and,

if appropriate, discipline.  Brown Decl. ¶ 4.  BART and BIP have none of these features: they addresses incidents alleged to be motivated by bias, not potential code or contract violations; they are voluntary, not mandatory; and they provide education and support, not investigative findings and disciplinary consequences.  *Id*. ¶ 7; Sealine Decl. ¶¶ 8-9.

### D.  No Contact Directives

The Student Disciplinary Procedures authorize University disciplinary officers to issue No Contact Directives (NCDs) that instruct a student to refrain from contact with one or more persons under penalty of discipline.  *See* Brown Decl. ¶¶ 16-17 & Ex. 6, § 4.06(a), (c).  However, a "No Contact Directive does not, on its own, constitute a disciplinary finding against the student and is not part of the student's official disciplinary record."  *See* Brown Decl., Ex. 6, § 4.06(e).  NCDs serve important purposes, such as preventing interaction between students after an allegation of sexual misconduct or separating students involved in an escalating conflict that could jeopardize their physical safety.  Brown Decl. ¶¶ 21-23.  NCDs prohibit various forms of contact, including "oral or written, directly or through any third party."  *Id*. ¶ 17.  NCDs do not, however, prohibit students from occupying the same space, nor do they prohibit students from talking or writing about each other or any other topic, whether privately or publicly.  *Id*. ¶¶ 17-18.  To the contrary, expressing views about other students or community members is fully protected speech, and the University has *refused* requests to issue NCDs that would bar such expression.  *See* Die Decl. ¶ 6.  A student's expression of bias-motivated speech is not a basis for the University to issue an NCD.  Brown Decl. ¶¶ 24-25; *see also* Die Decl. ¶ 5.  Only bias-motivated speech accompanied by an actual or foreseeable Student Code violation, such as sexual harassment or stalking, can justify the imposition of an NCD.  Brown Decl. ¶¶ 20-23.

Many students have expressed controversial or unpopular views on campus similar to those students A, B, C, and D claim they wish to express.  *Id.* ¶¶ 23-25.  None have received NCDs for that expression alone.  *Id.*; Die Decl. ¶¶ 4, 9.  The NCD issued to Andrew Minik, upon which Plaintiff bases almost the entirety of its argument concerning NCDs, is entirely consistent with these principles.  *See* Die Decl. ¶¶ 7-8; Mot., Ex. Q.  Indeed, the Minik-Khan interactions are the subject of a separate lawsuit in which this Court declined to dismiss Mr. Khan's counter-claims that Mr. Minik and others "engaged in threatening behavior and recruited others to threaten and harass him."  *See* Report and Recommendation at 2, *Minik v. Bd. of Trs. of Univ. of Ill.*, No. 2:18-CV-02101 (C.D. Ill. Sept. 21, 2018), ECF No. 25, *adopted*, 2018 WL 4904942 (C.D. Ill. Oct. 9, 2018) (Bruce, J.).  Those allegations and statements from involved University personnel belie the notion that an NCD was issued to Mr. Minik on the basis of his First Amendment protected speech alone.

E.       **Speech First's Lawsuit**

Plaintiff Speech First, Inc. is a national membership organization that claims to have student members who attend the University.  *See* Compl. ¶ 9.  According to its complaint's unverified allegations, four anonymous students hold "political, social, and policy views that are unpopular on campus," such as "support[ for] President Trump," "oppos[ition to] abortion," "belie[f] in traditional marriage," and support for "building of a wall along the U.S. southern border."  *Id.* ¶¶ 96, 105, 115, 124.  The complaint lacks any allegations that the University has targeted these students based on their views or subjected them to any adverse action whatsoever.  It nonetheless contends that the University's policies chill the students' speech.  *Id.* ¶¶ 3-5.

This action is the latest in a series of suits by Speech First against public universities.  In each, Speech First attempted—but failed—to obtain a preliminary injunction based upon

university policies that allegedly violated the First Amendment rights of anonymous students.  In the University of Michigan case, the district court found that Speech First's central claim was moot because the University had recently amended its policies to remove the challenged provision.  *Speech First, Inc. v. Schlissel*, 333 F. Supp. 3d 700, 713-15 (E.D. Mich. 2018).  The court also ruled that Speech First was not likely to prevail on the merits of its claims because it lacked standing to challenge Michigan's "Bias Response Team," which did not "pose[] a concrete or objective threat of harm to the First Amendment rights of University students."  *Id*. at 713.

