E-FILED
Monday, 05 August, 2019  05:12:36 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

SPEECH FIRST, INC.,

*Plaintiff*,

v.

Case No. 19-cv-3142

TIMOTHY L. KILLEEN, et al. ,

*Defendants.*

## PLAINTIFF'S REPLY IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

William S. Consovoy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd, Suite 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com

*Counsel for Plaintiff Speech First, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................................iii

INTRODUCTION.......................................................................................................................1

ARGUMENT..............................................................................................................................2

I.      Speech First Is Likely to Prevail on the Merits...........................................................2

    A.      The University's Voluntary Cessation Did Not Moot Speech First's Challenges to the
        University's Restraint on Speech Concerning Non-Campus Elections................................2

    B.      Speech First Has Standing to Challenge the University's Prohibition on
        Bias-Motivated Incidents. ...............................................................................................4

    C.      Speech First Has Standing to Challenge the University's Use of
        "No Contact Directives" to Silence Speech.......................................................... 14

    D.      The University's Policies Are Likely Unconstitutional and Should Be Preliminarily
        Enjoined........................................................................................................... 18

        1.      The University's Prior Restraint on Speech Concerning "Non-Campus Elections"
            Violates the First Amendment. ...................................................................... 18

        2.      The University's Prohibition on "Bias-Motivated Incidents" Violates the First
            Amendment.................................................................................................. 18

        3.      The University's Inclusion of Protected Speech in the "No Contact Directive"
            Policy Violates the First Amendment. .......................................................... 19

II.     Speech First Satisfies the Remaining Preliminary-Injunction Criteria ....................... 19

CONCLUSION........................................................................................................................ 20

# TABLE OF AUTHORITIES

## Cases

*ACLU of Ill. v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012) .................................................................................. 23, 24

*ACLU v. The Fla. Bar,*
  999 F.2d 1486 (11th Cir. 1993) .................................................................................. 4

*Already, LLC v. Nike, Inc.,*
  568 U.S. 85 (2013) ...................................................................................................... 3

*Am. Commc'ns Ass'n v. Douds,*
  339 U.S. 382 (1950) .................................................................................................... 8

*Associated Gen. Contractors of Am. v. City of Columbus,*
  172 F.3d 411 (6th Cir. 1999) ...................................................................................... 5

*Backpage.com, LLC v. Dart,*
  807 F.3d 229 (7th Cir. 2015) .............................................................................. passim

*Bell v. Keating,*
  697 F.3d 445 (7th Cir. 2012) ...................................................................................... 6

*Christian Legal Soc'y v. Walker,*
  453 F.3d 853 (7th Cir. 2006) .................................................................................... 24

*City of Mesquite v. Aladdin's Castle, Inc.,*
  455 U.S. 283 (1982) ................................................................................................ 2, 3

*Constantine v. Rectors & Visitors of George Mason Univ.,*
  411 F.3d 474 (4th Cir. 2005) .................................................................................... 11

*Ctr. for Indiv. Freedom v. Madigan,*
  697 F.3d 464 (7th Cir. 2012) ...................................................................................... 7

*Dambrot v. Central Michigan University,*
  55 F.3d 1177 (6th Cir. 1995) ................................................................................ 21, 23

*DeFunis v. Odegaard,*
  416 U.S. 312 (1974) .................................................................................................... 2

*Federation of Advertising Indus. Representatives, Inc. v. City of Chicago,*
  326 F.3d 924 (7th Cir. 2003) ...................................................................................... 3

*Gooding v. Wilson,*
  405 U.S. 518 (1972) .................................................................................................. 23

*Healy v. James,*
  408 U.S. 169 (1972).................................................................................................. 25

*Hunt v. Wash. State Apple Advert. Comm'n,*
  432 U.S. 333 (1977)....................................................................................................6

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.,*
  515 U.S. 557 (1995).................................................................................................. 25

*Lopes v. Int'l Rubber Distributors, Inc.,*
  309 F. Supp. 2d 972 (N.D. Ohio 2004) ....................................................................6

*Magnuson v. City of Hickory Hills,*
  933 F.2d 562 (7th Cir. 1991)....................................................................................5

*Majors v. Abell,*
  317 F.3d 719 (7th Cir. 2000) .................................................................................. 19

*McCullen v. Coakley,*
  573 U.S. 464 (2014).......................................................................................... 19, 25

*Northland Family Planning Clinic, Inc. v. Cox,*
  487 F.3d 323 (6th Cir. 2007) ...................................................................................5

*Okwedy v. Molinari,*
  333 F.3d 339 (2d Cir. 2003) .........................................................................11, 12, 16

*Papish v. Bd of Curators of Univ. of Mo.,*
  4010 U.S. 667 (1973)............................................................................................... 24

*Payne Enterprises, Inc. v. United States,*
  837 F.2d 486 (D.C. Cir. 1988) .................................................................................4

*Payne v. United States Marshals Serv.,*
  No. 15-cv-5970, 2018 WL 3496094 (N.D. Ill. July 20, 2018)...............................5

*Penny Saver Publications Inc. v. Village of Hazel Crest,*
  905 F.2d 150 (7th Cir. 1990)............................................................................... 8, 23

*Rosemere Neighborhood Ass'n v. EPA,*
  581 F.3d 1169 (9th Cir. 2009) .................................................................................4

