E-FILED
Tuesday, 17 September, 2019  02:39:23 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **SPEECH FIRST, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 19-cv-3142** |
| | ) | |
| **TIMOTHY L. KILLEEN, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

On June 6, 2019, Plaintiff filed a Motion for Preliminary Injunction (#4) and a Memorandum in Support (#5) with attached Exhibits.  Defendants filed a Response (#18), with numerous attached Exhibits, on July 22, 2019.  Plaintiff filed a Reply (#22) on August 5, 2019.  For the reasons that follow, the court DENIES the Motion for Preliminary Injunction.

## I.  BACKGROUND

On May 30, 2019, Plaintiff Speech First filed a Complaint (#1) against Defendants, twenty-nine people who hold positions at the University of Illinois ("University").  Plaintiff challenges the constitutionality of three university policies: (1) a rule prohibiting the posting and distributing of materials about candidates for non-campus elections unless an individual receives "prior approval" from the University ("prior approval requirement"); (2) a policy against "bias-motivated incidents"; and (3) a policy governing the issuance of "No Contact Directives."

Plaintiff's Motion for Preliminary Injunction seeks an order enjoining Defendants from (1) enforcing the prior approval requirement; (2) using the Bias Assessment and Response Team, University Housing, or any other University officials to investigate, log, threaten, or punish students (including informal punishments) for bias-motivated incidents; and (3) issuing No Contact Directives without clear, objective procedures ensuring the directives are issued consistent with the First Amendment.

A. The Parties

1. *Speech First and Its Members*

In the Complaint, Plaintiff Speech First describes itself as "a nationwide membership organization of students, alumni, and concerned citizens . . . dedicated to preserving civil rights secured by law, including the freedom of speech guaranteed by the First Amendment."

Speech First filed suit on behalf of four anonymous students at the University. Those students, referred to in the Complaint as Students A, B, C, and D (collectively, "Students"), are either "rising sophomores" (Students A and C) or "rising seniors" (Students B and D). The Students wish to express a wide variety of "political, social, and policy viewpoints that are unpopular on campus." The Complaint lists examples of such viewpoints, including opposition to abortion, support for President Trump, belief in traditional marriage, support for strong immigration and border policies, support for "deradicalization of Islam," support for Israel, support for First Amendment coverage for "hate speech," opposition to gun control, and support for LGBT rights. The

Students wish to engage in "open, robust, and civil discourse" with other students, including those who disagree with them.

The Complaint alleges the University's ban on "bias-motivated incidents" and its issuance of No Contact Directives for engaging in protected speech chills the Students' speech, deterring them from speaking openly about issues of public concern.  The Complaint states that the Students believe expressing their views "could result in being reported, investigated, and punished by the University's Bias Assessment and Response Team (BART) for engaging in a 'bias motivated incident.'"  It further alleges that Students A, B, and C want to distribute literature about non-campus elections, but the rule requiring prior authorization to do so chills their speech, and that Student C (who lives in the University's residential housing) fears expressing his views could result in "being reported, investigated, and punished by" University housing in addition to BART.

 2.  *The University and Its Personnel*

Defendants are all sued in their official capacities, due to their positions within the University.  The University is a public university governed by a Board of Trustees. Defendants Ramón Cepeda, Kareem Dale, Donald J. Edwards, Ricardo Estrada, Patricia Brown Holmes, Naomi D. Jakobsson, Stuart C. King, Edward L. McMillan, Jill B. Smart, Trayshawn M.W. Mitchell, Darius M. Newsome, Shaina Humphrey, and Governor J.B. Pritzker are the thirteen members of the Board of Trustees.

3

The Complaint states that the Board is responsible for the adoption and authorization of the challenged policies that govern University students, and that the Board "delegated certain authority and responsibilities to others, including the Defendants in this case." It describes the remaining Defendants as follows.

Defendant Timothy L. Killeen, President of the University, is responsible for enacting and enforcing the policies challenged by Speech First.

Defendant Robert J. Jones, Vice President for the University, oversees the departments under Student Affairs and is allegedly responsible for the policies challenged by Speech First.

Defendant Danita M. Brown Young, Vice Chancellor for Student Affairs, also oversees departments within Student Affairs. Those departments include the Office of the Dean of Students, the Office for Student Conflict Resolution (OSCR), BART, and University Housing.

Defendant Rhonda Kirts, Acting Dean of Students, oversees OSCR and BART. Defendant Justin Brown, Director of OSCR, oversees and is an ex officio member of BART. Defendants January Boten, Debra Imel, Rachael Ahart, Matthew Pinner, Arianna Holterman, Dementro Powell, Jamie Singson, and Kimberly Soumar are members of BART.

Defendant Lowa Mwilambwe, an Associate Vice Chancellor for Student Affairs, oversees seven departments within Student Affairs, including University Housing.

4

Defendant Alma R. Sealine, Director of University Housing, is responsible for leading, planning, and directing University Housing, including its bias incident protocol.  Defendant Patricia K. Anton, Associate Director of University Housing, is also responsible for that protocol.

B.  University Departments and Policies

Plaintiff's Motion concerns the prior approval requirement, bias-motivated incident policies within BART and University Housing, and No Contact Directives.

1.  *Prior Approval Requirement*

Prior to July 18, 2019, Section 2-407 of the Student Code provided that an individual needed "prior approval" to "post and distribute leaflets, handbills, and other types of materials" when such materials were "the promotional materials of candidates for non-campus elections."  Other promotional materials did not require "prior approval."  Section 2-407 stated:

> Any individual may post and distribute leaflets, handbills, and other types of materials intended to provide information about sociopolitical or educational issues and events, without prior approval under the following conditions:
>
> (a)   Such materials must not advertise the availability of alcohol, information associated with solicitation for profit (i.e., coupons, discounts, commercial advertisements), or the promotional materials of candidates for non-campus elections. . . .

The University has since amended the Student Code, pursuant to the "Procedure for Amending the Student Code," to remove the prior approval requirement for promotional materials of candidates for non-campus elections.  The Conference on Conduct Governance, a standing committee of the Urbana Champaign Senate

composed of faulty members, administrators, and students, reviews and recommends changes to the Student Code.  The Conference on Conduct Governance voted to recommend the elimination of the prior approval requirement for promotional materials of candidates from non-campus elections.  The amendment became effective on July 18, 2019, upon approval by the Chancellor.

Section 2-407 now states:

Any individual may post and distribute leaflets, handbills, and other types of materials intended to provide information about sociopolitical or educational issues and events, without prior approval, under the following conditions:

(a)     Such materials must not advertise the availability of alcohol, or include information associated with solicitation for profit (i.e., coupons, discounts, commercial advertisements). . . .