In the University of Texas at Austin case, the district court went a step further and dismissed the entire action.  *Speech First, Inc. v. Fenves*, No. 1:18-CV-1078, 2019 WL 2358057, at *8 (W.D. Tex. June 4, 2019).  The court found Speech First failed to present "evidence that any University students—much less any of Speech First's student members—have been disciplined, sanctioned, or investigated for their speech."  *Id*. at *7.  As a result, the court explained, Speech First failed to make the requisite "clear showing" that any self-censorship by the student members was "based on a well-founded threat of punishment under the University policies."  *Id*.

## ARGUMENT

"A preliminary injunction is an 'extraordinary and drastic remedy,'" *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008), "one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (quotation marks omitted).  The court's power to award a preliminary injunction is "never to be indulged in except in a case clearly demanding it," *D'Kids Partners, LP v. Kirlin*, No. 17-3057, 2017 WL 1502790, at *3 (C.D. Ill. Apr. 26, 2017) (quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States, Inc*., 549 F.3d 1079, 1085 (7th Cir.

2008)), and this relief is "never awarded as of right," *Smego v. Weitl*, No. 13-3068, 2015 WL 13688435, at *1 (C.D. Ill. Nov. 30, 2015) (Bruce, J.).

To justify this extraordinary remedy, "the moving party must demonstrate: (1) a likelihood of success on the merits; (2) a lack of an adequate remedy at law; and (3) an irreparable harm [that] will result if the injunction is not granted." *Woods v. Buss*, 496 F.3d 620, 622 (7th Cir. 2007) (quotation marks omitted).   If, and only if, the moving party can satisfy these threshold requirements, "then the district court balances the relative harms that could be caused to either party" in deciding whether to award the requested relief. *Smego*, 2015 WL 13688435, at *1 (citing *Incredible Techs., Inc. v. Virtual Tech., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005)).   The balancing process also takes into "any effects that granting or denying the preliminary injunction would have on nonparties"—*i.e.*, the public's interest in the case. *Girl Scouts*, 549 F.3d at 1086.

## I.   Plaintiff Is Unlikely To Prevail On The Merits.

### A.   Plaintiff's Prior Restraint Claim Is Moot.

Article III "limits federal courts' jurisdiction . . . to 'cases' and 'controversies,'" and thus federal courts "lack jurisdiction over moot cases." *EEOC v. Flambeau, Inc*., 846 F.3d 941, 946 (7th Cir. 2017).   "A question of mootness arises when, as here, a challenged ordinance is repealed during the pendency of litigation, and a plaintiff seeks only prospective relief." *Fed'n of Advert. Indus. Representatives, Inc. v. City of Chicago (Federation)*, 326 F.3d 924, 929 (7th Cir. 2003). In such circumstances, the Seventh Circuit has "repeatedly held that the complete repeal of a challenged law renders a case moot." *Id*. at 930; *see, e.g.*, *BBL, Inc. v. City of Angola*, 809 F.3d 317, 324 (7th Cir. 2015) (holding that defendant's elimination of approval requirement mooted prior restraint claim).

11

That is precisely what has happened here: Section 2-407, the subject of Plaintiff's prior restraint claim, is no longer part of the Student Code.  Plaintiff might nonetheless argue—as it did unsuccessfully in the Michigan case—that the University could reverse course.  To accept such an argument, the Court must find "evidence creating a reasonable expectation that [the University] will reenact the ordinance or one substantially similar."  *Federation*, 326 F.3d at 930.  That expectation is especially difficult to prove where the defendants are public officials, because courts "place greater stock in their acts of self-correction, so long as they appear genuine."  *Magnuson v. City of Hickory Hills*, 933 F.2d 562, 565 (7th Cir. 1991).