*Schirmer v. Nagode,*
  621 F.3d 581 (7th Cir. 2010).................................................................................. 21

*Six Star Holdings, LLC v. City of Milwaukee,*
  821 F.3d 795 (7th Cir. 2016)....................................................................................6

*Surita v. Hyde,*
665 F.3d 860 (7th Cir. 2011) ......................................................................................7

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ..........................................................................................6, 7, 18

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
137 S. Ct. 2012 (2017) ..............................................................................................3

*United States v. Atkins,*
323 F.2d 733 (5th Cir. 1963) ....................................................................................5

*United States v. Markowski,*
772 F.2d 358 (7th Cir. 1985) ....................................................................................4

*United States v. Sanchez-Gomez,*
138 S. Ct. 1532 (2018) ..........................................................................................2, 4

*United States v. Stevens,*
559 U.S. 460 (2010) ............................................................................................11, 21

*Wollschlaeger v. Gov'r of Fla.,*
848 F.3d 1293 (11th Cir. 2017) (en banc) ............................................................ 12

## Other Authorities

Illinois' Stalking No Contact Order Act, 740 ILCS 21 ...................................................... 16

*Policies & Guidelines,* Illini Union ......................................................................................4

**INTRODUCTION**

The University of Illinois claims to have "an unwavering commitment to the freedom of expression." Opp. 1. But its actions prove otherwise. Until weeks ago, the University's Student Code prohibited students from distributing literature on non-campus elections—expression at the heart of the First Amendment—without first obtaining the University's permission. The University employs an elaborate bureaucracy—the "Bias Assessment Response Team" ("BART") and "Bias Incident Protocol" ("BIP")—in order to eliminate "biased" and "hurtful" speech from its campus. And the University adopted a No Contact Directive policy that gives it nearly unlimited power to order students (upon threat of expulsion) not to speak to one another, and that contains no safeguards to protect students' First Amendment freedoms.

The University's opposition is designed to avoid constitutional scrutiny of its actions. The University claims the Court cannot reach its leafletting policy because the University amended its Student Code. But a defendant cannot moot a claim when nothing prevents it from reenacting the policy. The University claims Speech First lacks standing to challenge its prohibition on bias-motivated incidents because the BART and the BIP lack the formal power to punish students. But courts repeatedly have recognized that so-called "voluntary" policies can violate the First Amendment when they are (like here) designed to deter the expression of disfavored speech. And the University claims Speech First lacks standing to challenge the No Contact Directive policy because such a directive will be issued only in the context of a "potential or reported" violation of the Student Code, and not *solely* in response to protected speech. But the University's assurances (which appear nowhere in the policy) cannot save an unconstitutionally overbroad policy. The Court should grant the motion for a preliminary injunction.

**ARGUMENT**

## I.   Speech First Is Likely to Prevail on the Merits

### A.   The University's Voluntary Cessation Did Not Moot Speech First's Challenges to the University's Restraint on Speech Concerning Non-Campus Elections.

Before this lawsuit was filed, the University's student code prohibited students from "post[ing] and distribut[ing] leaflets, handbills, and any other types of materials" about "candidates for non-campus elections" without "prior approval." Mot., Ex. A at 46, § 2-407. A student who violated this rule was subject to disciplinary action, including reprimand, censure, probation, suspension, and dismissal from the University. Mot., Ex. B. at 9-10, § 2.04(a)(iii), (b); *see* Mot. at 2-3. On July 18, 2019, four days before it filed its opposition, the University revised its code to eliminate this policy. The University now claims the issue is moot. It is not.

 "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). If it did, the government could "engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where it left off, repeating this cycle until it achieves all its unlawful ends." *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 n.* (2018) (cleaned up). The government also could frustrate "the 'public interest in having the legality of the practices settled.'" *DeFunis v. Odegaard*, 416 U.S. 312, 318 (1974).

To be certain, courts have recognized a narrow exception to this general rule. A defendant can establish mootness based on voluntary cessation, but only if he "bears the formidable burden of showing that it is *absolutely* clear the allegedly wrongful behavior could not reasonably be expected to recur." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (cleaned up) (emphasis in original). The University cannot carry this heavy burden.

Because the University can easily amend its Student Code to bring back its leafletting policy, it is not "*absolutely* clear the allegedly wrongful behavior could not reasonably be expected to recur."

*Id.* As shown by the speed in which it acted, amending the Student Code requires nothing more than a committee vote and the Chancellor's signature. Opp. 5. A defendant does not carry its heavy burden when no practical or legal obstacle prevents it from returning to its prior policy. *See, e.g., Tree of Life Christian Sch. v. City of Upper Arlington*, 823 F.3d 365, 371 (6th Cir. 2016) (case not moot because "absent an injunction …, [the city] always could amend the [ordinance] once again" and could do so "at any time").

The University cites various decisions from the Seventh Circuit to argue that this Court should "place greater stock in [the University's] act of self-correction" because it is a state actor. Opp. 12. Those cases are not good law. In *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), a Missouri state agency argued that the case was moot because the State had changed its policy to "allow[] religious organizations to compete for and receive Department grants on the same terms as secular organizations." 137 S. Ct. 2012, 2019 n.1 (2017). The Supreme Court disagreed because the State could simply "revert to its policy of excluding religious organizations." *Id.* In doing so, the Court did not conclude the government's repeal was "disingenuous" or "not genuine," *Federation of Advertising Indus. Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 930 (7th Cir. 2003). Nor did it employ a relaxed mootness standard because the defendant was a state actor. Instead, the mere possibility that the government could readopt the policy rendered the case not moot. The Seventh Circuit cases to the contrary no longer control. *See United States v. Markowski*, 772 F.2d 358, 361 (7th Cir. 1985).