According to the Declaration of Rhonda Kirts, the Associate Dean of Students and a part of the University's Conference for Conduct Governance, the University never enforced the now-eliminated provision of § 2-407, and the University has no intention of restoring the eliminated provision or adopting a similar provision.

The Student Code website reflects the amendment.  See Article 2, Part 4 - University Property and Facilities—In General, https://studentcode.illinois.edu/article2/part4/2-407/ (last visited September 13, 2019).  Plaintiff included as an Exhibit a printout of the "Policies and Guidelines" page of the Illini Union website that still referred to the pre-amendment version of Section 2-407.  However, that website now also reflects the amendment.  Posting Policy, Policies and Guidelines,

6

https://union.illinois.edu/get-involved/rso-handbook/policies-and-guidelines (last
visited September 13, 2019).

   2. *Bias-Motivated Incident Policies*

      a.  BART

BART collects and responds to reports of "bias-motivated incidents."  BART's
website describes "bias-motivated incidents" as "actions or expressions that are
motivated, at least in part, by prejudice against or hostility toward a person (or group)
because of that person's (or group's) actual or perceived age, disability/ability status,
ethnicity, gender, gender identity/expression, national origin, race,
religion/spirituality, sexual orientation, socioeconomic class, etc."

      According to its website, BART supports students affected by such incidents,
promotes education and awareness about the impact of actions motivated by prejudice,
provides opportunities for educational conversation and dialogue, and publishes data
(without personally identifiable information) on reported incidents.

      January Boten, an Assistant Dean of Students and one of two Co-Chairs of BART,
further described the purpose and structure of BART in a Declaration, as follows.

      BART provides a forum for students to engage in voluntary and private
discussions about incidents alleged to be motivated by bias.  BART members are
University staff drawn from OSCR, the University Housing Office, the Office of Student
Affairs, the Office of Diversity, Equity, and Inclusion, the Student Assistance Center, the
Illini Union, and a law enforcement liaison from the University Police Department.  The
law enforcement liaison has no law enforcement function as part of her service on

7

BART.  BART does not refer reports to the University Police.  Police do not investigate incidents reported to BART unless the incidents are independently reported to the police for law enforcement reasons.[1]

Students can report incidents alleged to be motivated by bias to BART via email or an online form describing when and where the incident occurred, the perceived bias and how it was demonstrated, and the name or organization of involved parties.[2] Incidents are often reported anonymously.

BART's members meet periodically to review reports.  If the reporting party wishes to meet, a BART staff member will discuss the report and provide support.  If a report identified by name students who allegedly engaged in bias-motivated conduct, BART members decide whether to invite the students to participate in an optional conversation about the incident.

Most students contacted by BART do not respond at all, or decline the offer of a meeting.  Meeting with BART is entirely voluntary, so if a student declines to meet with BART, she will face no consequences and BART's involvement with the incident is deemed complete.

---

[1]Plaintiff includes as an exhibit a printout of a University Police Department tweet that states that acts of intolerance "create an unsafe and unwelcoming environment for campus community members"and can be reported to BART.

[2]The online form previously requested "Information About the Offender (if known)."  It now asks for the name of the "Person or Organization Responsible" in a section for information about "Involved Parties."  Bias-Motivated Incident Reporting Form, https://cm.maxient.com/reportingform.php?UnivofIllinois&layout_id=1 (last visited September 13, 2019).

If a student agrees to meet with BART, staff give the student the opportunity to reflect on her behavior and its effect on other students. However, BART does not require any student to change her behavior. BART has no authority to impose any sanctions if the student chooses to engage in the same behavior. BART staff explain to students that they are not being charged with any Student Code violation, and they are not "in trouble." If a student desires to continue the behavior that led to a report, BART staff offer to discuss plans to consider in cases of confrontation and escalation with a goal of ensuring the safety of the student and others.

BART does not disclose any student meetings to any other office or department without permission from the student. Plaintiff's Motion alleges that a student who was the subject of a BART report claimed that his academic advisor told him "that he could see from the student's files that the student had met with someone from BART," but Boten states that an individual outside of BART would only know a student met with BART if the student disclosed the meeting or gave BART permission to do so.

BART is administratively housed within OSCR, but it operates completely distinctly from the student disciplinary process dealing with Student Code violations. BART does not conduct "investigations" into reported incidents. BART has no power to compel responses to requests for information, or to sanction, discipline, or punish a student. BART does not make findings of facts regarding incidents. Expressing the views the Students wish to express would not violate the Student Code. The Students would not face discipline solely as a result of expressing those opinions.

9

Some behavior, such as bias-motivated physical violence, stalking, true threats, or sexual harassment, may be motivated by bias and also violate the Student Code, but bias-motivated conduct alone is not a Student Code violation.  For example, assaulting another student while yelling about her national origin would subject a student to the disciplinary process.  But, simply engaging in the speech the Students wish to engage in is not a Student Code violation, and no student has ever been charged with a violation of the Student Code for simply expressing those views.

From 2011 to 2015, Justin Brown was a conduct investigator within OSCR and chair of BART, which was then called the Tolerance Program.   He became Director of OSCR and an Associate Dean of Students in 2015.  In a Declaration, Brown described the student disciplinary system, including No Contact Directives, and how that system differs from BART, as follows.

Enforcement of the Student Code (sometimes referred to as the "student conduct process") is a formal process that follows the Student Disciplinary Procedures.  Disciplinary officers investigate and adjudicate potential Student Code violations.  A disciplinary officer sends a respondent a charge notice, including the allegation, the formal charge, and the respondent's rights.  The respondent has five days to schedule an appointment with the officer, who conducts an investigation, makes a formal finding, determines whether any Student Code violations occurred, and assigns any resulting sanction.  Cases involving suspensions or dismissals are decided by a subcommittee of the Senate Committee on Student Discipline.

According to Brown, student participation in BART is voluntary.  Discipline can only be imposed where reported conduct also violates the Student Code.  OSCR enforces the Student Code, but BART is a separate subsection of OSCR that is not a part of Student Code enforcement.  BART involves no disciplinary consequences and is an entirely voluntary process, in contrast to the formal notification, required participation, and potential sanctions involved in enforcement of the Student Code.  BART interactions with students are private, not recorded in academic or disciplinary records, and not disclosed outside of OSCR without permission.

Like Bowen, Brown reaffirmed that the Student Code does not contain any sections penalizing students for engaging in bias-motivated speech.  Bias-motivated speech alone is not a Student Code violation.  It is not treated as such.  The Students could never be charged with a violation of the Student Code for expressing their views.  No student has ever been so charged.