No basis exists to question the University's action here.  The University has completely eliminated the portion of § 2-407 referenced by Plaintiff, and there is no risk of the University reinstating it.  The amendment to the Code was recommended by CCG and approved by the Chancellor, consistent with the University's formal amendment process.  *See supra* at 5.  The elimination of this provision is "definitive," and it reflects a "considered judgment" that the Student Code now "more accurately reflects the University's longstanding non-enforcement of this provision as well as its commitment to the freedom of expression on campus."  *See* Kirts Decl. ¶ 16.  A university official has sworn that there is no intention of restoring the prior provision or a provision like it, and that statement rings all the truer here where there is no history of past enforcement whatsoever.  *Id.*; *see also Schlissel*, 333 F. Supp. 3d at 705, 714 (relying on declarations of University officials regarding finality of policy change).  Simply put, Plaintiff "face[s] no future danger," so its claim is moot.  *Magnuson*, 933 F.2d at 565.

### B.      Plaintiff Lacks Standing.

Under the doctrine of associational standing, an organization like Speech First has standing only if its members do.  *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of*

*Am. v. Brock*, 477 U.S. 274, 289 (1986).  Standing has three essential elements: (1) injury-in-fact, (2) sufficient causal connection between the injury and the challenged conduct, and (3) the likelihood that the injury will be redressed by a favorable decision.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014).  These elements must be established for each claim the plaintiff advances.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  Moreover, the plaintiff's burden to demonstrate standing in the context of a preliminary injunction motion is "at least as great as the burden of resisting a summary judgment motion," *Lujan v. Nat'l Wildlife Fed'n (Lujan I)*, 497 U.S. 871, 907 n.8 (1990), and therefore requires "specific facts" rather than "mere allegations," *Lujan v. Defs. of Wildlife (Lujan II)*, 504 U.S. 555, 561 (1992).

The injury-in-fact requirement demands injury that is real and immediate.  *Bell v. Keating*, 697 F.3d 445, 451 (7th Cir. 2012).  Where, as here, the plaintiff brings a First Amendment facial challenge, a prior enforcement action against the plaintiff is not necessary to establish standing. *Susan B. Anthony List*, 573 U.S. at 158-59.  But in the absence of an enforcement action, a plaintiff can only establish standing "under circumstances that render the threatened enforcement sufficiently imminent."  *Id*. at 159.  Specifically, to demonstrate injury-in-fact, the plaintiff must show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by" the challenged provision.  *Id*. (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  In addition, a plaintiff must show "a credible threat of prosecution" under the challenged provision.  *Id*.

Moreover, "a plaintiff's notional or subjective fear of chilling is insufficient to sustain a court's jurisdiction under Article III."  *Bell* 697 F.3d at 454 (citing *Laird v. Tatum*, 408 U.S. 1, 11, 13-14 (1972)).  Thus, plaintiffs have standing based on the fear of chilled speech only if "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature,

and the [plaintiffs were] either presently or prospectively subject to the regulations, proscriptions, or compulsions." *Laird*, 408 U.S. at 11.  When plaintiffs fail to show "that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible,' they do not allege a dispute susceptible to resolution by a federal court." *Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010) (quotation marks omitted).  Fear that is "chimerical"— either because the challenged policy has no enforcement component, or because it is unrealistic that enforcement will be directed at the plaintiff—does not suffice.  *See Susan B. Anthony List*, 573 U.S. at 159.

### 1. Plaintiff lacks standing for its claims regarding bias-motivated incidents.

Plaintiff lacks standing to challenge BART or BIP because neither poses a "credible threat" to any student.  *Id.*  No student is required to engage with BART or BIP, and no penalty can result from either process.  BART and BIP members do not investigate reports, make findings, or mete out discipline.  BART and BIP lack authority even to compel a student to have a *discussion* with a staff member if the student does not wish to participate.  *See supra* at 5-8.

It is entirely speculative to suggest that students A, B, C, and D would ever be contacted by BART or BIP at all.  But even if they were contacted, they would face no credible threat to their First Amendment rights in processes that are entirely voluntary and cannot by rule result in any adverse or disciplinary action.  These facts "weigh[] heavily against finding a credible threat of prosecution." *Johnson v. City of Rock Island*, No. 4:11-CV-4058, 2012 WL 4510434, at *4 (C.D. Ill. Sept. 28, 2012).  Standing requires that the conduct at issue be subject to a specific penalty such as arrest, prosecution, or (potentially) enforcement proceedings.  *Susan B. Anthony List*, 573 U.S. at 165-66.  Plaintiff cannot make that showing here.