But the University cannot carry its burden even if it is entitled to more solicitude than private parties. The University notes that the Associate Dean of Students, Rhonda Kirts, has stated that "the University has no intention of restoring" the old rule. Opp. 12. But this assertion cannot moot the case. *See Rosemere Neighborhood Ass'n v. EPA*, 581 F.3d 1169, 1174 (9th Cir. 2009) (the "bare assertion" by the [government] … that this situation will not recur" cannot moot the case) (citation omitted); *ACLU v. The Fla. Bar*, 999 F.2d 1486, 1494-95 (11th Cir. 1993) (same). Nor can Ms. Kirts "speak for

her superiors" or the other members of the University's Conference for Conduct Governance, who have not "signed affidavits pledging future compliance." *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 491-92 (D.C. Cir. 1988). And even if her superiors had signed affidavits, "the word of the present [officials]" is "not sufficient to make the case moot" because it is "not binding on those who may hereafter be appointed." *United States v. Atkins*, 323 F.2d 733, 739 (5th Cir. 1963).

Other factors also weigh in favor of finding the case not moot. The voluntary cessation in this case occurred only "once this lawsuit was filed," which undermines the University's assurances that it will never reinstate the rule. *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 343 (6th Cir. 2007). Moreover, despite the revised Student Code, "'the effects [of the policy] continue after discontinuance.'" *Payne v. United States Marshals Serv.*, No. 15-cv-5970, 2018 WL 3496094, at *2 (N.D. Ill. July 20, 2018) (quoting *Magnuson v. City of Hickory Hills*, 933 F.2d 562, 565 (7th Cir. 1991)). To this day, the University's website warns students that they are forbidden from passing out "promotional materials of candidates for non-campus elections" without prior approval. *Policies & Guidelines*, Illini Union, bit.ly/2YyR1Ig (Ex. A at 3).

If the University truly intends to never adopt these rules again, then it should have no problem "agree[ing] to a judgment declaring [them] unconstitutional." *Associated Gen. Contractors of Am. v. City of Columbus*, 172 F.3d 411, 420 (6th Cir. 1999). But without an injunction, there is no guarantee that the University will not revert to its old ways. *See, e.g., Lopes v. Int'l Rubber Distributors, Inc.*, 309 F. Supp. 2d 972, 983-84 (N.D. Ohio 2004). This issue is not moot.

**B.      Speech First Has Standing to Challenge the University's Prohibition on Bias-Motivated Incidents.**

To establish Article III standing, a plaintiff must show (1) an "injury in fact," (2) a sufficient "causal connection between the injury and the conduct complained of," and (3) a "likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, (2014) (cleaned up). An association seeking to bring suit on behalf of its members has standing when

"its members would otherwise have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Here, the University challenges only whether Speech First can show an "injury in fact." Opp. 13-16.

There are two ways in which an individual may establish an ongoing injury when seeking to enjoin a policy alleged to violate First Amendment rights. *See Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 802-03 (7th Cir. 2016). First, an individual can show that his speech is being chilled by a policy, though not expressly prohibited by it. That is because "[c]hilled speech is, unquestionably, an injury supporting standing." *Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012). "Self-censorship" is a distinct "harm that can be realized even without an actual prosecution." *Ctr. for Indiv. Freedom v. Madigan*, 697 F.3d 464, 474 (7th Cir. 2012). A plaintiff thus has suffered an injury-in-fact when, as an objective matter, "the alleged conduct by the defendants would likely deter a person of ordinary firmness" from engaging in protected speech. *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011). Second, an individual can show a cognizable injury-in-fact when he faces a "credible threat of enforcement" of the policy. *Susan B. Anthony List*, 573 U.S. at 161-65. The person faces such a threat when (1) he "inten[ds] to engage in a course of conduct arguably affected with a constitutional interest," (2) his "intended future conduct is arguably proscribed by the [policy] [he] wish[es] to challenge," and (3) "the threat of future enforcement of the [challenged policy] is substantial." *Id.* (cleaned up).

Speech First satisfies both tests. As explained, Speech First's members' speech is being chilled because they reasonably fear the consequences of engaging in speech that is deemed "biased." Mot. 12, 16-18. Speech First's members also face a "credible threat of enforcement" of the University's bias-incidents policy. Speech First's members intend to express themselves on a host of issues of public policy, *see* Neily Decl. ¶ 9, which are obviously "affected with a constitutional interest"; their expression can be covered as a "bias incident" (which the University *never* disputes), Mot. 12, 16-18; and the threat of being reported to the BART is "substantial," as bias incidents are easy to report and

the University receives and addresses hundreds of reports each year, many of which cover these precise topics, Mot. 17; *see, e.g.,* Ex. D; *see Susan B. Anthony List*, 573 U.S. at 161-65.