BART annual reports summarize reported incidents.  Reports include students referring to other students using offensive slurs, graffiti on campus that is racist, homophobic, or anti-Semitic, a student complaining that women are automatically admitted into engineering programs, students saying religion is "lies" that people would have to be stupid to believe, a student equating the Black Lives Matter movement to the KKK, people accusing Muslims on campus of being terrorists, a student in a bar being told to go back to Korea, a man being beaten by someone yelling racial slurs and saying "go back to your country" and "stop taking our jobs," and events such as a "Build that Wall" event involving a wall of blocks, a "Meeting with

the Chief" program and other Chief Illiniwek-related activities, and an "Affirmative Action Bake Sale" charging different prices based on race and ethnicity.

Nicole Neily, President of Speech First, Inc., also submitted a Declaration.  She states that she is "personally familiar with several of Speech First's members at the University," including the Students.  She states that she is "aware of how BART operates" through her "discussion with Speech First members and other students who attend and have attended the University."  Neily states that BART contacts "offenders" to tell them that BART received a bias report about them and BART needs to speak with them, not identifying the person accusing them of bias or informing them of "any rights he or she may have."  She states that details of reported incidents are recorded on students' permanent records and made available to others outside of BART, as one student was told by his advisor "that he could see from the student's files that the student had met with someone from the BART."

b.  University Housing

Similar to BART but in the campus housing context, University Housing has a Bias Incident Protocol (BIP).  The University website states that the BIP was implemented "to address and implement corrective action for any offensive acts committed within its facilities."

Alma Sealine, Executive Director of University Housing, submitted a Declaration concerning University Housing's policies, including the BIP, stating as follows.

The BIP is entirely voluntary.  Students are not required to report incidents, and they need not engage with members of University Housing staff if they do not wish to do so.  There are no sanctions, punishments, or discipline of any kind associated with a reported incident.  By contrast, a separate, formal disciplinary process (the Conduct Process) exists by which students may face disciplinary consequences (from reprimands to dismissal) for breaching their housing contracts or University policies.

The Students would not face any consequences from University housing for expressing their views.  Expressing their views would not violate any housing contracts or University policies.  Sanctions available through the Conduct Process could not be applied to the Students for expressing their views because the Conduct Process does not apply to students expressing those or any other opinions.[3]

Residents in University Housing can report incidents alleged to be motivated by bias by email, through a web form, or by speaking to University Housing staff including Resident Advisors and Resident Directors who live in their buildings.  About half of BIP reports are made anonymously, and about half do not name the student whose behavior is being reported.

University Housing staff meet to discuss reports of bias-motivated incidents.  As many as five staff may meet: a Resident Director, the Resident Director's Supervisor, an Assistant Director of Residential Life, the Program Director of Social Justice & Leadership Education, and the Program Director for Community Standards.  The staff

---

[3] Without pointing to any supporting University protocol, Neily's Declaration claims that the sanctions available in the Conduct Process can be imposed on a student who commits a "bias-motivated incident."

13

discuss: the report, appropriate responses to a reporting student, and who will reach out to make voluntary contact with the involved parties (if identified).  University Housing staff may have voluntary discussions with reporting students, but it does not conduct an "investigation" or make a "finding" as to whether a bias incident has occurred.

If staff reach out to try to engage in a conversation with a student who is the subject of a report, the student can choose not to participate.  Refusal to discuss a report with staff has no consequences to the student.

If staff speak with a reporting student, in a voluntary and informal one-on-one discussion, the staff member will acknowledge that every student enjoys a First Amendment right to freedom of speech within University Housing, and that offensive speech or conduct alone cannot subject the speaker to formal sanctions.  The voluntary conversation alerts the student to the possibly unintended impact his or her behavior had on fellow students.

If a student chooses to persist in his conduct, staff will do nothing.  For example, a student who displayed a Confederate flag in a residence hall window was not instructed to take it down.  Sanctions cannot be imposed as a result of reports of incidents alleged to be motivated by bias.

Students may post materials within their own residence hall rooms, on residence hall windows, and on their doors.  Posting about the views that the Students wish to express does not violate the Student Code or housing contracts.  Students are free to

post such material, and have done so, including posting material supporting policies that are anti-immigration, pro-life, pro-choice, pro-Israel, pro-Palestine, and pro-gun rights.

Events sponsored by University groups or offices may be posted on bulletin boards after submission to the University Housing Residential Life office, if the events are open to all students and alcohol/drugs are not available at the events.  Requests to post materials for such events are never denied.  If materials are posted without following the submission process, they will be taken down, but no other consequence will follow.

3. *No Contact Directives*

No Contact Directives are issued pursuant to § 4.06 of the Student Disciplinary Procedures.  That section states:

a. **Authority.** University disciplinary officers are among those responsible for the enforcement of student behavioral standards and, when possible, the prevention of violations of the Student Code. In addition, students are expected to comply with the reasonable directions of university officials acting in the performance of their duties. For these reasons, the Senate Committee on Student Discipline recognizes the right of disciplinary officers to direct an individual subject to student discipline, as described in §1-301(c) of the Student Code, to have no contact with one or more other persons.

b. **Expectations of Recipients.** A university No Contact Directive prohibits all oral, written, or third party communication between the identified parties. In addition, the issuing disciplinary officer will evaluate deliberate nonverbal acts intended to provoke or intimidate a protected party as possible violations of the directive. Furthermore, although there is no specific physical distance requirement that must be maintained, all parties are advised to leave the vicinity if they encounter one of the other parties. Repeatedly failing to do so will be

15

evaluated as a possible violation. The disciplinary officer may modify these expectations on a case-by-case basis.

c. **Violations.** If a No Contact Directive recipient fails to comply with the directive, they will face disciplinary action for violating §1-302(g) of the Student Code. The Senate Committee on Student Discipline recommends dismissal from the university in such cases. Please note that students who request No Contact Directives against other students thereby agree to be held to the same stipulations and will also face disciplinary action for initiating contact with the other party.

d. **Procedures.**
   i. **Notice.** If, based upon a report received or a direct request from a member of the university community, a disciplinary officer believes that a No Contact Directive is warranted, the disciplinary officer will notify all recipients in writing, typically by email. The directive will be effective when the notification is sent and will last until further notice if no end date is specified. The University of Illinois Police Department is also notified of all No Contact Directives for informational purposes only.
   ii. **Meeting.** The issuing disciplinary officer will attempt to meet with all recipients. At this meeting, the disciplinary officer will explain their expectations in detail as well as the consequences for noncompliance. The recipient will also be given an opportunity to explain to the issuing disciplinary officer why the No Contact Directive should not be continued.
   iii. **Modifications.** If the issuing disciplinary officer decides that modifications or exceptions to the No Contact Directive are necessary, they will communicate these changes to all parties in writing, typically by email.
   iv. **Rescission.** A No Contact Directive may only be rescinded by the issuing disciplinary officer, the issuing disciplinary officer's supervisor, the Executive Director, or, if the directive has been issued as part of an investigation, by the hearing body responsible for deciding the case.

e. **Status of Record.** Unless issued as a sanction in a disciplinary case, a No Contact Directive does not, on its own, constitute a disciplinary finding against the student and is not part of the student's official disciplinary record. As such, it would not be reported as part of a routine disciplinary background check. A No Contact Directive issued

as a sanction in a disciplinary case is subject to release according to the
retention policies dictated by the controlling formal sanction as
outlined in Section 2.04 above.