Plaintiff nonetheless alleges that its members feel "chilled" by the mere existence of BART and BIP.  Compl. ¶ 4.  But the Court should not accept at face value these generalized and unverified allegations made by anonymous students.  *See Fenves*, 2019 WL 2358057, at \*7 ("Standing is not created by a declaration in court pleadings." (citation omitted)).  Even assuming these allegations are true, they do not suffice to establish injury-in-fact.  Plaintiff has not claimed that any of its student members "have ever been threatened" with discipline by the BART or BIP. *Schirmer*, 621 F.3d at 586.  Nor has Plaintiff adduced any facts demonstrating that "a prosecution is likely."  *Id*.  In fact, Plaintiff has not cited a single instance of a University student facing discipline through BART or BIP.  The reason is simple:  neither BART nor BIP is punitive.  *See supra* at 5-8.  Discipline is thus not "remotely possible" for bias-motivated speech.  *See Schirmer*, 621 F.3d at 586; *see Abbott v. Pastides*, 900 F.3d 160, 179 (4th Cir. 2018) ("Even an objectively reasonable 'threat' that the plaintiffs might someday have to meet briefly with a University official in a non-adversarial format, to provide their own version of events in response to student complaints, cannot be characterized as the equivalent of a credible threat of 'enforcement' or as the kind of 'extraordinarily intrusive' process that might make self-censorship an objectively reasonable response."), *cert. denied*, 139 S. Ct. 1292 (2019).

Indeed, students routinely express the same viewpoints that Plaintiff describes as "chilled," and do so without any repercussions.  According to Plaintiff, its members wish to express opposition to abortion and gun control and support for President Trump and strong immigration policies.  *E.g.*, Compl. ¶¶ 96, 105, 115, 124.  The record demonstrates that other students as well as registered student organizations have espoused precisely these beliefs in student publications and at campus events.  *See supra* at 3-4.  For example, WeDignify presented an anti-abortion photo and video exhibition on the Main Quad; a campus debate between the Illini Democrats and Illini

Republicans featured differing views on gun control; and Turning Point USA built a wall on campus to honor victims of crimes perpetrated by undocumented immigrants and advocate for immigration reform.  Kirts Decl. ¶ 13.  Far from facing discipline, these students and organizations have received logistical and financial support from the University, including security support where necessary, that fosters and protects their expression.  *Id.*

Two other federal district courts have denied preliminary injunctive relief to Speech First based on copycat challenges to university bias response policies.  In *Schlissel*, the district court found "Speech First fail[ed] to demonstrate that the BRT poses a concrete or objective threat of harm to the First Amendment rights of University students."  333 F. Supp. 3d at 713.  The district court underscored that BRT was voluntary, lacked authority to impose discipline, and did not level threats.  *Id.*  In *Fenves*, the district court found:

> Speech First presents no evidence that any University students—much less any of Speech First's student members—have been disciplined, sanctioned, or investigated for their speech.  And without any evidence of a credible threat of enforcement of the challenged policies—much less the "clear showing" required to support standing at the preliminary-injunction stage—this court concludes that the students' self-censorship is not based on a well-founded threat of punishment under the University policies that is not "imaginary or wholly speculative."

2019 WL 2358057, at *7-8 (citations omitted).  Just as in *Fenves* and *Schlissel*, Plaintiff has failed to meet its burden to establish standing for its challenge to the University's bias response policies.

### 2.    Plaintiff lacks standing for its No Contact Directives claim.

Plaintiff claims that University officials have "virtually limitless power to issue No Contact Directives," Compl. ¶ 82, and points to one incident in which an NCD was allegedly issued against a student "solely because of the student's protected speech," *id*. ¶ 89.  But these allegations, which are belied by the factual record, cannot demonstrate a "credible threat" of enforcement against Plaintiff's members or justify their purported self-censorship.  *See Susan B. Anthony List*, 573 U.S. at 159.