In its opposition, the University first misstates the legal standard. The University argues that an individual's speech cannot be chilled unless the public-official defendant has the formal power to "subject [the individual] to a specific penalty such as arrest [or] prosecution." Opp. 13-14. That is wrong. "[C]onstitutional violations may arise from the 'chilling' effect of governmental regulations that fall short of a direct prohibition against the exercise of first amendment rights." *Penny Saver Publications Inc. v. Village of Hazel Crest*, 905 F.2d 150, 154 (7th Cir. 1990). A public official can violate the First Amendment even if he "ha[s] no authority to take any official action." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 236 (7th Cir. 2015); *see, e.g., Levin v. Harleston*, 966 F.2d 85, 89 (2d Cir. 1992) (professor's speech chilled by the university's committee even though it "was purely advisory, utterly lacking any power to take action against [the professor]"). "Indirect 'discouragements',," at bottom, can "undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions or taxes." *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 402 (1950).

The University next contends that Speech First unfairly describes the BART. According to the University, the BART's mission is not to stop or prevent bias from occurring on campus. Boten Decl. ¶ 4. Instead, the BART is merely a group of people who "promote education and awareness about the impact of actions motivated by prejudice, and facilitate respectful and productive dialogue between individuals and groups with differing or opposing views." Opp. 5. The evidence disproves this rosy picture. The BART—its structure, members, terminology, procedures, and even its name—is designed to resemble a disciplinary apparatus. The co-leaders of the BART, January Boten and Debra Imel, are also members of the Office for Student Conflict Resolution, the disciplinary body charged with enforcing violations of the student code. Mot., Exs. F, G, H. Also on the BART are the Director of the OSCR, Justin Brown, and a detective from the University Police Department, Rachael Ahart. *Id.*

The University defines key terms such as "bias incident" to invoke the notion of a formal rule. Mot., Ex. C. It labels the students who express "bias" as "offenders." Mot., Ex. I at 6. And aggrieved students file "reports," like they would at the police station. Mot., Ex. I.

Most telling, reports to the BART can be filed anonymously, just as any law-enforcement office allows anonymous "tips" about criminal activity. *Id.* at 1. Indeed, the "vast majority of reports made to BART are submitted anonymously." Boten Decl. ¶ 19. If the primary purpose of the BART is, as the University claims, to "support[] students affected by bias-motivated incidents" and "facilitate[] respectful and productive dialogue between individuals and groups with differing or opposing views," the BART would have no need for such anonymous information. Anonymous allegations are useful only if the BART's purpose is to target the *speaker*.

When the BART receives a report, moreover, it is formally logged, and the University holds itself accountable to reporters of bias by disclosing how it responded to the bias. Mot. 7-8; Boten Decl. ¶ 20. The University also maintains individualized student records of the allegations against the student, the BART's response, and the student's consequences. Mot. 7-8. The BART then categorizes reports of bias by "using the FBI Uniform Crime Reporting Program's Hate Crime categories in order to … break down the individual(s)/group(s) that were targets of bias incidents/reports." Mot., Ex. K at 3. Even the BART's name shows its disciplinary purpose. It is the Bias *Assessment* & *Response* Team, not the Bias *Support* Team (or even the Bias *Education* Team). "Response Teams" typically are not passive entities offering mediation. *See, e.g., Tactical Response Team*, City of Dixon, Illinois, bit.ly/2JZtPz9 (the City of Dixon's "TRT" specializes in "hostage rescue, downed officer retrieval, and close quarter battle techniques"). It strains credulity to assert that the BART has no interest in stopping or preventing "bias" on campus—that is its *raison d'être*. Boten Decl. ¶ 4.

The University next claims that it reaches out to "offenders" only to have a "dialogue" and that students cannot be compelled to speak with the BART. Opp. 5, 14. But if true, students are never

told this. As Speech First has explained, "when a BART official contacts the offender, the official tells the student that the BART has received a bias report about the student and that the BART needs to speak with the student to discuss the allegations." Neily Decl. ¶ 12. The BART official also "will not identify the person who has accused the student of 'bias' or inform the student of any rights he or she may have." *Id.* Critically, the University *does not dispute* these facts. Opp. 5-8. Indeed, nowhere in any of the hundreds of pages of declarations or exhibits is there any evidence that students are ever informed of their supposed rights when dealing with the BART.

Without these warnings, no student would see requests from the BART as voluntary. These impressionable 18- to 22-year-olds, many living away from their parents for the first time with tens of thousands of dollars in tuition at stake, are unlikely to treat a request from a university official to have a meeting over accusations of "bias" as voluntary. Indeed, as the University highlights elsewhere, *see* Opp. 19-20, students are *required* "to comply with the reasonable directions of a University or other law enforcement official acting in the performance of her or his duty," Student Code § 1-302(h). And common sense suggests the average college student is unlikely to *want* to meet with a University official to discuss the appropriateness of his speech or to accept a "resolution agreement" or "educational referral" to address his alleged bias. Mot. 7. Students do so only because the BART is making that "request." *Backpage.com, LLC*, 807 F.3d at 235-36.

That some students have expressed "controversial or unpopular viewpoints," Opp. 3-5, and others apparently have ignored the BART's instructions to speak with them, Boten Decl. ¶ 24, does not show that no problem exists. The First Amendment "targets conduct that tends to *chill* [speech], not just conduct that *freezes* it completely," and the constitutionality of a particular course of action cannot turn on "the plaintiff's will to fight." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). Informal coercion "is actionable and thus can be enjoined even if it turns out to be empty—the victim ignores it, and the threatener folds his tent." *Backpage.com, LLC*,

807 F.3d at 231. Further, the brunt of the harm caused by the BART falls on the silent majority of students who, like Speech First's members, self-censor their speech to avoid the BART altogether. The BART has no experience with these students—precisely *because* its existence chills speech on campus.