Brown also described in his Declaration how No Contact Directives are issued. Disciplinary officers may issue No Contact Directives, which direct a student to have no contact with one or more other persons, in order to enforce student behavior standards and prevent Student Code violations.  No Contact Directives prohibit contact between parties, requiring *both* parties to make reasonable attempts not to contact each other directly or through a third party, orally or in writing.  Violating a No Contact Directive can result in discipline, up to dismissal from the University.

While prohibiting direct interaction, No Contact Directives do not prevent parties from being present in the same public space.  Nor do they prohibit parties from talking or writing about the other party, publicly or privately.  No Contact Directives do not limit any other statements a student might wish to make on any subject; the student simply cannot make statements to the other student named in the No Contact Directive.

While No Contact Directives are usually issued when OSCR is investigating pending Student Code violations (such as sexual misconduct against another student), they can be issued to prevent escalation of pre-existing conflict likely to result in a Student Code violation or to jeopardize student safety.  No Contact Directives are not issued for bias-motivated conduct alone.  Expressing the views the Students wis-h to express, without more, could not form and has never formed the basis for a No Contact Directive.

Plaintiff alleges that the University issued a No Contact Directive to a student, Andrew Minik, solely because of an article he wrote about another student, Tarik Khan, published on the website "Campus Reform."[4]  Rony Die, Associate Director of OSCR and an Assistant Dean of Students, submitted a Declaration concerning the Minik-Khan No Contact Directive.

Die was the one who issued that No Contact Directive.  He states that the Plaintiff's description of the events surrounding it is "simply incorrect."  No Contact Directives are not and never have been imposed because of a student expressing views about a topic, controversial or not.  They are issued when two students with a history of interpersonal conflict continue to interact in a way that could lead to a Student Code violation, in order to promote de-escalation and ensure student safety.

A No Contact Directive does not prohibit a student from writing about another student or from expressing views that may offend others.  Die recently declined a student's request to issue a No Contact Directive in order to prevent another student from talking about her online, because a No Contact Directive does not prevent such conduct.

Die did not issue the Minik-Khan No Contact Directive just because Minik wrote about Khan online.  Rather, he issued it based on an extensive history of hostile and escalating interactions that started before the article (including a direct confrontation and shouting match) and continued after it (when Khan received death threats and

---

[4]The court is familiar with Minik and this No Contact Directive, as Minik was a Plaintiff in another lawsuit concerning the No Contact Directive. *Minik, et al. v. Board of Trustees of the University of Illinois, et al.*, Case No. 18-2101.

observed strangers taking pictures outside of his house).  Khan perceived Minik to have

jeopardized Khan's safety, causing Khan to be extremely angry, but Khan did not want

Die to attempt to mediate.  Worried about potential physical violence and Student Code

Violations, Die issued the No Contact Directive to try to diffuse tension by preventing

contact between Minik and Khan.  Die was not punishing Minik for writing about

Khan, and never would have issued the No Contact Directive without the extensive

history of escalation between the two.

In an email to Die in which Minik summarized his understanding of an earlier

meeting, Minik stated that the no contact order was "not a direct disciplinary charge,

rather a probationary measure" to ensure he would not contact Khan, and that the order

did not pertain to public events or prevent Minik from writing journalistic stories

related to Khan.  Minik wrote that Die recommended the second person to arrive at a

public event should leave, or they should avoid each other, and that Die suggested that

Minik not write about Khan if Minik hoped "for the situation to improve."

In his Declaration, Die states that Minik asked him whether he could continue

publishing articles on Khan and other topics, and Die told Minik the only limitation

placed on Minik by the No Contact Directive was directly contacting Khan.  Die notes

that Minik's email confirmed that understanding.  Die emphasizes that while he

indicated Minik could choose to stop writing about Khan if he wanted to improve the

hostile relationship between them, Die never indicated to Minik that he must stop

writing about Khan or that doing so would be a violation of the No Contact Directive.

19

4.  *Other University Policies*

The Student Code opens with some broad statements.  The Preamble of the Student Code provides: "A student at the University of Illinois at the Urbana Champaign campus is a member of a University community of which all members have at least the rights and responsibilities common to all citizens, free from institutional censorship."

The next section, "In the Classroom," opens: "The instructor, in the classroom and in conference, should encourage free discussion, inquiry, and expression.  Student performance should not be evaluated on opinions or conduct in matters unrelated to academic standards."

The following section is titled "Campus Expression" and it states: "Discussion and expression of all views is permitted within the University subject only to requirements for the maintenance of order."  It further states that University members "may invite and hear any persons of their own choosing," campus press shall not be censored, and "[t]he right of peaceful protest is recognized within the University community."

The University has "Guiding Principles," including a commitment to freedom of speech, stating: "An unyielding allegiance to freedom of speech - even controversial, contentious, and unpopular speech - is indispensable to developing the analytical and communication skills of our students and empowering all members of our university communities to be active and informed citizens."

The University has over 1,800 registered student organizations.  Such groups include groups devoted to advocacy across the political and social spectrum, including some of the positions Students A through D state a desire to profess.  All registered student groups receive financial and logistical support for their programming from the University.  With University support, student groups in recent years have put on events in line with some of the  Students' stated views, including events hosting conservative media personalities, a pro-life television display on the University's Main Quad, and an event with an Immigrations and Customs Enforcement official.  Campus publications have also featured pieces and letters to the editor expressing views held by the Students, such as support for a border wall, opposition to a University referendum to divest from Israel, and support for a right to engage in hate speech.

## II.  ANALYSIS

A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  As a threshold matter, a party seeking a preliminary injunction must demonstrate: (1) a reasonable likelihood of success on the merits of the underlying claim; (2) the absence of an adequate remedy at law; and (3) the suffering of irreparable harm if the injunction is not granted.  *Coronado v. Valleyview Pub. Sch. Dist. 365-U*, 537 F.3d 791, 794-95 (7th Cir. 2008).