The record evidence refutes Plaintiff's claim that University officials issue NCDs in essentially any circumstance they desire, including to suppress controversial speech "fully protected under the First Amendment." Mot. at 10. To the contrary, officials issue these Directives only in three narrowly circumscribed situations. First, the majority of NCDs are issued while the University investigates allegations that a student violated the Student Code. Brown Decl. ¶¶ 20-22. Second, of the remainder, most are issued in response to informal sexual misconduct complaints. *Id*. Third, the University issues a small number of Directives—11 of 103 Directives issued during the past academic year—"when a severe, prolonged, and/or escalating conflict between students suggest[s] that a violation of the Student Code, and in some cases physical violence, was likely in the near future." *Id*. ¶ 23. All three uses of NCDs are fully consistent with the Student Code's robust protections for free expression.

The record evidence confirms that simply expressing unpopular or controversial views, including the views that Plaintiff's members allegedly wish to express, cannot trigger an NCD. There is no record of the University issuing an NCD in response to this expression or any other protected First Amendment activity, Brown Decl. ¶¶ 24-25, and, other than its mischaracterization of the Minik case as described in the Die Declaration, *see* Die Decl. ¶¶ 7-8, Plaintiff cites none. Individual students as well as registered student organizations have frequently expressed these views without being threatened by, or made subject to, NCDs. Brown Decl. ¶ 25. Moreover, even when an NCD is issued, it prevents only direct confrontation or contact via third party. Thus students who are subject to NCDs remain free to express their views—including views about the other student. *See supra* at 8-9. This type of prohibition on unwanted contact with a specific person has been upheld against First Amendment challenge. *See, e.g.*, *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1343 (2d Cir. 1989) ("There is no constitutional privilege to

assault or harass an individual or to invade another's personal space."); *see also Yoona Ha v. Nw. Univ.*, No. 14-CV-895, 2014 WL 5893292, at *2 (N.D. Ill. Nov. 13, 2014) (recognizing that universities may face liability for deliberate indifference where they *fail* to order no contact between individuals involved in harassment complaint). For all these reasons, it is "imaginary or wholly speculative" that any student would face a threat of punishment under the NCD simply for expressing the views that Plaintiff's members hold. *Fenves*, 2019 WL 2358057, at *7.

### C.   Plaintiff Would Not Prevail On The Merits Even If Plaintiff Had Standing.

Even setting standing aside, Plaintiff's overbreadth and vagueness claims have no likelihood of success. An overbreadth challenge, *see* Compl. ¶¶ 144-152, 161-68, can succeed "only when the statute is substantially overbroad, *i.e.*, when the statute is unconstitutional in a substantial portion of the cases to which it applies." *Regan v. Time, Inc.*, 468 U.S. 641, 650 (1984). Striking down a policy as overbroad is "strong medicine" to be administered "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). To succeed on a vagueness challenge, *see* Compl. ¶¶ 153-160, a plaintiff must show that the challenged policy "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or that it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Plaintiff's claims would fail under these standards.

### 1.   The University's policies on bias-motivated incidents do not implicate the First Amendment.

Plaintiff challenges the University's definition of "bias-motivated incidents" as overbroad and vague. Mot. at 16-18. This challenged definition only applies to BART and BIP. Yet neither of those processes place any "burden on protected expression" because neither process is disciplinary nor compulsory. *Meese v. Keene*, 481 U.S. 465, 480 (1987); *see also Laird*, 408 U.S. at 11 (finding no cognizable First Amendment claim when the alleged "chilling effect" appeared

to arise from perception that program at issue was "inappropriate," and not from any "regulations, proscriptions, or compulsions" to which the challengers were subject).