That is why courts do not ignore First Amendment problems simply because state defendants promise that their interactions are "voluntary." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67-68 (1963); *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003). The University can chill speech even if it does not "directly threaten the [students] with an investigation or prosecution." *Backpage.com, LLC*, 807 F.3d at 236. Nor can such assurances in lawyer-drafted declarations eliminate the problem, as they amount to nothing more than "promises to use [the University's policies] responsibly." *United States v. Stevens*, 559 U.S. 460, 480 (2010).

Even if the BART lacks the power to *formally* discipline students for their "biased" speech, it certainly "implies" that it can. *Backpage.com, LLC*, 807 F.3d at 234; *see Bantam Books, Inc.*, 372 U.S. at 67-68; *Levin*, 966 F.2d at 89. Given the significant overlap between the BART and the OSCR, a student could reasonably think that the BART and the University's disciplinary arm are one and the same, or that members of the BART will "use whatever authority [they] do[] have, as [university administrators]" to punish them. *Okwedy*, 333 F.3d at 344. Indeed, BART officers do not even need to "pull strings to get [a student] investigated and even [punished] by" another officer; as members of the OSCR, they can just do it themselves. *Backpage.com, LLC*, 807 F.3d at 233. Students "who are looking down the barrel of the [University]'s disciplinary gun" need not "guess whether the chamber is loaded" to have standing. *Wollschlaeger v. Gov'r of Fla.*, 848 F.3d 1293, 1306 (11th Cir. 2017) (en banc).

The University assures the Court that the allegations of bias it collects against students and the BART's interactions with students accused of bias "are not disclosed outside of the Office for Student Conflict Resolution unless a student gives permission." Opp. 6. Again, there is no evidence that

students are ever told this, *see* Opp. 5-8, and so a student could reasonably assume that if he expresses "bias" the allegations against him will be made available to others—both inside and outside the University. In any event, a promise that this information will be shared only with OSCR—the campus's *disciplinary body*—provides little comfort to a student thinking about expressing speech that could be interpreted as "biased." Moreover, some of this information *is* disclosed outside of OSCR. The BART publishes summaries of the bias reports it receives and its responses; and, although the BART does not specifically identify the names of students involved, students who have been accused of "bias" are easily identifiable to those in the know. *See, e.g.,* Mot. Ex. N at 4-9.

The Bias Incident Protocol ("BIP") suffers similar defects. University Housing receives complaints of bias about its residents (half of which are anonymous), and it then asks students to "voluntarily" accept "corrective action" for the "bias-motivated incident." Mot. 9-10; Sealine Decl. ¶¶ 11-12, 15. Although the University assures the Court that these interactions are also voluntary, there is no evidence that students are ever informed of their supposed rights. *See id.* Like interactions with the BART, students are unlikely to ignore "requests" from those who control whether they can continue to live in their residence. Mot. 8-9.

Although the University paints this case as novel, many cases (some binding on this Court) are directly on point. In *Bantam Books*, the U.S. Supreme Court confronted Rhode Island's attempt to circumvent the First Amendment's limitation on regulating obscenity by creating a Commission to Encourage Morality in Youth. 372 U.S. at 59. The Commission's mission was to "educate the public" about printed materials that contain "obscene, indecent or impure language, or manifestly tend[ed] to the corruption of the youth." *Id.* To that end, the Commission would circulate "lists of objectionable publications," receive "complaints from outraged parents," "investigate" incidents, and "recommend legislation, prosecution and/or treatment" to address these incidents. *Id.* at 60 n.1. If the Commission concluded that a book was "objectionable," it would then send a notice to the publisher stating its

10

conclusion and thanking the publisher for its "cooperation" in preventing its spread. *Id.* at 62-63. A "local police officer" would follow up with the publisher shortly thereafter. *Id.* at 63. Yet the Commission had no power to force publishers to withdraw the materials or sanction them if they refused. *See id.* at 66-67.

The Supreme Court held that this regime violated the First Amendment. The Commission's definition of "objectionable" material was unconstitutionally vague and overbroad. *Id.* at 65-66, 71. True, the Commission had no "power to apply formal legal sanctions," *id.* at 66, and the publishers were "'free' to ignore the Commission's notices, in the sense that [their] refusal to cooperate would have violated no law," *id.* at 68. But the Court "look[ed] through forms to the substance" and noted that "[p]eople do not lightly disregard public officers' thinly veiled threats." *Id.* at 67-68. "The Commission deliberately set out to achieve the suppression of publications deemed 'objectionable' and succeeded in its aim." *Id.* at 67. Because it "acted as an agency not to advise but to suppress," the Commission violated the First Amendment. *Id.* at 72.

Similarly, in *Backpage.com*, the Sheriff of Cook County, Illinois, sought to shut down Backpage.com, which provided an online forum for "adult" classified ads. 807 F.3d at 230. Given that the Sheriff could not prohibit Backpage from posting the adult ads online (because of the First Amendment), he instead tried to deprive the company of ad revenues. *Id.* To do so, the Sheriff sent letters to Mastercard and Visa "requesting" that the credit card companies stop allowing their credit cards to be used to place ads on the website. *Id.* at 236-37. Although Sheriff Dart did not threaten the companies with punishment, he "implied" as much, as his letter was on the sheriff's letterhead, criticized the credit card companies' actions, and referenced criminal statutes. *Id.* at 231, 236. The district court denied Backpage's preliminary injunction motion, but the Seventh Circuit reversed.