If the moving party establishes the above factors, this court then considers (1) the irreparable harm the non-moving party will suffer if the injunction is granted and (2) the public interest in granting or denying the injunction. *Abbot Lab. v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992).

Plaintiff argues that it is entitled to a preliminary injunction because it is likely to prevail on the merits and it satisfies the other preliminary injunction criteria. Defendants respond that the prior approval requirement claim is moot, and that Plaintiff lacks standing to bring the bias-motivated conduct and No Contact Directive claims, which are also meritless.

A.  Plaintiff's Challenge to the Prior Approval Requirement is Moot

Plaintiff seeks an order enjoining Defendants from enforcing the prior approval requirement.  However, as of July 18, 2019, the prior approval requirement is no longer part of the Student Code.

Defendants argue that the removal of the prior approval requirement means Plaintiff's first claim is now moot, while Plaintiff argues that claim is not moot because the University could change the language back to its former version.

The Seventh Circuit recently discussed the mootness doctrine in the context of a governmental party having removed a complained-of defect from a rule, in *Ozinga v. Price*, 855 F.3d 730, 734 (7th Cir. 2017).

> Our jurisdiction as a federal court is limited by Article III to live cases and controversies, U.S. Const. art. III, § 2, and "an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." *Kingdomware Technologies, Inc. v. United States*, ––– U.S. ––––, 136 S.Ct. 1969, 1975, 195 L.Ed.2d 334 (2016) (quoting *Already, LLC v.*

22

*Nike, Inc.*, 568 U.S. 85, 133 S.Ct. 721, 726, 184 L.Ed.2d 553 (2013)); *see also Campbell-Ewald Co. v. Gomez*, ––– U.S. ––––, 136 S.Ct. 663, 669, 193 L.Ed.2d 571 (2016). When a plaintiff's complaint is focused on a particular statute, regulation, or rule and seeks only prospective relief, the case becomes moot when the government repeals, revises, or replaces the challenged law and thereby removes the complained-of defect. *See, e.g., Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 474, 478, 110 S.Ct. 1249, 1252, 1254, 108 L.Ed.2d 400 (1990) (amendments to statute); *Princeton Univ. v. Schmid*, 455 U.S. 100, 103, 102 S.Ct. 867, 869, 70 L.Ed.2d 855 (1982) (per curiam) (amendment of regulations). At that point, there is no longer an ongoing controversy: the source of the plaintiff's prospective injury has been removed, and there is no "effectual relief whatever" that the court can order. *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 449, 121 L.Ed.2d 313 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895)); *see, e.g., Fed'n of Adver. Indus. Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 930 (7th Cir. 2003) (repeal of challenged statute) (collecting cases); *City of Milwaukee v. Block*, 823 F.2d 1158, 1163–64 (7th Cir. 1987) (repeal of regulations that plaintiff alleged defendants were ignoring). Only when there is a substantial likelihood that the offending policy will be reinstated if the suit is terminated will a court recognize that the controversy remains live. *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 & n.11, 102 S.Ct. 1070, 1074–75 & n.11, 71 L.Ed.2d 152 (1982) (case not moot despite repeal of challenged statute where city had announced its intent to reenact the statute if district court's judgment were vacated). Otherwise, we presume that government officials have acted in good faith in repealing the challenged law or policy. *See, e.g., Fed'n of Adver. Indus. Representatives*, 326 F.3d at 929.

*Ozinga*, 855 F.3d at 734.

Plaintiff suggests that Seventh Circuit cases examining state actors' acts of self-correction are no longer good law after *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012, 2019 n.1 (2017).  The court disagrees that *Comer* overruled Seventh Circuit case law on mootness in the single footnote it devoted to discussing the issue of mootness.  Instead, *Comer* cited and applied case law noting that voluntary cessation *can* moot a case.

The *Comer* court stated:

> We have said that such voluntary cessation of a challenged practice does not moot a case unless "subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (internal quotation marks omitted).

*Comer*, 137 S. Ct. at 2019 n.1.

The *Comer* Court found that the Missouri Governor's announcement that he directed the state's Department of Natural Resources to change how it enforced a grant policy did not moot a challenge to the policy as it had originally been enforced. The Department viewed its interpretation of the grant policy as being compelled by the Missouri Constitution. The parties agreed that no barrier prevented the Department from resuming the challenged behavior, with the petitioner noting that the original interpretation of the policy stemmed from the Missouri Supreme Court's interpretation of the Missouri Constitution and the policy change did not remedy that source. The *Comer* Court found that the Governor's announcement did not make clear that the Department could not revert to its prior policy. *Comer*, 137 S. Ct. at 2019 n.1.

24

After *Comer*, the Seventh Circuit has continued to find that a government actor's act of self-correction can render a case moot. *Freedom From Religion Found., Inc. v. Concord Cmty. Sch.*, 885 F.3d 1038, 1051 (7th Cir. 2018) ("A defendant's voluntary cessation of challenged conduct does not necessarily render a case moot. . . . But if a government actor sincerely self-corrects the practice at issue, a court will give this effort weight in its mootness determination.").

Here, the University amended the Student Code to remove the prior approval requirement for promotional materials of candidates for non-campus elections, following the formal procedures for doing so. The Conference on Conduct Governance voted to recommend the elimination of that provision. The amendment became effective on July 18, 2019, upon approval by the Chancellor. According to the Declaration of Rhonda Kirts, the Associate Dean of Students and a part of the University's Conference for Conduct Governance, the University never enforced the now-eliminated provision of § 2-407 and the University has no intention of restoring the eliminated provision or adopting a similar provision. The court finds that Defendants have established that there is no substantial likelihood that the offending policy will be reinstated if this suit is terminated; it is clear that the allegedly wrongful behavior could not reasonably be expected to recur.

The formality of a change to a policy is significant in determining whether a policy is reasonably likely to be reinstated. Assurances based only on informal discussions resulting in "what appeared to be a consensus . . . that the changes should

be made permanent," with no actual documentation of the decision to make changes

permanent, did not moot a challenge to a policy that a party claimed to have changed.

*Concord*, 885 F.3d at 1041.