The definition of "bias-motivated incidents" *cannot* as a matter of law be unconstitutionally overbroad or vague, because nothing is proscribed and no one can be punished.  Were any further proof needed of this fact, the challenged definition of "bias-motivated incidents" cited by Plaintiff comes from the BART website, and does not appear in the University's Student Code or Student Disciplinary Procedures.  *Compare* Mot., Ex. C at 1, *with* Mot., Exs. A-B.  As the University has demonstrated, BART does not have any investigative or disciplinary function, *see supra* at 5-8, so Plaintiff's claim that "First Amendment freedoms are at stake" in the University's definition is simply false, *see* Mot. at 18.  Ultimately, Plaintiff's First Amendment challenge to the University's bias protocols relies upon a complete mischaracterization of University policy and practice.  The record demonstrates—contrary to Plaintiff's unsupported claim—that the University does *not* make findings or impose discipline for bias-motivated incidents.  *See supra* at 5-8.  In fact, there is no evidence that the University has ever subjected any student to adverse action solely for a bias-motivated incident.  Students routinely engage, without consequence, in speech that falls within the University's definition.  *See supra* at 3-7.  In short, the University's definition of "bias-motivated incidents" does not implicate, let alone violate, the First Amendment.

### 2.       The provision on No Contact Directives is not overbroad.

Plaintiff's overbreadth challenge to NCDs also falters.  Plaintiff selectively misquotes from the Student Disciplinary Procedures in claiming that University disciplinary officers can issue NCDs whenever they subjectively believe such action is "warranted."  Mot. at 18-19.  In fact, the Procedures expressly limit the circumstances in which NCDs can be issued to potential or reported violations of the Student Code.  Authority to issue NCDs is vested exclusively in "Disciplinary Officers" who are "acting in the performance of their duties."  *See* Brown Decl., Ex. 6, § 4.06(a).

Those duties are limited to "investigating and/or adjudicating alleged violations of the Student Code." *Id*. § 2.01(e). Moreover, the authority to issue NCDs is tied directly to the Student Code. Section 4.06(a) of the Student Disciplinary Procedures only authorizes Disciplinary Officers to issue NCDs to "an individual student subject to student discipline, as described in § 1-301(c) of the *Student Code*," and only in the context of enforcing or preventing violations of the standards set forth in the Student Code. *Id*. § 4.06(a) (emphasis added). The Student Code does not prohibit speech protected by the First Amendment, *see supra* at 2-3, and thus by the plain terms of the Student Disciplinary Procedures, NCDs cannot be issued based solely on speech such as that which the anonymous students wish to express.

Thus, read in context, the NCD policy is not unconstitutionally overbroad. *Cf. United States v. Stansell*, 847 F.2d 609, 614 (9th Cir. 1988) (rejected overbreadth challenge because when "[c]onstrued in proper context, the regulation at issue is not a grant of unfettered discretion"). A facial challenge based on overbreadth can succeed only in cases of substantial overbreadth, where the policy at issue "is unconstitutional in a substantial portion of the cases to which it applies." *Regan*, 468 U.S. at 650. This means "the district court must ascertain whether the unconstitutional applications of a statute are substantially greater than the statute's legitimate sweep." *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 688 n.4 (7th Cir. 1998) (citing *Broadrick*, 413 U.S. at 613). Plaintiff has identified only one purportedly unconstitutional application of the policy, but because the NCD was not issued based on Mr. Minik's protected speech, it does not demonstrate an unconstitutional application. *See supra* at 9. But in any event, "one arguably unconstitutional application of the statute does not prove that it is substantially overbroad, particularly in light of the numerous instances in which" the University issues NCDs that are indisputably legitimate. *Regan*, 468 U.S. at 652 n.8; *see also supra* at 8-9, 17 (detailing

20

circumstances in which Directives are issued); Mot. at 19 (conceding various circumstances in which the University "could properly issue No Contact Directives," including to protect health and safety).

Plaintiff's challenge also fails because the policy is "readily susceptible to a narrowing construction that would make it constitutional." *Schultz v. City of Cumberland*, 228 F.3d 831, 850 (7th Cir. 2000) (citing *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397 (1988)).  As explained above, the policy can be (and in practice is) construed to permit NCDs only in the context of potential or reported violations of the Student Code.  *See supra* at 17-18.  Even if this were not the only reading of the policy, it is a "reasonable and readily apparent" construction, *Wis. Right To Life, Inc. v. Barland*, 751 F.3d 804, 833 (7th Cir. 2014), and it prevents any "potentially unconstitutional applications from dwarfing the [policy's] legitimate reach," *Schultz*, 228 F.3d at 851.