Per the Seventh Circuit, "[a] public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether

the threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less direct form." *Id.* at 230-31. It was irrelevant that "Sheriff Dart did not directly threaten the companies with an investigation or prosecution." *Id.* The letter "could reasonably be interpreted as an implied threat to take, or cause to be taken, some official action against the companies if they declined his 'request' to stop providing a method to pay for advertising on Backpage.com." *Id.* at 236. Nor was it relevant that "his department had no authority to take any official action with respect to Visa and MasterCard." *Id.* Sheriff Dart violated the First Amendment because he "could reasonably be seen as implying that the companies would face some government sanction … if they did not comply with his 'request.'" *Id.* As the Seventh Circuit reminded, "censorship—an effort by administrative methods to prevent the dissemination of ideas or opinions thought dangerous or offensive, as distinct from punishing such dissemination ... after it has occurred—is prohibited by the First Amendment." *Id.* at 235. By denying a preliminary injunction, the district court had created "a formula for permitting unauthorized, unregulated, foolproof, lawless government coercion." *Id.* at 237-38. The Seventh Circuit ordered Sheriff Dart and his office to "take no actions, formal or *informal*, to *coerce* or threaten credit card companies … with sanctions intended to ban credit card or other financial services from being provided to Backpage.com." *Id.* at 239 (emphasis added).

Likewise, in *Okwedy*, the plaintiff rented billboards in Staten Island to post messages denouncing homosexuality. 333 F.3d at 341. The President of the Staten Island Borough wrote a letter to the billboard company, on official letterhead, stating that the billboards were "unnecessarily confrontational and offensive" and "convey[ed] an atmosphere of intolerance which is not welcome in our Borough." *Id.* at 341-42. The President asked the company to "contact" the "Chair of [the] Anti-Bias Task Force" to "establish a dialogue" and "discuss" these issues. *Id.* He "call[ed] on [the company] as a responsible member of the business community," reminding that the company "owns

a number of billboards on Staten Island." *Id.* at 342. The Second Circuit, in an opinion joined by then-Judge Sotomayor, reversed the dismissal of the plaintiff's First Amendment claim. A jury could find that the President's letter crossed the line "between attempts to convince and attempts to coerce." *Id.* at 344. The letter harkened to the President's "official authority" and "call[ed] on" the billboard company to contact his anti-bias task force. *Id.* "Even though [the President] lacked direct regulatory control over billboards," the company "could reasonably have feared that [he] would use whatever authority he does have" against it. *Id.* And the fact that the letter called for "dialogue" did not necessarily dissipate this "implicit threat." *Id.*

Finally, in *Levin*, the plaintiff was a college professor who had written inflammatory articles about race. 966 F.2d at 87. In response to his articles, the University took two actions. First, it allowed students assigned to the professor's class to transfer to an "alternative" section. *Id.* at 87-88. Even though the professor was still allowed to teach, the Second Circuit held that the University violated his First Amendment rights by "'stigmatizing'" him with the creation of these "shadow classes." *Id.* at 88. Second, the President of the University created a Committee on Academic Rights and Responsibilities to study "when speech … may go beyond the protection of academic freedom or become conduct unbecoming a member of the faculty, or some other misconduct." *Id.* at 89. (The words "conduct unbecoming" ominously mirrored the language used in the University's disciplinary code for professors. *Id.*) The Second Circuit held that the creation of this committee independently violated the professor's First Amendment rights. Even though the committee was "purely advisory, utterly lacking the power to take action," and even though the President never "explicitly" threatened disciplinary charges, the court held that the committee's existence was an "implicit threat" that chilled

the professor's speech. *Id.* at 89-90. "It is the chilling effect on free speech that violates the First Amendment, and it is plain that an implicit threat can chill as forcibly as an explicit threat." *Id.*[1]

A tweak in the facts of this case demonstrates the flaws in the University's position. Imagine that in the wake of the September 11th attacks, the University established a "Patriotism Assessment Response Team" to foster a sufficiently patriotic "campus climate." If students witnessed "anti-American incidents" on campus, they could file a report and receive counseling and support about how to cope with unpatriotic actions. The Patriotism Assessment Response Team would also contact the offending student and offer to facilitate a "voluntary" conversation about why that student's anti-American actions were hurtful and how the student could be more patriotic in the future. No one could argue with a straight face that the Patriotism Assessment Response Team did not even *implicate* the First Amendment, and that no student would have standing to challenge it due to its "voluntary" nature. The Patriotism Assessment Response Team would instead be roundly criticized—and held unconstitutional—for what it is: a fundamentally coercive policy designed to deter students from expressing disfavored views. The BART is no different. Speech First has standing because it has shown that the University's policies likely impose an objective chill on student speech.