On the other hand, "a case is moot when a state agency acknowledges that it will

not enforce a statute because it is plainly unconstitutional." *Wisconsin Right to Life, Inc.*

*v. Schober*, 366 F.3d 485, 492 (7th Cir. 2004). So, a challenge to a statute that had never

been enforced, and that was held unconstitutional by a district court, was moot where a

state agency acknowledged that the law was unconstitutional and would not be

enforced. *Id.*

Finding that a case was "like *Wisconsin Right to Life* and unlike *Concord*," the

court in *Cooper v. Vaught*, 2019 WL 3556885, at *3 (S.D. Ind. Aug. 5, 2019), found a

challenge to a rule moot where the rule had been formally changed. The court

explained: "Three formal steps have culminated in the Board's decision not to readopt

the challenged rule: (1) the Rules Committee's vote to submit its proposed revision to

the Board, (2) the Board's vote to begin the rulemaking process, and (3) the Board's

ultimate vote not to readopt [the challenged rule]." *Id.*

This case is like *Cooper*, and not like *Comer*. In this case, the University took all of

the formal steps necessary to officially change the requirement at issue. The

requirement had never been enforced, and there is no evidence that the elimination of

the provision was insincere. The University here followed its formal policy to officially

amend its Student Code, marking a change far more formal and definite than the Governor's announcement in *Comer*.

Plaintiff points to the "Policies and Guidelines" page of the Illini Union website to suggest that the prior version of the policy is still having an effect.  However, that website has now been updated to include the amended version of Section 2-407.  The Illini Union website's prior inclusion of the pre-amendment language did not change the Student Code back to the old version; it simply showed that the Illini Union website had not yet been updated.

It is theoretically possible that the University could reverse course.  The Conference on Conduct Governance could vote to recommend the re-adoption of the prior approval requirement for promotional materials of candidates from non-campus elections.  The Chancellor could approve that change.  But there is no evidence tending to show that such a theoretical possibility is even remotely likely, especially given the history of non-enforcement of the requirement.  Because the allegedly wrongful behavior could not reasonably be expected to recur, and there is no substantial likelihood that the offending policy will be reinstated, Plaintiff's challenge to the Prior Approval Requirement is moot.

B.  Plaintiff Lacks Standing on Its Remaining Claims

Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014), quoting U.S. Const., Art. III, § 2.  "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'"  *Id.*, quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  A plaintiff must have standing to seek a preliminary injunction.  *Shaw v. Wall*, 2013 WL 6498238, at *2 (W.D. Wis. Dec. 11, 2013).

Speech First is the only Plaintiff in this case, and it relies on associational standing.  It brings suit on behalf of four anonymous University students, Students A, B, C, and D, who the Complaint alleges are members of Speech First affected by the policies at issue.

Associational standing is governed by the test set forth in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977).  *Keep Chicago Livable v. City of Chicago*, 913 F.3d 618, 622 (7th Cir. 2019).  To sue in a representative capacity, *Hunt* requires Speech First to show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in their lawsuit."  *Keep Chicago Livable*, 913 F.3d at 625, quoting *Hunt*, 432 U.S. at 343.

"Standing requires a threefold demonstration of (1) an injury in-fact; (2) fairly traceable to the defendant's action; and (3) capable of being redressed by a favorable decision from the court.  The alleged injury must be not just concrete and particularized, but also actual and imminent, not conjectural or hypothetical." *Keep Chicago Livable*, 913 F.3d at 622-23 (internal quotations and citations omitted).

The injury-in-fact requirement helps to ensure that the plaintiff has a "personal stake in the outcome of the controversy." *Driehaus*, 573 U.S. at 158 (citation omitted). The plaintiff bears the burden "of demonstrating the requisite injury to invoke federal jurisdiction." *Keep Chicago Livable*, 913 F.3d at 622-23.

"[T]he burden of establishing irreparable harm to support a request for a preliminary injunction is, if anything, at least as great as the burden of resisting a summary judgment motion on the ground that the plaintiff cannot demonstrate 'injury-in-fact.'" *Lujan v. Nat. Wildlife Fed'n*, 497 U.S. 871, 907 at n.8 (1990), quoting *Nat. Wildlife Fed'n v. Burford*, 878 F.2d 422, 432 (D.C. Cir. 1989).

None of the Students have been investigated or punished pursuant to any of the challenged University policies.  Rather, Plaintiff alleges that the University's policies are injuring the Students by chilling their speech, because the Students fear that speaking as they wish to speak will lead them to be investigated or punished under those policies.

"An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Driehaus*, 573 U.S. at 158 (internal quotations and citations omitted).  In the chilled speech context, an

individual need not expose himself to an enforcement action before challenging a threatened government action so long as the threatened enforcement is "sufficiently imminent." *Id.* "A plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* (internal quotations and citations omitted).

"Chilled speech is, unquestionably, an injury supporting standing . . . but a plaintiff's notional or subjective fear of chilling is insufficient to sustain a court's jurisdiction under Article III." *Bell v. Keating*, 697 F.3d 445, 453-54 (7th Cir. 2012). "The plaintiff must substantiate a concrete and particularized chilling effect on his protected speech or expressive conduct to pursue prospective relief." *Id.* at 454.

1. *Bias-Motivated Incidents*

Defendants argue that Plaintiff fails to satisfy the injury-in-fact requirement concerning the University's bias-motivated incident policies because those policies do not pose a credible threat to any student and the allegations of chilled speech are unsupported or based on subjective fears only. The court agrees with Defendants.

In a conclusory statement based on it's national association's president's "familiarity with" anonymous students, Plaintiff alleges that the Students' expressing their views on (very generally-described) topics could result in their being reported, investigated, and punished by BART for engaging in a bias-motivated incident. The

court finds more informative the detailed statements about BART from University staff that are personally involved with BART, consistently describing how BART operates.

The court finds that there is no evidence that any University policy concerning bias-motivated incidents constitutes a credible threat to speech protected by the First Amendment.  The Students have not described any statements they wish to make with any particularity, so it is unclear whether they would even be likely to be reported to BART or BIP.  It is also not clear that the Students making their desired statements would result in BART or BIP actually contacting them even if someone did report such statements along with the name of the person who made the statements.

Moreover, being reported to BART or BIP results in essentially no consequences. The disciplinary processes do not apply to students expressing the views the Students wish to express or any other opinions.  Bias-motivated speech alone is not a Student Code violation.

While some BART staff are drawn from departments with disciplinary or law enforcement functions, BART has no such functions.  Conversations with BART are optional.  Most students contacted by BART do not respond at all, or decline the offer of a meeting, and no consequences occur if a student declines to meet with BART.  If a student does meet with BART, staff explain that the student is not "in trouble" and not being charged with a Student Code violation.  BART has no authority to impose sanctions, and BART does not require any student to change his behavior.  BART does not list reports on any students records.  BART does not make findings.  The Students

profess a desire to engage others in discussions on certain topics, and all BART can do is provide a forum for students to do exactly that: engage in voluntary discussions.

BIP likewise engages in voluntary discussions with students about the impact of their behavior on fellow students, but the students can refuse to discuss the reports without any consequences, as BIP has no power to sanction anyone.