## II.    Additional Factors Weigh Against A Preliminary Injunction.

Without a likelihood of success on the merits, Plaintiff cannot establish a critical threshold requirement for obtaining preliminary injunctive relief.  *See Foodcomm Int'l v Barry*, 328 F.3d 300, 303 (7th Cir. 2003).  Additional factors that guide this Court's analysis also weigh decisively against granting the relief Plaintiff seeks.

*First*, Plaintiff cannot show irreparable harm absent a preliminary injunction.  Plaintiff falls back on the presumption that any deprivation of a First Amendment right constitutes irreparable harm.  Mot. at 7, 19-20.  But for all the reasons discussed above, Plaintiff has not "shown it likely" that the University violated, or in the future will violate, First Amendment freedoms, so irreparable harm cannot be "presumed" here.  *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006); *see also Schlissel*, 333 F. Supp. 3d at 715 (finding no irreparable harm where Speech

First failed to show that challenged University policies blocked or punished any expression protected by the First Amendment).  There is simply no basis in the record to hold that the University will deprive Plaintiff's student members of their First Amendment rights if the Court refuses to issue a preliminary injunction.

*Second*, Plaintiff cannot show that the balancing of harms favors this extraordinary relief. *See Smego*, 2015 WL 13688435, at *1.  There is no credible threat of harm to Plaintiff's members or other students, much less irreparable harm.  Yet the policies that Plaintiff seeks to enjoin are critical to the University's educational mission.  The University "must do all it can to promote respect among students." *Schlissel*, 333 F. Supp. 3d at 715.  Each challenged policy advances this goal, including by fostering dialogue on important issues, providing resources to students who feel victimized by bias, ensuring that students can express themselves safely and effectively, and preventing escalation between students that could lead to violence or other conduct prohibited by the Student Code.  *See supra* at 5-8.  Indeed, students who share viewpoints with Plaintiff's members have used BART to reports incidents they perceive as biased against them.  *See, e.g.*, Mot., Ex. E, at 11 (report of pro-Israel flyer vandalized with "Free Palestine"); *id*. at 6 (report of student using slur that peer was "white supremacist"); *id*. at 14 (report of student insulting peers who believe in religion).

If the policies are enjoined, the University's mission will suffer, as will all students who wish to live and learn in a respectful environment where individuals can disagree without derision, insult, or violence.  For the same reasons, the public interest would not be served in issuing the injunction. *See, e.g.*, *Sonnier v. Crain*, 649 F. Supp. 2d 484, 491 (E.D. La. 2009).

## CONCLUSION

For the foregoing reasons, Plaintiff's motion should be denied.

Respectfully Submitted,

/s/     Ishan K. Bhabha

Ishan K. Bhabha
Lauren J. Hartz
Jennifer J. Yun
Jenner & Block LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001
Telephone:  (202) 637-6327
Facsimile:  (202) 639-6066
IBhabha@jenner.com
LHartz@jenner.com
JYun@jenner.com

William D. Heinz (IL 1176900)
Richard Steinken (IL 3128253)
Jenner & Block LLP
353 N. Clark St
Chicago, IL 60654
Telephone:  (312) 222-9350
Facsimile:  (312) 840-7338
WHeinz@jenner.com
RSteinken@jenner.com

*Counsel for Defendants*

Dated: July 22, 2019

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing memorandum complies with the type-volume limitations set forth in Local Rule 7.1(B)(4)(b).  The memorandum contains 6,964 words, including all headings, subheadings, footnotes, and quotations.

/s/     Ishan K. Bhabha

Ishan K. Bhabha
Jenner & Block LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001
Telephone:  (202) 637-6327
Facsimile:  (202) 639-6066
IBhabha@jenner.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on July 22, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send email notification of the filing to the following:

Cameron Thomas Norris
William Spencer Consovoy
John Michael Connolly
CONSOVOY MCCARTHY PLLC
Suite 700
3033 Wilson Blvd
Arlington, VA 22201
703-243-9423
cam@consovoymccarthy.com
will@consovoymccarthy.com
mike@consovoymccarthy.com

/s/    Ishan K. Bhabha

Ishan K. Bhabha
Jenner & Block LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001
Telephone:  (202) 637-6327
Facsimile:  (202) 639-6066
IBhabha@jenner.com

*Counsel for Defendants*