### C. Speech First Has Standing to Challenge the University's Use of "No Contact Directives" to Silence Speech.

For similar reasons, Speech First has standing to bring a pre-enforcement challenge to the University's No Contact Directive policy. Speech First's members intend to engage in a course of conduct "arguably affected with a constitutional interest," *Susan B. Anthony List*, 573 U.S. at 161-65, namely speech on issues of public concern, Mot. 17. The students' "intended future conduct is

---

[1] Although two district courts have denied Speech First's requests for preliminary injunctions against the University of Michigan and the University of Texas at Austin, *see* Opp. 9-10, those decisions were wrong, and Speech First has appealed. *See Speech First v. Schlissel*, No. 18-1917 (6th Cir.); *Speech First v. Fenves*, No. 19-50529 (5th Cir.).

arguably proscribed by the [policy] they wish to challenge," *Susan B. Anthony List*, 573 U.S. at 161-65, as the policy on No Contact Directives is so broad that it authorizes disciplinary officers to issue No Contact Directives in response to fully protected speech, Mot. 18-19. And the students face a credible "threat of future enforcement," as the students' views are controversial on campus, Mot. 17, a No Contact Directive is easily and frequently issued, Mot. 18-19; *infra* at 16, and the University previously has issued them in response to speech protected under the First Amendment, Mot. 10-11; *see Susan B. Anthony List*, 573 U.S. at 161-65. Whether Speech First's members have been threatened with a No Contact Directive themselves is of no moment. *See Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2000) ("A plaintiff who mounts a pre-enforcement challenge to a statute that he claims violates his freedom of speech need not show that the authorities have threatened to prosecute him; the threat is latent in the existence of the statute.") (citations omitted).

The University nevertheless argues that Speech First has no cognizable injury-in-fact because the University's policies "expressly limit the circumstances in which [No Contact Directives ("NCDs")] can be issued to potential or reported violations of the Student Code" and, accordingly, students cannot "face a threat of punishment under the NCD [policy] simply for expressing [their] views." Opp. 18-19.

The University's reading of Section 4.06 is strained, to say the least. Section 4.06 plainly states that disciplinary officers may issue a No Contact Directive whenever the officer concludes "that a No Contact Directive is warranted," *id.* § 4.06(d), and the section contains no "express[]" limitation on the issuance of No Contact Directives. Regardless, the University's interpretation cannot save the policy. As the University acknowledges, Section 4.06 does not prohibit disciplinary officers from issuing a No Contact Directive because of a student's First-Amendment protected speech, if the officer believes it will prevent a potential violation of the Student Code. *See* Opp. 20 ("NCDs cannot be issued based *solely* on speech such as that which the anonymous students wish to express."). Thus,

there is no dispute that "even though the [policy] says nothing about speech on its face … it is subject to First Amendment scrutiny." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014). The question is whether Section 4.06 is "narrowly tailored to serve a significant governmental interest." *Id.* at 486. It is not.

Section 4.06 is not remotely tailored to serve the University's interests. Under the University's interpretation of the provision, a disciplinary officer has the right to issue a No Contact Directive if he believes a student might "potentially" violate *any* provision of the Student Code—a document spanning more than 100 pages and prohibiting a wide range of conduct, from violence and sexual assault to plagiarism and disruptive shouting. *See* Mot., Ex. A. Moreover, the disciplinary officer can issue a No Contact Directive against a student even if he does not believe the student will potentially violate the Student Code—all the disciplinary officer needs is an indication that *someone* (it could be the *listener*) could violate the Student Code. *See* Brown ¶ 17 (No Contact Directives are always issued against "both students"). This is not a "tailored" approach to campus problems.

That Section 4.06 is unconstitutionally overbroad becomes apparent when compared to similar statutes. For example, Illinois' Stalking No Contact Order Act creates a civil remedy allowing stalking victims to force offenders to "stay away from the victims and third parties." 740 ILCS 21/5. Not surprisingly, the state law does not authorize a no-contact order merely because there is a "potential or reported" violation of any law. Instead, a no contact order can issue only if the offender is "engaging in a course of conduct directed at a specific person, and [the offender] knows or should know that this course of conduct would cause a reasonable person to fear for his or her safety or the safety of a third person or suffer emotional distress." *Id.* § 10.

The University cites a declaration from the Director of OSCR to assure the Court that, in practice, the University uses its power rarely and only when needed. Opp. 17. But the declaration shows nothing of the kind. During the 2018-19 school year, the University issued *over one hundred* No Contact Directives, each prohibiting at least two students (and sometimes "groups" of students) from

having any oral, written, or third-party communications (whether on campus or off campus) for an indefinite period of time. Brown Decl. ¶¶ 22-23. Although some of these directives appear to have addressed cases of physical violence or sexual misconduct, others were for nothing more than incidents that "suggested that a violation of the Student Code … was likely in the near future." *Id.* ¶ 23. Which provisions of the Student Code warranted a No Contact Directive, it does not say.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

In any event, the University's promise that it uses its limitless authority responsibly does not resolve the issue. This Court cannot "uphold an unconstitutional statute merely because the Government promise[s] to use it responsibly." *Stevens*, 559 U.S. at 480; *Dambrot v. Central Michigan University*, 55 F.3d 1177, 1183 (6th Cir. 1995) (finding a university policy unconstitutionally broad, despite the university's promise to not enforce the policy "to interfere impermissibly with individuals' right to free speech"). As long as the policy "*arguably* prohibits certain protected speech, a reasonable fear of prosecution can provide standing for a First Amendment challenge." *Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010) (emphasis added). Speech First has made that showing.

### D.    The University's Policies Are Likely Unconstitutional and Should Be Preliminarily Enjoined.

If the Court agrees with Speech First on mootness and standing, then Speech First readily satisfies each of the remaining criteria for a preliminary injunction. The merits are straightforward and largely undisputed.