The court also finds unsupported Plaintiff's allegations that the bias-motivated policies impermissibly chill the Students' speech. It is a possibility that the Students' desired speech could result in someone making a report, that report could identify the speaker, and BART or BIP could decide to contact the speaker based on the report. But, even if all of those events did occur, the only result would be a voluntary conversation without any possibility of discipline. The allegations of subjective chill are insufficient to establish an injury-in-fact, as they fail to substantiate a concrete and particularized chilling effect. See *Bell*, 697 F.3d at 454.

The court finds instructive the rulings of two other federal district courts that denied preliminary injunctive relief to Speech First: *Speech First, Inc. v. Fenves*, 384 F. Supp. 3d 732, 738 (W.D. Tex. 2019) and *Speech First, Inc. v. Schlissel*, 333 F. Supp. 3d 700, 707 (E.D. Mich. 2018).[5] Those cases both involved challenges to similar university bias response policies, and in both cases the courts found Speech First lacked standing to challenge the policies.

---

[5] Speech First has appealed in both cases, and the appeals remain pending.

In *Fenves*, Plaintiff challenged portions of the University of Texas at Austin's Residence Hall Manual, and a Campus Climate Response Team.  That manual stated that residents were expected to "behave in a civil manner," and that Residence Life staff were committed to addressing "acts of racism, sexism, heterosexism, cissexism, ageism, ableism, and any other force that seeks to suppress another individual or group of individuals," including through floor and hall meetings to discuss incidents and steps to take in response to incidents.  The Campus Climate Response Team responded to "perceived bias incidents impacting the University community" by fielding reports, gathering information, supporting involved individuals, and providing education.

The *Fenves* court found Speech First "offers no more than generalized declarations of broad categories of speech in which Students A, B, and C wish to engage" and "[w]ithout such  evidence, this court cannot determine whether Students A, B, and C have an intention to engage in speech that is prohibited or arguably covered by the challenged policies."  The court further noted a lack of evidence that students had been punished for violating the policies at issue.  The court concluded:

> In sum, Speech First presents no evidence that any University students—much less any of Speech First's student members—have been disciplined, sanctioned, or investigated for their speech.  And without any evidence of a credible threat of enforcement of the challenged policies—much less the "clear showing" required to support standing at the preliminary-injunction stage—this court concludes that the students' self-censorship is not based on a well-founded threat of punishment under the University policies that is not "imaginary or wholly speculative." *Barber* [*v. Bryant*], 860 F.3d [345,] 352 [(5th Cir. 2017)].  Because Speech First's student members have not made a clear showing that they "have

> standing to sue in their own right," Speech First likewise does not have
> standing to sue.  *Hunt*, 432 U.S. at 343, 97 S.Ct. 2434.

*Fenves*, 384 F. Supp. 3d at 743.

In *Schlissel*, Speech First challenged the University of Michigan's Bias Response Team ("BRT"), a non-disciplinary entity to "support students who believe they have been affected by incidents of bias, to report them to other campus resources as appropriate, and to educate the University community regarding bias issues." *Schlissel*, 333 F. Supp. 3d at 705.  Speech First asserted that anonymous students feared being reported to the BRT if they discussed political and social issues, but the *Schlissel* court found that Speech First had "presented no evidence to support" its allegations that the BRT investigated and punished students in response to reports of bias.  *Id.* at 710.

Here, like in *Fenves* and *Schlissel*, Plaintiff has failed to demonstrate an injury-in-fact sufficient to confer standing.  With the generalized description of the desired speech, this court cannot determine whether the Students have an intention to engage in speech that would result in any actual interactions with BART or BIP.  The speech could possibly be reported, as it appears students can report anything, but there is no evidence the Students would ever even be contacted by BART or BIP as a result of a report, if made.  There is no evidence any student has ever been punished for a report of bias-motivated conduct.  Instead, neither BART nor BIP has any power to issue any sanctions.  Their only available action is asking for a voluntary conversation.

34

Plaintiff argues that "indirect discouragements" to speech can have "the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions or taxes" and that the bias-motivated conduct policies have such an effect. Plaintiff argues that there is no evidence that students are told that they can choose not to speak with BART, and that without such warnings, the meetings would be viewed as mandatory.

The burden is on Plaintiff to establish standing.  The only evidence Plaintiff points to concerning the mandatory nature of BART meetings is the national president of the organization's statement that BART officials will tell a student "that the BART needs to speak with the student to discuss the allegations."  This statement is based on a "familiarity with" anonymous students.  The court does not find that Plaintiff has established that students are told that meeting with BART is mandatory.  There is evidence that *most* of the students contacted by BART either do not respond to BART at all, or decline to meet with BART.  That fact suggests most students view BART requests as voluntary, casting doubt on any suggestion that BART requests are presented as mandatory.  Defendants also presented evidence from a BART Co-Chair who stated that BART staff explain to students that they are not "in trouble" and that they are not being charged with any Student Code violation.  All that ever happens is an informal discussion, where students are even informed that they can continue in their behavior and staff will assist with plans for them to do so safely.  Plaintiff has failed to

establish that BART has a sufficiently coercive effect to substantiate a concrete and particularized chill of the Students' protected speech.

The same conclusion applies to University Housing's BIP.  There is no evidence that BIP ever tells students that they must meet with BIP; Neilly's Declaration says nothing about BIP.  The Executive Director of University Housing described how bias-motivated incidents are handled, describing contact and discussions between students and housing staff as voluntary and informal.  If speaking with a student, staff members acknowledge that every student enjoys a First Amendment right to freedom of speech within University Housing, and that offensive speech or conduct alone cannot result in sanctions.  Students can choose not to have a discussion with housing staff, without any consequences.  Nothing happens if students wish to persist in their conduct.

In its Reply, Plaintiff argues that this case is like other cases in which government actions violated the First Amendment: *Bantam Books v. Sullivan*, 372 U.S. 58 (1963), *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003), *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015), and *Levin v. Harleston*, 966 F.2d 85, 87 (2nd Cir. 1992).  The court disagrees.

*Schlissel* discussed similar arguments by Speech First about *Bantam Books* and *Okwedy*, distinguishing those cases on the basis that "the courts in the cases cited by Speech First found implicit threats of sanctions or retaliation if there was a refusal to engage in the voluntary and informal resolution mechanisms offered."  *Schlissel*, 333 F. Supp. 3d 700, 711.  That discussion applies here:

36

In *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003), the court concluded that a reasonable juror could find a city borough president's letter to a billboard company to be threatening some form of punishment or adverse regulatory action and therefore an unconstitutional infringement of the plaintiff's free speech rights.  *Id.* at 344.  In *Okwedy*, a religious organization contracted with the billboard company to post billboards denouncing homosexuality in or near neighborhoods containing a significant number of gay and lesbian residents.  *Id.* at 340. The billboards did not identify the sponsor of the message.  *Id.* at 341.