#### 1.    The University's Prior Restraint on Speech Concerning "Non-Campus Elections" Violates the First Amendment.

The University does not dispute that its prior restraint on speech concerning "non-campus elections" violates the First Amendment. Nor could it—which is probably why it rushed to change the policy. *See* Mot. 14-16. The University has no compelling interest for this prior restraint on core political speech, nor is this prohibition narrowly tailored to any such interest. *See id.*

#### 2.    The University's Prohibition on "Bias-Motivated Incidents" Violates the First Amendment.

As explained in its motion, the University's prohibition on "bias-motivated incidents" violates the First Amendment because (1) it is overbroad, as it encompasses speech that is fully protected by the First Amendment; and (2) it is void for vagueness, as it offers students no guidance about the meaning of the term "bias-motivated incident" or how students can avoid committing a violation. Mot. 16-18. The University does not dispute that its definition of "bias-motivated incidents" covers speech that is fully protected by the First Amendment. Nor does it dispute that the definition offers students no guidance as to how it can avoid committing a "bias-motivated incident." Opp. 18-19.

The University's sole argument is that "the definition of 'bias-motivated incidents' *cannot* as a matter of law be unconstitutionally overbroad or vague, because nothing is proscribed and no one can be punished." Opp. 19. Again, this is wrong as a matter of law, as "constitutional violations may arise from the 'chilling' effect of governmental regulations that fall short of a direct prohibition against the exercise of first amendment rights." *Penny Saver Publications Inc.*, 905 F.2d at 154; *see supra* at 6. Here, the University's definition of "bias incident" serves as the trigger for the administrative apparatus of

the BART and the BIP. If the Court agrees with Speech First on standing (*i.e.*, that Speech First's members' speech is being chilled), it necessarily agrees with Speech First on the merits.

### 3. The University's Inclusion of Protected Speech in the "No Contact Directive" Policy Violates the First Amendment.

The University's authorization of No Contact Directives is unconstitutionally overbroad because it encompasses speech that is fully protected under the First Amendment. Mot. 18-19; *supra* at 14-17. Although the University could properly issue No Contact Directives in certain circumstances (*e.g.*, to protect the health and safety of students), its policy as it stands is "so broad as to chill the exercise of free speech and expression," *Dambrot*, 55 F.3d at 1182, and does not "regulate … only with narrow specificity," *Gooding v. Wilson*, 405 U.S. 518, 522 (1972). It is likely unconstitutional.

## II. Speech First Satisfies the Remaining Preliminary-Injunction Criteria

The University does not dispute that if Speech First shows a likely constitutional violation, it necessarily shows irreparable harm. Opp. 21-22. That is because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (citation omitted). Instead, the University claims that the balancing of harms does not favor a preliminary injunction because the University "must do all it can to promote respect among students." Opp. 22. But "injunctions protecting First Amendment freedoms are *always* in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) (emphasis added). "The mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd of Curators of Univ. of Mo.*, 4010 U.S. 667, 670 (1973). Promoting "respect among students," while important, cannot trump the First Amendment. *Id.*; *see ACLU of Ill.*, 679 F.3d at 589-90 & n.1.

*     *     *

In the end, it bears emphasizing the narrowness of Speech First's motion. The University paints Speech First as seeking a sweeping injunction that would strip the University of its ability to

help students in need and to respond to hateful speech. That is not true. Speech First's request for a preliminary injunction is limited, targeted only at the University's efforts to restrict speech.

With regards to the BART and the BIP, Speech First's requested preliminary injunction is focused entirely on protecting the constitutional rights of the *speaker*. Mot. 21. The University can provide "resources to students who feel victimized by bias" through counseling and other support. Opp. 22. The University can "foster[] dialogue on important issues" through roundtables, lectures, and guest speakers. *Id.* The University can take steps to ensure that students can "express themselves safely" without the fear of "violence." *Id.* The University can counter hateful speech with speech of its own. *See Backpage.com, LLC*, 807 F.3d at 231. Speech First does not question the University's right to take any of these actions. Similarly, with regards to the No Contact Policy, Speech First asks only for "clear, objective procedures that ensure the directives are issued consistently with the First Amendment." Mot. 21. The University can (and should) protect its students from violence, sexual harassment, stalking, and similar harms. Opp. 8. No one is questioning the validity of such a regime.

What the University cannot do is what it has done here: summon the might of its official machinery to "squelch the free speech of private citizens," *Backpage.com, LLC*, 807 F.3d at 231, and enforce a far-reaching No Contact Directive policy that "sacrific[es] speech for efficiency," *McCullen*, 573 U.S. at 486. After all, "the point of all speech protection ... is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995). This "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher education]." *Healy v. James*, 408 U.S. 169, 180 (1972). A preliminary injunction is warranted.

## CONCLUSION

For these reasons, the Court should grant the preliminary injunction.

Respectfully submitted,

Dated: August 5, 2019

　　/s/ J. Michael Connolly　　

William S. Consovoy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com

*Counsel for Plaintiff Speech First, Inc.*

**CERTIFICATE OF SERVICE**

I certify that on August 5, 2019, I electronically filed this Reply with the Clerk of Court using the CM/ECF system, and emailed an unredacted copy of the brief to opposing counsel.


_/s/ J. Michael Connolly_