When controversy ensued concerning the message on the billboards, the borough's president sent a letter to the billboard company, on city letterhead, requesting "a dialogue with [the company] and the sponsor as quickly as possible" and stating that "many members of the Staten Island community, myself included, find this message unnecessarily confrontational and offensive."  The borough president concluded the letter, writing:

> [The billboard company] owns a number of billboards on Staten Island and derives substantial economic benefits from them.  I call on you as a responsible member of the business community to please contact Daniel L. Master, my legal counsel and Chair of my Anti-Bias Task Force ... to discuss further the issues I have raised in this letter.

*Id.* at 342.  Later that day, the billboard company removed the plaintiff's signs.  The Second Circuit concluded that the letter could be interpreted as containing an implicit threat of retaliation if the billboard company did not remove the plaintiff's signs, even if the borough president lacked direct regulatory or decisionmaking authority.  *Id.* at 344.

Similarly, the Supreme Court concluded that the plaintiff had standing in *Bantam Books v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963), based on the lower court's finding that vendors complied with the Rhode Island Commission to Encourage Morality out of fear of criminal prosecution.  *Id.* at 68-69, 83 S.Ct. 631.  The Court wrote:

> People do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around, and [one distributor]'s reaction [i.e., stopping further circulation of the books the Commission

37

found "objectionable"], according to uncontroverted
testimony, was no exception to this general rule.  The
Commission's notices, phrased virtually as orders,
reasonably understood to be such by the distributor,
invariably followed up by police visitations, in fact stopped
the circulation of the listed publications ex proprio vigore. It
would be naïve to credit the State's assertion that these
blacklists are in the nature of mere legal advice, when they
plainly serve as instruments of regulation independent of
the laws against obscenity.

*Id.* (footnote omitted). In the present matter, in comparison, there is no evidence
of any "thinly veiled threat[ ]" from the BRT to individuals reported to have
engaged in "biased" conduct.

*Schlissel*, 333 F. Supp. 3d at 711-12 (E.D. Mich. 2018).

Here, like in *Schlissel*, there is no evidence of any thinly veiled threat,

distinguishing *Bantam Books* and *Okwedy*.

*Backpage.com* and *Levin* are similarly distinguishable.  *Backpage.com* concerned a

sheriff's implied threat of official action against credit card companies if they did not

cease providing services to a website that provided an online forum for "adult"

classified ads.  *Backpage.com*, 807 F.3d at 231-35.  *Levin* concerned a professor implicitly

threatened with discipline for publishing articles.  *Levin*, 966 F.2d at 89.  Here, there is

no threat rising to the level of those in *Backpage.com* or *Levin*.

Having failed to establish that the bias-motivated incident policies impose an

objective chill on their protected speech, the Students do not have standing to challenge

those policies.  Thus, Speech First lacks associational standing, and cannot challenge the

bias-motivated incident policies.

38

2. *No Contact Directives*

Defendants argue that Plaintiff fails to satisfy the injury-in-fact requirement concerning the issuance of No Contact Directives, because the evidence shows that such Directives are never issued based on any student speaking about any of the topics the Students wish to speak upon (or any other topics) so there is no credible threat of any enforcement action to justify the Students' purported self-censorship. The court again agrees with Defendants.

Plaintiff alleges that the Students fear being issued No Contact Directives for speaking on sensitive and controversial topics. However, the evidence shows that No Contract Directives have not been and would never be issued for speaking on the topics the Students wish to discuss, and a No Contact Directive does not prevent a student from expressing any views, it just prevents the student from contacting another person.

Plaintiff argues that circumstances surrounding the No Contact Order issued to Andrew Minik and Tarik Khan prove otherwise. The court disagrees. Minik confirmed in an email that he understood that he could continue publishing articles about Khan. Dean Die's suggestion that not doing so could improve the tense situation is just a commonsense observation. It carried no threat of discipline. Minik acknowledged that Die told him "[t]his is not a direct disciplinary charge" and that "the no contact order does not prevent me from writing journalistic stories related to Khan." Die described the history of escalation between Minik and Khan, including Khan receiving death threats which he believed were caused by Minik, and Khan's anger towards Minik over

39

the same, and Die stated that the No Contact Directive would not have been issued absent that history.  At this point, the court cannot conclude that the Minik-Khan No Contact Directive shows that students are punished for their speech.  The existence of that No Contact Directive would not lead a student to reasonably believe that speaking about controversial issues will result in the issuance of a No Contact Directive, or violate a No Contact Directive if issued.

Plaintiff also argues that Section 4.06 of the Student Disciplinary Procedures authorizes disciplinary officers to issue No Contact Directives if they believe a No Contact Directive is "warranted," meaning there are no limits on when one can be issued.  The court reads the "warranted" language in light of Section 4.06's "Authority" section, which states: "University disciplinary officers are among those responsible for the enforcement of student behavioral standards and, when possible, the prevention of violations of the Student Code."  This reading is consistent with Brown and Dies' statements that No Contact Directives can only be imposed to enforce the behavioral standards in the Student Code and prevent violations of the Student Code.

*Fenves* involved an analogous provision.  In *Fenves*, Speech First challenged a university's internet technology Acceptable Use Policy, which encouraged civility and stated "if someone asks you to stop communicating with him or her, you should.  If you fail to do so, the person can file a complaint and you can be disciplined."  *Fenves*, 384 F. Supp. 3d 732, 737.  The *Fenves* court found Speech First failed to meet its burden to establish standing where there was no evidence that the university had punished

40

students for violating the Acceptable Use Policy (or other policies at issue), and no evidence that any students had been disciplined, sanctioned, or investigated for their speech.  Here, the court likewise finds no evidence that the University uses No Contact Directives to punish students for exercising their First Amendment rights.  Plaintiff has failed to meet its burden to establish standing.

### III. CONCLUSION

Plaintiff's claim concerning the Prior Approval Rule is moot.  Plaintiff lacks standing to pursue its remaining claims.  Accordingly, Plaintiff's Motion for Preliminary Injunction is DENIED.

IT IS THEREFORE ORDERED THAT:

(1) Plaintiff's Motion for Preliminary Injunction (#4) is DENIED.

(2) The hearing set for September 23, 2019 at 1:30 PM is vacated.

(3) This case is referred to Magistrate Judge Eric I. Long for further proceedings.

ENTERED this 17th day of September, 2019.

s/COLIN S. BRUCE
U.S. DISTRICT JUDGE